# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LAURA GONZÁLEZ-VERA,<br>Calle Galera num. 37<br>Madrid, 28022, SPAIN | )<br>)<br>)<br>)<br>) | Civil Action |
| AARON LLOYD<br>As personal representative of the estate of<br>*CARMELO SORIA ESPINOZA,* deceased<br>c/o Michael E. Tigar<br>4801 Massachussetss Avenue, N.W.<br>Suite 206(c)<br>Washington, D.C. 20016 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | COMPLAINT UNDER<br>18 U.S.C. § 3523 &<br>28 U.S.C. § 1361 |
| Plaintiffs,<br>v. | )<br>)<br>) | Case No. |
| MICHAEL VERNON TOWNLEY,<br>Witness Security Program<br>c/o U.S. Marshal: Donald W. Horton<br>U.S. Courthouse<br>3rd & Constitution Avenue, NW<br>Room 1103<br>Washington, D.C. 20001 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| ALBERTO R. GONZALES,<br>U.S. Department of Justice<br>950 Pennsylvania Avenue, NW<br>Washington, D.C. 20530-0001<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>) | JURY TRIAL DEMANDED |

## PLAINTIFFS' COMPLAINT

## JURISDICTION

1.    This Court has jurisdiction under 28 U.S.C. § 1331, and 18 U.S.C. § 3523.  Venue is appropriate under 18 U.S.C. § 1651.

## NATURE OF THE ACTION

2.    This action seeks enforcement of the Attorney General's non-discretionary obligation, under 18 U.S.C. § 3523, to assist Plaintiffs with locating Defendant Michael Vernon Townley ("Defendant Townley"), and enforcing a default judgment in the amount of $7,259,000 entered against him on November 23, 2005 in the case of *González-Vera v. Kissinger*, case number 1:02CV02240.  Defendant Townley has defaulted in this case and has confessed his complicity in the wrongful acts on which the action is based.  Though Defendant Townley was properly served, he did not respond to Plaintiffs' claims that he collaborated in the torture and death of Carmelo Soria Espinoza ("Mr. Soria") in violation of international, domestic, and Chilean law.

3.    This is a related case to *González-Vera v. Kissinger*, case number 1:02CV02240, in which the judgment sought to be enforced was entered.  *See* LCvR 40.5.

## PARTIES

### *(Plaintiffs)*

4.    Plaintiff Laura González-Vera brings this suit on her own behalf.  Plaintiff González-Vera is a citizen of Spain, and has the capacity to sue under Fed. R. Civ. P. 17(a).

5.    Plaintiff Aaron Lloyd is the personal representative of the estate of Carmelo Soria Espinoza ("Mr. Soria"), and brings this suit on behalf of Mr. Soria.  Mr. Soria was, at all times herein, a United Nations diplomat who lived and worked in Chile.  Mr. Soria was a dual citizen of Chile and Spain.  Plaintiff Lloyd is a U.S. citizen and resident of the District of Columbia. Plaintiff Lloyd has the capacity to sue under Fed. R. Civ. P. 17(a) and 17(b).

*(Defendants)*

6.      Defendant Michael Vernon Townley is a U.S. Citizen. Upon information and belief, Defendant Townley received protection under the U. S. Marshal Service Witness Security Program ("Witness Security Program") and remains protected under the program to date.

7.      Defendant Alberto R. Gonzales has served as the Attorney General of the United States since February 3, 2005. Defendant Gonzales is a U.S. Citizen. Defendant Gonzales is being sued in his official capacity as Attorney General of the United States. Defendant Gonzales is joined in this case as a necessary party under Fed. R. Civ. P. 19(a)(1).

## FACTS

8.      Defendant Townley is a former agent of the Direccíon Nacional de Inteligencia ("DINA"), an organization created to suppress political opposition to the Chilean junta led by General Augusto Pinochet Ugarte. *See Letelier v. Republic of Chile*, 488 F. Supp. 665, 666 n.1 (D.D.C. 1980).

9.      On the evening of July 14, 1976, DINA agents kidnapped Mr. Soria and drove him to Defendant Townley's home, where they tortured and killed Mr. Soria with Defendant Townley's knowledge. Exhibit A. Dr. Laura González-Vera and her children have suffered severe emotional distress due to the torture and murder of their husband and father, and their suffering has been exacerbated by the lack of judicial accountability for this crime. Exhibit B.

10.     Upon information and belief, Defendant Townley entered the Witness Security Program in or about 1978, as part of an agreement to testify against his co-defendants for the assassination of former Chilean foreign minister Orlando Letelier and Ronni Karpen Moffitt in Washington, D.C., on September 21, 1976. *Letelier*, 488 F. Supp. at 666 n.1. Plaintiffs have reason to believe that Defendant Townley remains a protected person in the Witness Security Program, and bring

this action under 18 U.S.C. § 3523, seeking either the disclosure of Defendant Townley's current identity and location, or a court appointed guardian through which a debtor's examination may be held.

11.     On November 13, 2002, Plaintiffs sued Defendant Townley and others for complicity in the torturing and killing of numerous people, including Mr. Soria. *See González-Vera,* case number 1:02CV02240.

12.     Defendant Townley was served a copy of the *González-Vera* complaint through the U.S. Marshal Service, due to his status as a Witness Security Program participant. *See González-Vera,* case number 1:02CV02240.  A letter and affidavit confirming Defendant Townley's status are attached as exhibits and by this reference incorporated herein.  Exhibit C.

13.     In spite of being represented by counsel and having been served with process, Defendant Townley defaulted.  Default was entered August 29, 2003.  A copy of the default is attached and by this reference incorporated herein.  Exhibit D.

14.     On November 23, 2005, Judge Henry H. Kennedy, Jr., of this Court, awarded Plaintiffs a default judgment against Defendant Townley.  A copy of that judgment is attached and by this reference incorporated herein.  Exhibit E.

15.     On February 2, 2007, Plaintiffs attempted to utilize 18 U.S.C. § 3523 to enforce the default judgment and sent a letter to Attorney General Gonzales, referencing his statutory obligation to aid in locating Defendant Townley and collecting the judgment.  A copy of the letter is attached and by this reference incorporated herein.  Exhibit F.

16.     Plaintiffs sent a second letter to Attorney General Gonzales on April 12, 2007, a copy of which is attached and by this reference incorporated herein.  Exhibit G.  Plaintiffs' counsel

followed up with several telephone calls to senior Department of Justice officials to inquire as to the status of their request. Exhibit H.

17.    Under the Witness Security Program statute as it now exists, 18 U.S.C. § 3521 *et seq.*, the Attorney General is required to take affirmative steps to protect the rights of judgment creditors such as Plaintiffs, thereby fulfilling a Congressional policy that the Witness Security Program should not be a haven for criminals to commit crimes with impunity.  *See, e.g.,* 18 U.S.C. § 3521(d)(1)(A-I).

18.    At the time Defendant Townley entered the Witness Security Program in or about 1978, he was guilty of two murders.  The trials in which he was to testify, however, have long ended, and the Chilean military regime on whose behalf he committed these crimes is no longer in power.  Therefore, the Attorney General's office has no reason to continue to hide Defendant Townley's identity and location, or to shield him from consequences of his other crimes.  In short, it would be a flagrant abuse of discretion for the Attorney General to continue to withhold Defendant Townley's identity or to impede collection of this judgment.

19.    Defendant Townley's current counsel has refused to assist Plaintiffs in obtaining a debtor's examination of their client.  Plaintiffs are willing to provide the name of that counsel under an appropriate protective order.

20.    Plaintiffs have already discovered, through ordinary investigation, the identity and location of several members of his family and will make this information available to the Court under a proper protective order.

**PRAYER FOR RELIEF**

21.    Plaintiffs seek an order requiring the Attorney General to affirm or deny that Defendant Townley remains in the Witness Security Program;

22.    If Defendant Townley remains in the Witness Security Program, that the Attorney General be ordered to take appropriate steps to compel Defendant Townley to comply with the judgment, including but not limited to, revealing his identity and or location to Plaintiffs or to a guardian ad litem appointed to act in accordance with 18 U.S.C. § 3523, so that Defendant Townley may be compelled to attend a debtor's examination under the Court's supervision, and to otherwise act in compliance with the judgment entered against him;

23.    If Defendant Townley refuses to act in compliance with the judgment, that the Court hold a hearing to determine whether Defendant Townley's identity and location should be disclosed to Plaintiffs under an appropriate protective order.

## FIRST CLAIM FOR RELIEF
### (*Relief under 18 U.S.C. § 3523*)

24.    Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1-23 as fully set forth herein.

25.    On November 23, 2005, Judge Kennedy of the United States District Court for the District of Columbia issued a default judgment against Defendant Townley in the amount of $7,259,000.  Exhibit E.  Pursuant to the Federal Rules of Civil Procedure, the entry of the judgment in the docket of *González-Vera v. Kissinger* serves as conclusive proof of notice given to all parties.  *See generally* Fed. R. Civ. P. 5(a).  In spite of having received notice, Defendant Townley has not responded to the judgment since it was entered against him 19 months ago.

26.    Upon information and belief, Defendant Townley remains under the protection of the U.S. Department of Justice Witness Security Program, and therefore is a person afforded protection under the Witness Security Program.  *Letelier*, 488 F. Supp. at 666 n.1.

27.    Pursuant to 18. U.S.C. § 3523, Plaintiffs procured and filed with the Court an affidavit from Mr. Kearn J. Knowles, Chief of Witness Security Program, attesting that Defendant

Townley was served with a Civil Summons and Complaint by a Deputy United States Marshal on January 9, 2003.  Exhibit C.

28.    On February 2, 2007, Plaintiffs wrote to the Attorney General, pursuant to the requirements of 18 U.S.C. § 3523, and requested information regarding Defendant Townley's current status as a protected person in the Witness Security Program.  Exhibit F.

29.    After not receiving any reply from the U.S. Department of Justice, or the U.S. Marshal Service, Plaintiffs wrote a second letter on April 12, 2007.  Exhibit G.

## SECOND CLAIM FOR RELIEF
### (*Relief under 28 U.S.C. § 1361*)

30.    Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1-29 as fully set forth herein.

31.    Defendant Alberto R. Gonzales, in his capacity as Attorney General of the United States, has a clearly defined ministerial duty under 18 U.S.C. § 3523 to respond to Plaintiffs' inquiries regarding the protective custody status of Defendant Townley.  Since this statute provides the sole method for Plaintiffs to inquire about the location and identity of Witness Security Program participants, the Attorney General's failure to comply will render Plaintiffs' default judgment unenforceable, and leave Dr. Laura González-Vera and the estate of Mr. Soria without any compensation for the suffering they sustained as a result of Mr. Soria's torture and murder.  The Attorney General's joinder as a party in this case is therefore necessary for complete relief to be granted.  His joinder is also an efficient use of this Court's resources.

32.    The statute 18 U.S.C. § 3523 states in pertinent part, "the Attorney General *shall* determine whether [the defendant] has made reasonable steps to comply with the judgment.  The Attorney General *shall* take appropriate steps to urge the person to comply with the judgment." 18 U.S.C. § 3523 (emphasis added).  Although Plaintiffs wrote to the Attorney General on two

occasions to inform him of the default judgment against Defendant Townley, and to request the disclosure of Defendant Townley's identity and location, the Attorney General has not yet confirmed or denied Plaintiffs' allegations regarding Defendant Townley's protective status.

33.    The Attorney General's failure to make a timely response indicates a clear and compelling cause for the Court's assistance in compelling the Attorney General to comply with his ministerial duty as stated in the following portion of the statute: "The Attorney General *shall* appear in the action, and *shall* affirm or deny the statements in the complaint that the person against whom the judgment is allegedly held is provided protection ... and that the petitioner requested the Attorney General to disclose the identity and location of the protected person for the purpose of enjoining the judgment." 18 U.S.C. § 3523 (emphasis added).

WHEREFORE, Plaintiffs respectfully request this Court enter an order compelling the Attorney General to make all statutorily required efforts to urge Defendant Townley to comply with the judgment, and to disclose the identity and location of Defendant Townley either directly to Plaintiffs under protective order, or through a guardian ad litem.

Respectfully submitted,

Michael E. Tigar, Esq.
Washington College of Law
4801 Massachusetts Ave., N.W.
Washington, D.C. 20016
(202)-274-4088
D.C. Bar No.  103762
ATTORNEY FOR PLAINTIFFS

JS-44
(Rev.1/05 DC)

## I (a) PLAINTIFFS

Laura Gonzalez-Vera  and Aaron Lloyd

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF     99999
(EXCEPT IN U.S. PLAINTIFF CASES)

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Michael E. Tigar
4801 Massachusetts Avenue, NW 206(c)
Washington, DC 20016

## DEFENDANTS

Michael Vernon Townley and Alberto Gonzales

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT     unkown
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

ATTORNEYS (IF KNOWN)

U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ● 3 Federal Question (U.S. Government Not a Party)
- ○ 2 U.S. Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

- ○ **A. Antitrust**
  - ☐ 410 Antitrust

- ○ **B. Personal Injury/ Malpractice**
  - ☐ 310 Airplane
  - ☐ 315 Airplane Product Liability
  - ☐ 320 Assault, Libel & Slander
  - ☐ 330 Federal Employers Liability
  - ☐ 340 Marine
  - ☐ 345 Marine Product Liability
  - ☐ 350 Motor Vehicle
  - ☐ 355 Motor Vehicle Product Liability
  - ☐ 360 Other Personal Injury
  - ☐ 362 Medical Malpractice
  - ☐ 365 Product Liability
  - ☐ 368 Asbestos Product Liability

- ○ **C. Administrative Agency Review**
  - ☐ 151 Medicare Act

  **Social Security:**
  - ☐ 861 HIA (1395ff)
  - ☐ 862 Black Lung (923)
  - ☐ 863 DIWC/DIWW (405(g)
  - ☐ 864 SSID Title XVI
  - ☐ 865 RSI (405(g)

  **Other Statutes**
  - ☐ 891 Agricultural Acts
  - ☐ 892 Economic Stabilization Act
  - ☐ 893 Environmental Matters
  - ☐ 894 Energy Allocation Act
  - ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

- ○ **D. Temporary Restraining Order/Preliminary Injunction**

  Any nature of suit from any category may be selected for this category of case assignment.

  *(If Antitrust, then A governs)*

- ⊙ **E. General Civil (Other)**    OR    ○ **F. Pro Se General Civil**

**Real Property**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**Personal Property**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**Bankruptcy**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**Property Rights**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**Federal Tax Suits**
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**Other Statutes**
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☒ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| O  **G.  Habeas Corpus/ 2255** | O  **H.  Employment Discrimination** | O  **I.  FOIA/PRIVACY ACT** | O  **J.  Student Loan** |
|---|---|---|---|
| ☐ **530 Habeas Corpus-General**<br>☐ **510 Motion/Vacate Sentence** | ☐ **442 Civil Rights-Employment** (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ **895 Freedom of Information Act**<br>☐ **890 Other Statutory Actions** (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ **152 Recovery of Defaulted Student Loans** (excluding veterans) |

| O  **K.  Labor/ERISA (non-employment)** | O  **L.  Other Civil Rights (non-employment)** | O  **M.  Contract** | O  **N.  Three-Judge Court** |
|---|---|---|---|
| ☐ **710 Fair Labor Standards Act**<br>☐ **720 Labor/Mgmt. Relations**<br>☐ **730 Labor/Mgmt. Reporting & Disclosure Act**<br>☐ **740 Labor Railway Act**<br>☐ **790 Other Labor Litigation**<br>☐ **791 Empl. Ret. Inc. Security Act** | ☐ **441 Voting (if not Voting Rights Act)**<br>☐ **443 Housing/Accommodations**<br>☐ **444 Welfare**<br>☐ **440 Other Civil Rights**<br>☐ **445 American w/Disabilities-Employment**<br>☐ **446 Americans w/Disabilities-Other** | ☐ **110 Insurance**<br>☐ **120 Marine**<br>☐ **130 Miller Act**<br>☐ **140 Negotiable Instrument**<br>☐ **150 Recovery of Overpayment & Enforcement of Judgment**<br>☐ **153 Recovery of Overpayment of Veteran's Benefits**<br>☐ **160 Stockholder's Suits**<br>☐ **190 Other Contracts**<br>☐ **195 Contract Product Liability**<br>☐ **196 Franchise** | ☐ **441 Civil Rights-Voting** (if Voting Rights Act) |

**V. ORIGIN**

⦿ 1 Original Proceeding  O 2 Removed from State Court  O 3 Remanded from Appellate Court  O 4 Reinstated or Reopened  O 5 Transferred from another district (specify)  O 6 Multi district Litigation  O 7 Appeal to District Judge from Mag. Judge

**VI.  CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

18 U.S.C. 3523 & 28 U.S.C. 1361

**VII.  REQUESTED IN COMPLAINT**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   **DEMAND $** [_____]   Check YES only if demanded in complaint   **JURY DEMAND:** YES ☒  NO ☐

**VIII.  RELATED CASE(S) IF ANY**  (See instruction)  YES ☒  NO ☐  If yes, please complete related case form.

DATE  06/01/2007    SIGNATURE OF ATTORNEY OF RECORD  *Michael E Tigar  Jack*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

**SUPREME COURT OF CHILE.-**

<u>Writ Nº 92-92  /</u>

        Attached I forward YOU[R honor] legalized photocopies of Michael Townley's deposition in the Letter Rogatory filed in the United States and submitted before this Tribunal.

        All of which is in response of [your decree in] Writ Nº 1.512 dated August 24r, 1992.

        God keep your grace.

Signed (Illegible)
ADOLFO BANADOS CUADRA
Supreme Court Justice


Seal of
The Office of the Secretary of
The Supreme Court of Chile

Signed (Illegible)
Carlos Meneses Pizarro
Secretary

TO MADAM
VISITING SUPREME COURT JUSTICE
MS. VIOLETA GUZMAN FARREN
THIRD CRIMINAL COURT OF SANTIAGO
[Delivered herein] IN PERSON.-

174

**I HEREBY CERTIFY:** That the blank portion does not correspond to what was requested herein. Santiago, August 25, 1992.
Signed (Illegible)
Carlos A. Meneses Pizarro
Secretary


     Q. Question K is that you must state any information you may have in connection

with the supposed crimes


- 129 -

**[THE COPY HEREIN] CONFORMS TO THE ORIGINAL INSPECTED ON SITE SANTIAGO DE CHILE** on the _____twenty fifth_____day of the month of _____August_____of the year nineteen _ninety two_. Signed (Illegible)

175

REPUBLIC OF CHILE
DEPARTMENT OF FOREIGN AFFAIRS

Doc. I - 454/92. - p. 129. -

- 129 -

perpetrated against Carmelo Soria…

A.    Soria Espinoza…

Q.    …Espinoza

A.    Renato León Zenteno and Manuel Jesús Leyton Robles. Of the three names written down there, the first one belongs to a Spanish diplomat…not [a] Diplomat from Spain, but a Diplomat belonging to the United Nations. He was assigned to Chile.

They ordered the other half of the Mulchen unit to find the means to kidnap Mr. Soria, [proceed to] kill him and then make the death appear accidental…this was in Chile.

Q.    What is the name of the other band of the Mulchen unit?

A.    Honestly I can't recall. When you say "the other band", was…they call themselves Mulchen, while we called ourselves Quetropillan. But we all are Mulchen.

Q.    Who was the head of the other band?

A.    [back] Then, and it seems to me that detail, the people that composed this unit were Armando Fernandez, Jaime Lepe, L-e-p-e, first name Jaime, J-a-i-m-e, last name Delmas, D-e-l-m-a-s. I will later talk in greater detail about Delmas.

And a Salinas, Captain Salinas…later Major Salinas, S-a-l-i-n-a-s. There were at least two others. There was a Sergeant Major in the [Chilean] Army Parachute School that was assigned to this unit. I don't think he was involved that night, the night, that this took place.

- 130 -

176

**[THE COPY HEREIN] CONFORMS TO THE ORIGINAL INSPECTED ON SITE SANTIAGO DE CHILE** on the _____ twenty fifth _____ day of the month of _____ August _____ of the year nineteen _ninety two_. Signed (Illegible)

REPUBLIC OF CHILE
DEPARTMENT OF FOREIGN AFFAIRS

Doc. I - 454/92. - p. 130. -

- 130 -

Q.    When you say "that night", do you mean when Soria was murdered?

A.    When Soria was murdered

What I remember from that night, the people from the other band of the Mulchen brigade did not really have a place to take him to after kidnapping him. They…

Q.    Do you know where they kidnapped him?

A.    They stopped him on the street for a traffic violation…they invented a traffic violation. They dressed as policemen…at least some of them did this. They stopped him and then they took him from that place in his car. They took the car with Soria [in it] to the house in Lo Curro.

Q.    All right. Was he alive or dead when he arrived there?

A.    He was alive. He was detained there by that group. I had other things to do. He was detained there by that group and later murdered that night.

Q.    How did they kill him?

A.    I think they fractured his neck, I don't know.

Q.    Did you witness this or hear…

A.    I saw that he was in their power. I went out once or twice…they were making a great deal of noise in the patio…to tell them to hold back. We were in a residential area.

Q.    I know that once he passed away they took him out of there by car and they went further than the place you mentioned…La Piramide. In a northerly direction, on the other side of the city, there is a very steep drop…it is not a cliff or a precipice…it is

178

simply a very steep,

- 131 -

**[THE COPY HEREIN] CONFORMS TO THE ORIGINAL INSPECTED ON SITE SANTIAGO DE CHILE** on the _____ twenty fifth _____ day of the month of _____ August _____ of the year nineteen _ninety two_. Signed (Illegible)

REPUBLIC OF CHILE
DEPARTMENT OF FOREIGN AFFAIRS

Doc. I - 454/92. - p. 131. -

- 131 -

very deep, drop.

They made it look as if Soria had lost control of the car and had overturned it. And I think that in reality the body went out of the car and rolled into an irrigation canal, where it was found a certain distance from the car.

The autopsy was carried out and there was an investigation . The Autopsy Protocol coincided with the report of accidental death. I don't…In think that then it was…it seems to me some date in 1976.

Q.    All right. When did you state that the order to kidnap and murder Carmelo Soria was given to the other band of the Mulchen brigade…

A.    I suppose that the order was given by Colonel Espinoza.

Q.    What is your supposition based on?

A.    On the fact that during conversations with the Colonel a long time before…not to long before, I don't know how long before…he had mentioned a Soria whom he had had a confrontation in Brazil. An then, in a moment he made the comment that Soria had now appeared in Chile.

Q.    Did he tell you what kind of a confrontation he had had in Brazil?

A.    No, only that he held a very profound dislike for Mr. Soria.

Q.    Did you know Mr. Soria's position with the United Nations in Chile?

A.    No, I was not aware of it.

- 132 -

**[THE COPY HEREIN] CONFORMS TO THE ORIGINAL INSPECTED ON SITE SANTIAGO DE CHILE** on the _____twenty fifth_____day of the month of _____August_____of the year nineteen _ninety two_. Signed (Illegible)

181

REPUBLIC OF CHILE
DEPARTMENT OF FOREIGN AFFAIRS

Doc. I - 454/92. - p.  132. -

- 132 -

Q.    From your knowledge of DINA, if Espinoza was to order something like the assassination of an employee of the United Nations…he would have to explain this at a higher level? Killing an employee of the United Nations seems like a very serious thing to do.

A.    I would say that yes. I can't imagine it…I can't imagine Colonel Espinoza doing something of this nature without [previous] higher approval. It is possible, I won't say it is impossible. Pedro Espinoza, more than most, run his own operations, he ran them very closely. As I told you before, he was superb, a superb intelligence operations officer.

Q.    You mentioned that…

A.    It is possible that he could have carried this out of his own initiative, having established the circumstances to justify having done this.

Q.    You mentioned that you saw members of the Mulchen brigade bring Soria back to the house in Lo Curro?

A.    Correct.

Q.    Who did you see? Who was there that night?

A.    Jaime Lepe, it seems that Sergio Delmas was there…I'm not sure if…I think…yes Salinas was there, no, I don't know, I don't remember. He probably must have been there. I think that Armando Fernadez was there.

There were two people that stayed…that stayed in my mind. I am practically sure …it seems to me that Captain…or Lieutenant or Captain Lepe, very shortly

- 133 -

182

**[THE COPY HEREIN] CONFORMS TO THE ORIGINAL INSPECTED ON SITE SANTIAGO DE CHILE** on the _____ twenty fifth _____ day of the month of _____ August _____ of the year nineteen _ ninety two _. Signed (Illegible)

183

REPUBLIC OF CHILE
DEPARTMENT OF FOREIGN AFFAIRS

Doc. I - 454/92. - p. 133. -

- 133 -

after this, he left the DINA agency, and I believe that he was assigned to the security

detail of the President's office…or in something of there. But I know that he quit the

DINA and did not work there again.

Q.     In your judgement did this imply a promotion or a demotion?

A.     I think that him having participated in what he was part of, it was probably

neither of those two things. I am under the impression that he simply decided that this

was not an agency or institution where he wanted to continue and he was offered a lateral

position of some kind to get him out of there.

Afterwards, Delmas was promoted to Major…Major Delmas continued at

DINA. I understand that he has had a pretty…a good career. He carried out various tasks

in the provinces and in remote regions of Chile.

And after DINA became the CNI, after Contreras left the CNI, I am under the

impression that Delmas was still involved with general Contreras. In fact, in Arica, A-r-I-

c-a, Chile…it is the city that is further north…several years after this, Delamas committed

suicide without bullet wounds or powder burns in the body, throwing himself through a

closed window.

The general notion behind this was not to use the word "murdered", he had

committed suicide. That years later was involved in some bank robberies, and the

presumption that the security personell was involved in this particular robberies and in

several other happenings that occurred in Chile at that time.

- 134 -

184

**[THE COPY HEREIN] CONFORMS TO THE ORIGINAL INSPECTED ON SITE SANTIAGO DE CHILE** on the _____ twenty fifth _____ day of the month of _____ August _____ of the year nineteen _ ninety two_ . Signed (Illegible)

185

REPUBLIC OF CHILE
DEPARTMENT OF FOREIGN AFFAIRS

Doc. I - 454/92. - p.  134. -

- 134 -

But that was Delmas…Delmas was in the DINA before this suicide case and after everything else happened.

Q.    Do you remember approximately when the suicide took place?

A.    It seems to me that at the beginning of the 80's decade. Again, I…

Q.    This happened after you left Chile?

A.    Oh yes, much later.

Renato León Zenteno, the second name, if I recall correctly at this point, he was a…and I know there are things that I should remember in relation to this. He was a Real Estate Registrar, R-e-g-i-s-t-r-a-r.

Q.    Of real estate?

A.    Yes, of real estate. The only thing that I can…I really don't remember any of that. And the third name, Manuel Jesus Leyton Robles does not tell me anything.

Q.    Allow me to interrupt once more, [focusing] on León. In his position as Registrar, could he have had any relations with DINA?

A.    It is possible. I mean, a Registrar of…lands, is the Registrar of Title Deeds. And any real estate transfer, any transfer of lands, etc. would be carried out by…must go through a conservator or registrar of title deeds, if you want to do this.

It is…it seems to me that in some writs I have read it has been suggested that he had some business dealings with the DINA and/or that the DINA arranged it in such a way that they would take over the properties under his authority over which he

-135 -

186

**[THE COPY HEREIN] CONFORMS TO THE ORIGINAL INSPECTED ON SITE SANTIAGO DE CHILE** on the _____ twenty fifth _____ day of the month of _____ August _____ of the year nineteen __ninety two__. Signed (Illegible)

187

REPUBLIC OF CHILE
DEPARTMENT OF FOREIGN AFFAIRS

Doc. I - 454/92. - p. 135. -

- 135 -

was creating problems. He was becoming a nuisansce and people in the DINA had to

eliminate him or murder him. I actually do not know anything beyond what I read or what

I heard in the way of anecdotes and gossip.

      Q.     And Manuel Jesús Leyton Robles?

      A.     It is possible I should remember the name or that it reminded me…it does

not.

**I HEREBY CERTIFY:** That the blank portion does not correspond to what was
requested herein. Santiago, August 25, 1992.
Signed (Illegible)
Carlos A. Meneses Pizarro
Secretary

State Duty Stamps: Euros 0.15
Seal of Notary Public Luis Sanchez Marco - Madrid.
O3/2004

<div style="border: 1px solid black;">

LUIS SANCHEZ MARCO
NOTARY PUBLIC
C/ Antonio Maura Nº 7 1º Izda
Tel: 91 522 40 - Fax: 91 531 41 66
28014 MADRID
E-mail: lusanchez@laley.net

</div>

NUMBER ONE THOUSAND AND EIGHT.------------------------------------------------------

-------------------------------------- = AFFIDAVIT = ---------------------------------------------

In Madrid, at mi residence, on the twenty ninth of April of two thousand four.-----

Before me, **LUIS SANCHEZ MARCO**, Notary Public of the Capital and

[member of] its honorable Bar Association,------------------------------------------------------------

------------------------------------- = STANDS BEFORE ME = ------------------------------------

**MRS. LAURA GONZALEZ-VERA MARCHANT,** above age, widow, and

resident of 28042-Madrid, La Galera Street , Number 37, 1º "B" -; with Identification

Number 404.314-C.-----------------------------------------------------------------------------------

[who] comes before me in her own right and in self representation.-------------------

I find in the undersigned , legitimate interest to carry out the act herein, and

thereby ----------------------------- = REQUESTS FROM ME: = -------------------------------

That I, the Notary Public, to protocolize, as in fact I am doing, through the act

herein, and the record above, the sworn statements carried out by the undersigned , that

comprise of ten common paper pages, typed  on one face only,

- 1 -

all of which the undersigned signs in my presence, delivers unto me and all of which I

attach to the act herein so that they may be considered to form an integral part of the same

276

act.-------------------------------------------------------------------------------------------------------

The sworn statements carried out by the undersigned and that are accounted for in the aforementioned ten pages, are carried out by the undersigned under legal warning of the punishments prescribed for false or misleading statements enacted in a public record.-

I have read the declarant the corresponding legal reservations and warnings, specially those provided by Article 5 of Organic Law Number 15/1.999 titled Protection of Personal Data, dated December 13, 1999.-------------------------------------------------------

Having both the declarant and myself read, in its entirety, the act herein and having the declarant expressed her conformity therewith, the undersigned hereby approves and having the declarant previously expressed her consent thereto, she ratifies and approves the content therein and [consequently] places her signature along with mine, the Notary Public.------------------------------------------------------------------------------

I, the Notary Public, DO ATTEST for all of the above, inasmuch as its [legal] pertinence, including having provided for the pages herein the appropriate type of paper of exclusive use for public records, with notarial paper series 5L and serial number 1686756.-------------------------------------------------------------------------------------------
-----------------------------------AFFIXED DOCUMENTATION--------------------------------
---------------------------------------------------------------------------------------------------------
---------------------------------------------------------------------------------------------------------
---------------------------------------------------------------------------------------------------------

- 2 -

277

Affidavit of Dr. Laura González-Vera de Soria regarding the disappearance and death of her husband and the psychological damages caused to the Soria González-Vera family.

Carmelo Soria was a Spanish and Chilean citizen, under the dual-nationality treaty between Spain and Chile of May 24, 1958.  He was born in Madrid on November 5, 1921.  He was an official of the United Nations system since 1960 (FAO 1960 – 1969, CELADE 1969 – 1971 and May 1973 – July 16, 1976). He was tortured and murdered by the Mulchén Brigade (Exterior Brigade), which belonged to the political police (DINA) of the dictatorship, whose members were part of the Armed Forces and were under the direct command of its Director General, of General Augusto Pinochet, dictator of Chile and Commander in Chief of the Army.  The murder took place on July 14, 1976 in Santiago, Chile, in the house of Mr. Michael Townley, civilian member of the DINA, of United States citizenship.

The murder was presented by the news media as "an automobile accident, provoked by Mr. Soria's drunkenness, due to the emotional tensions he suffered because of his wife's infidelity,"  certified by a typed note that was found in his clothes when his body was retrieved on July 16 from the Canal del Carmen, where he and his automobile had been thrown.

During the course of the investigation, it was proven that the anonymous letter had been written by a member of the Brigade in Mr. Townley's house, on a typewriter that belonged to Mr. Townley.

My children, Laura, Carmen and Luis, who were 18, 16, and 11 years old, and I, the signatory of this affidavit, made up his family in Chile. His brothers and the rest of his Spanish family lived in Madrid and Barcelona.

Carmelo Soria's family:

His paternal grandfather, Don Arturo Soria y Mata, was a great Spanish urban planner, creator of the Linear City project that he constructed, forming the perimeter of Madrid. Because of the project's transcendent nature, there exists in Paris, a Bureau of The Linear City, which studies this type of urbanization that took place in many European and South American cities, and its theoretical application in WWII.

His father, Luis Soria y Hernández, was a great Andalucian lawyer who was educated in London and brought very important cases in Andalucia. He was the founder of various literary magazines and a defender of equal rights for women in 1895.

His older brother, Arturo Soria Espinoza, was a lawyer and was exiled to Chile after the end of the Spanish civil war.  There, he founded the prestigious publishing company Cruz del Sur and returned to Spain in 1959, continuing his publishing career with writers of the "Generation of '27" of whom he was a contemporary and friend.  His brother Luis, a chemist, died in the civil war as a member of the Republican army.

278

His was a very large family, that was a part of the progressive liberal movement and was very much involved with politicians and intellectuals of the time.

González-Vera Marchant Family:

My father, José Santos González-Vera was a writer and received Chile's National Prize in Literature in 1950. He belonged to the generation of 1920, among whose members were Pablo Neruda, Manuel Rojas, Juan Guzman Chruchaga, etc,. He was a friend and correspondent of Gabriela Mistral, the Chilean Nobel Laureate in Literature, until his death. He worked at the University of Chile as a member of the International Relations Department (Commission of Intellectual Cooperation).

My mother, María Marchant Riquelme:

Was a professor of English, studied in the United States at Columbia University from 1924 to 1928 and 1940 to 1942. She had high-level appointments in the education field at the beginning of her career and became a part of the Chilean Pedagogical Mission, which later founded the Pedagogical Institute of Caracas, in the capital of Venezuela. During 1937-1938 she worked at the Manuel de Salas secondary school, the first experimental and co-educational school in Chile. She was part of the group of professors who founded this school in 1932.

Carmelo Soria:

Studied at the "Instituto Escuela de Madrid" and later studied architecture, a career that was shortened because he had to take care of himself, his mother and a semi-invalid sister, while at the same time working at a bank and handling the exports to his brother's bookstores in Chile.

In 1947, he traveled to Chile to take books to his brother and try to get support from the universities for the "Federación Escolar Universitaria (FUE)," an anti-Franco organization of which he was the Secretary-General. A month into his trip in Chile, the Council-members of the FUE were detained, and they testified against him, as was the plan, so Carmelo was unable to return to Spain. In Chile, he worked in radio, printing houses and publishing companies, in order to later enter the United Nations in 1960.

My father belonged to the committee of intellectuals for the Defense of the Spanish Public, which during the entire civil war, supported the Republicans. Because of this, when exiled Spaniards came to Chile aboard the Winnipeg, a ship chartered by Pablo Neruda in the name of the government of Chile, many of them came to my house. Among these exiles were Arturo Soria and his family, who came later to Chile, and through whom I met Carmelo.

I have told this story to show that even coming from such distant countries, our two families moved in the same cultural and social circles, which contributed to the stability of my marriage.

279

When we were married, I was studying medicine and finished my studies while still married. We were married in 1956 and we had three children: Laura, Carmen and Luis.

Because we had the same view of life and a very similar education, our lives together were very harmonious, happy and interesting and to show this: when Carmelo was offered to be transferred to Rome after the military coup, since he had been identified with the Allende government, he rejected this offer without consulting me, because he thought he could help during the dictatorship in Chile, and when he told me his decision, I was absolutely in agreement with it.

Carmelo, using the United Nations vehicle, helped give asylum in the embassies to people who were persecuted for political reasons, together with various other international officers and personnel of the embassies. He helped economically in the creation of small companies for those whom the coup had left without work. We gave refuge to politically persecuted persons in our home.

I was fired in September of 1973, and I began to assist relatives of executed persons and political prisoners and had to practice medicine privately (before I worked in the National Ministry of Health).

After the military coup of September 11, 1973 in Chile, Carmelo Soria was followed ostensibly on seven occasions One day, while we were visiting a friend, a Peugeot without license plates waited for us for three hours outside our friend's house and followed us for several blocks.

Half a block from the CELADE office at Huelén Street, at 24 Rafael Cañas in Santiago, was a DINA office. An officer of the Investigation Police lived across from our house and was in charge of watching the home of Mrs. Silvia Pinto, the director of the military government's newspaper, which was on the same street as our house. Police cars often arrived at this house and would received loads. Young men with short military-style haircuts would stay in the house as well. Because of this presence, Carmelo was followed both to and from his office.

In April of 1976, my husband traveled to Spain for family reasons. When I didn't receive any correspondence from him, I telephoned him in Madrid. He explained that he had sent five letters about the sale of certain family lands, the values of these and things relating to lawyers, etc. We agreed that he would not write any more. Surely, DINA was intercepting these letters and interpreted them as being written in code, since DINA speculated that officials of the UN and accredited embassies were taking information out of Chile and bringing money in for the opposition, such an interpretation was plausible.

On July 14th, I went to pick up my husband at his office, a little before 1:00 pm and we had lunch together at home. During lunch, he showed me a $100 bill from the United States, which he had in his pocket. He left for the office at 1:30 pm. This was the last time I saw him alive.

280

Around 5:10pm, he left his office. The printing officer told me that my husband had said he had a bad headache. My husband also phoned home and gave the housekeeper the same information, so that she could make him something [for the pain].

At 5:20 pm, Mrs. Eliana Garrido de Cruz, a friend and neighbor of ours who lived on the same block, saw him. She was traveling in a taxi in the direction of her house and saw my husband's car on Eleodoro Yañez street until beyond Amapola Street, in other words, he was traveling on his normal route home.

Around 8:00 pm, since my husband had not come home, I called the home of an officer at CEPAL and the UN and I called one of my husband's secretaries to ask if at the moment of leaving work, perhaps a friend of his had arrived, with whom he may have gone out, but she said no. This was very strange to me, since he always let me know of any change in his routine schedule, so as not to alarm me.

I called the emergency services in the capital to obtain a positive response; in the almost 20 years of marriage, my husband never slept outside our home, except when he was traveling. That night, he did not come home.

On July 15th, I called various persons, and immediately went to CEPAL, from where I was accompanied by Mr. Vaz (chief of security) to the 24th Precinct, in the district of Vicatura, to fill out a missing persons report. I also informed the Spanish Consulate of his disappearance.

The police called my house on July 15th in the afternoon and told us that Carmelo's car had been found turned over and covered by the water in the Canal del Carmen and that Carmelo would have been detained in the local precinct.

On July 16th, around 10:00 pm, my daughters and officers of CELADE and CEPAL, went to the canal, to wait for it to dry up. I note that this was the only day in which the car could be seen whole, and that the interior was empty and that nothing was retrieved from it. My daughters were told to remain near the car, probably so that they could not see the sight of their father's body beneath the waters.

Mr. Vaz was given a folded-up piece of paper that was taken from Carmelo's vest, and which was an anonymous writing that accused me of conjugal infidelity and that said "Carmelo I have proved your wife's infidelity. Your friend always."

I note that it is physically unexplainable that three bodies of different densities (in this case, the vest, the body and the back seat of the car) would be found in the same place, after being dragged by the waters of the canal. The distance between the body and the car was 500 meters and the bridge between the car and the body was at a distance that can be traveled in 4 minutes at a regular pace. I addition to the objects found nearby (scarf, United Nations document and national identity document) there were things missing: the

281

raincoat, overcoat, a Longuines brand watch, a Parker brand pen and pencil, another mechanical pencil and a $100 bill from the United States.

Around 3:00 pm, I made the decision to go to the Forensic Institute to find out the results of the autopsy (since the body had been retrieved from the bottom of the canal at 11:40 am). At the Forensic Institute, I examined the body and had conversations with the doctors that were later part of the legal process.

On July 18th, I carried out the private expert report, together with some friends, which analyzes the fall of the car from the edge and the conditions in which it was found and the way in which the objects mentioned above had arrived near the car.

On July 24th, the car was retrieved from the canal by personnel of CEPAL's auto insurance provider. At this point, there had not been any expert investigation by the police into the vehicle. I went to the place where the vehicle was held and I confirmed that the doors were locked and that because of the deformation of the car, it would have been impossible for any body to leave its interior, given the measurements of the new structure of the windshield and comparing it with different measures of a body.

In my testimony before the judge, I explained to her how absurd the discovery of the anonymous letter mentioned above was. The best proof of this, in addition to the technical details of the placing of the paper in my husband's vest and how long it remained there, was that he would have received the letter either by mail or by hand delivery on July 14th, between 2:00 and 5:00 pm, [and] the mail was delivered at 4:30 pm. That afternoon, Carmelo only received one visitor, a man with whom he met regarding a printing issue; the doorman keeps a record book of all of the afternoon visitors, a measure implemented by the UN in response to the conditions in the country.

The Chilean press' treatment of the case is notable. The first released account was published in the Santiago newspaper, El Mercurio on July 19th, and appeared that afternoon in the TV news broadcast. The photograph showed the automobile overturned in the middle of the canal; in other words, the photograph was taken before 3.30 pm on the 15th of July, before the UN employees and my family members had arrived on the site of the event, as they saw the automobile already on the sidewalk. The press had access to a piece of news which was censored for 4 days.

Following the death of my husband, we received insulting telephone calls: "This is what you get for being *upelientos*[1]." *"I saw how they recovered your father's car. How much money will you give me for the information?"* The UN was made aware of all of these phone calls.

The famous Peugots and classic Ford Ranchera pick-up trucks of the DINA would wait for me at all hours on the corner of my street and would follow me everywhere.

---

[1] Translator's note: "Upeliento" is a Chilean slang word, a derogatory term for those belonging to the Unidad Popular political party.

An employee of CEPAL, who on occasion would offer me transport in his automobile, received a phone call threatening to kidnap his young children. From that point on, CEPAL provided me with an official truck for some of my transport.

Psychological damage inflicted on the Soria González-Vera family:

Initial post-traumatic shock:

My children and I suffered through the uncertainty of his disappearance for 48 hours, until his body was found, following the draining of the canal. My daughters participated in this search.

From that moment on, they exhibited a state of anxious depression, manifested as: inconsolable weeping, rage, impotence and absolute rupture of the rhythm of their lives and immediate prospects, altered sleep pattern, nightmares, a decrease in physical activity, feelings of profound sadness, changes in behavior, occasional temporal-spatial disorientation, weight loss of 8 kilos in two months; and it was necessary to administer anti-anxiety medications to them daily, during this time.

Naturally, they had to abandon their academic activities and prepare for their trip into exile, for which they had to visit the downtown area of the city to obtain the necessary documentation. In all of these outings they were accompanied by their friends, as they were ostensibly followed by members of the DINA. On one occasion, they attempted to kidnap Carmen, who fled by jumping a fence. Since the children could not bare this persecution, I had to handle these preparations.

Our telephone was tapped and we were threatened and insulted at all hours, our garden was invaded, they beat/thrashed on our wooden blinds at night, and helicopters would fly low over our house.

Our housekeepers were highly affected, and were also accosted on the street.

At home, there was an unusual activity made up of friends who helped us, people who brought information and I was constantly running around the city. My son appeared, more than anything, to be floating above that scene, and naturally attached himself to his sisters' groups of friends; his appearance was of great sadness and reservation. My daughter's friends would sleep at our house to protect us. Meanwhile, my mother was in charge of maintaining the daily routine, as a measure of stability.

I went through a stage of hyper-awareness, with great physical activity, and "hallopathy" - a condition which consists of a mental unfolding in which the person finds herself carrying out activities that produce no emotional resonance in her, alterations in sleep, sadness, a sense of emptiness in the stomach, abundant hair loss, considerable changes in the skin, and a weight loss of 9 kilos in two months.

The family brought closure to the mourning at a very late stage, in part because none of the rituals relating to death took place. On the 20th, I retrieved the body and helped to place it in the coffin. Later, along with my brother and a woman who had been my husband's secretary, we deposited the coffin into their family's tomb. DINA agents observed us from a prudent distance, a situation which I had predicted, and the reason for which my children did not attend this event.

After completing the necessary preparations for our exile, other legal errands, and initiating the trial for the murder of Carmelo Soria, of which the DINA was accused, I sent my children to Spain on September 12. I continued with the preparations, during which, of course, I was constantly followed by the DINA who would wait for me in untagged cars, even when I traveled by taxi.

I traveled with my mother to Madrid on September 22. I headed to the airport in an official UN vehicle, accompanied by the Chief of Security of this institution, also with the protection of the Embassy of Spain.

<u>Exile in Spain</u>:

Upon arrival in Spain, my children were located by DINA in Madrid. As my children proved, this fact was later corroborated within the course of the trial.

In Madrid, it was not possible for my daughters to normalize their academic and university life, which added to their previous symptoms many behavioral inconsistencies and they felt watched and persecuted in the street. During this period, they received professional psychological support for 8 months, which fortunately resulted in the slow normalization of their lives. The support of Carmelo's friends and their children also helped in this effort.

My son was able to quickly begin his studies in a school that was founded by a childhood friend of Carmelo. His classmates were the children of friends or acquaintances of the Soria family.

I had to travel to Geneva on two occasions to present my case at the UN Commission on Human Rights. Later I had to focus my activities in the hospital so that I could take the equivalency exam that would allow me to practice medicine in Spain. I found that I was experiencing a complete mental block with respect to medicine; I was unable to absorb my readings, so I spent approximately 8 months studying in the library, taking notes for 8 hours a day and examining patients for 4 hours a day, in the hopes that this mental block would cease, which occurred overnight, thus I was able to take my exam under relatively good conditions.

My sleep disruption continued and in addition, I tended towards isolation. I lost the ability to see in three dimensions; I saw everything as being flat. Colors seemed opaque to me and I knew that the landscape I was looking at was beautiful but I couldn't sense it. I also suffered frequent episodes of spatial disorientation. I brought final closure to the

mourning of my husband after 4 years, and my children did so after one year. All mourning that continues after 9 months is considered pathological.

In 1979, the trial in Chile was temporarily dismissed as "homicide by unknown third parties".

My daughters, Laura and Carmen had both married and returned to Chile in the early 80's.

In 1985, my daughter Carmen was once again persecuted by the DINA and had to seek refuge in the Spanish Embassy in Santiago, who later helped her leave Chile with her two children and begin her new exile. I was in Chile during those months and was witness to the persecution, and her escape to the Spanish Embassy, where I would visit her, and also to her subsequent house arrest that enabled her to organize her new trip. As expected, her symptoms of anxiety recurred during various months. This exile lasted more than a year. In addition, she experienced emotional instability and great hyperactivity.

In 1990, with the advent of democracy in Chile, President Patricio Aylwin created the Chilean Truth and Reconciliation Committee, known as the Rettig Committee after the name of the presiding attorney.

My daughters, Laura and Carmen testified regarding the murder of their father. After their testimony, during which the secretary, the psychologist and others wept, the lawyer on the Commission stated that he now understood why the Commission should be called the "Truth, Reconciliation and Justice Committee."

Once the Commission's report was submitted, President Aylwin chose 60 cases that were sent to the Criminal Tribunals to be reopened. Carmelo Soria's case was among these.

In 1991, headed by efforts by my daughter Carmen, and our lawyer Mr. Alfonso Insunza Bascuñan, the case was reopened. During the legal proceedings and due to the great national and international repercussion, Carmen was threatened in public on various occasions. On one occasion, a quick intervention by a bystander prevented her from being shot. She was threatened by telephone during those years, creating for her a climate of great stress, causing her to undergo sleep therapy and psychological treatment that lasted 5 years. During the last years of the trial she had police guards at the door of her home for her protection.

As of 1994 she was diagnosed with irritable bowel syndrome and intestinal ulcers, a condition which still exists to date, frequently reemerging. Irritable bowel syndrome is a chronic disease.

The trial ended on August 23, 1996 after a torturous process and those on trial for homicide were granted amnesty under the Amnesty law passed by the dictatorship of 1978 that continues in Chile to date.

285

It was established that the Mulchén brigade was responsible for the following crimes: kidnapping, torture and murder. There is also documentation regarding the application of sarin gas on Carmelo Soria's person.

At the home of Mr. Townley, where Carmelo Soria was murdered, there existed a laboratory for the development of toxic gases, among them, sarin gas. Mr. Townley was in charge of this project and he had been able to create the gas in April of 1976, as established by the trial for the murder of Mr. Orlando Letelier and Mrs. Ronnie Moffit in Washington.

The murder of Carmelo Soria was celebrated with a dinner and congratulations from Manuel Contreras, general Director of DINA.

Following the detention of Mr. Augusto Pinochet in London, in 1998, and due to the harassment, threats and insults suffered by my daughter Carmen in Santiago, Amnesty International sponsored her exit from Chile and she once again exiled herself in Spain for some months, with her family. At that time she again manifested her symptoms of anxiety.

My son Luis, was just a year ago able to verbalize and articulate just how difficult his father's murder had been on him, and never complained about the negative state of the rest of the family. Due to this, he received psychological support during those last years.

We have done everything that a family going through this situation does; we have hidden our suffering from each other to help the others, but this brings disarray and <u>collapse of the family structure.</u> As 27 years have passed and we are all adults now, and as we contemplate all that happened to us, all that still happens to us and will keep happening, we now realize that due to the brutal nature of the murder, due to the climate of terror that prevailed in our society, all efforts to repair our psychological health came too late, and we could not take on a holistic method of treatment. This situation continues, thanks to the impunity that reigns in Chile, which forces us to constantly search for recourse in the judiciary system to achieve justice. Because of all of this, the situations of stress in the family continue to repeat themselves and the symptoms of anxiety reemerge in new ways, because of the national and international repercussions of this crime.

Now that, unfortunately, the United States has suffered the second Tuesday, September 11, in 2001 – the first was in Chile on Tuesday, September 11, 1973, all who read these lines will understand more profoundly how it has been shown since the end of the second World War, in medical articles, essays, chronicles and books, that when a member of a family is "observed, followed, kidnapped, disappeared, tortured, and murdered" for his political ideas and the news is manipulated by the press, by governments and in the media, and the legal trials are tortuous and disregard international treaties, the family remains damaged forever. In our case, 4 generations were directly harmed.

286

And since in Chile, the persons murdered, disappeared, tortured and jailed and exiled amounted to thousands, we have also had to suffer for our friends, acquaintances, or people whom we highly respected, who have faced this same fate since 1973.

For reasons of modesty, I have spared an infinity of details and accounts of suffering that the family has endured and continues to endure, as these are part of our intimacy and family history, in which my husband is present, despite the 27 years that have passed since his unfortunate death.

Permanent Psychological Damage:

When I've spoken of disarray and collapse of the family structure, and that "the family remains damaged forever," I am referring to the anxious state created in my daughter and in myself each time I hear of a decision in this long process and now, in the effort to make the Chilean government comply with the recommendations of the OAS report on the Soria case. My daughter, Carmen, for example, had to attend a working group meeting of the OAS Commission on Human Rights in Washington this past March 4th. This produced recurrences of her ulcers and so, she had to be treated with anti-anxiety medication before, during and after her appearance. As for me, I was in Chile during those days, and I also handle the situation with the use of anti-anxiety medication.

My daughter Laura has refused to become aware of any details of the trial since her return to Chile because they affect her profoundly, and we've had to warn her not to see the newspapers or the TV when there is news. My son Luis, who has suffered through this whole process since he was a little boy, obtains news via internet, reactivating his state of impotence, frustration, pain and rage.

The family has never been able to speak normally as a group or individually about the murder, torture, or the trials.

Apart from the anxious states produced by events related to the trials, with negative responses from governments and with duties we must carry out in order to obtain support, there is also the physical aggression in public places that Carmen endured, the last of which occurred one and a half months ago; and the unnatural relationship my other children have to their own name: when they are introduced to somebody, the reaction to hearing the name varies from great affection to very uncomfortable situations. This will accompany them for a long time to come because Chile is still a country with a profoundly divided society.

The personal associations that each one of us establishes in relation to all of this are very different, but they always are surprising and uncomfortable. For me, helicopters, car crashes, canals and any lesions around the neck (stranglings, wounds, scars, karate [chops], etc...) represent the crime, and thus are daily associations. My children have their own associations, and these will be with us until our deaths.

287

We also know that our nightmares, which we do not communicate to each other, will be with us all of our lives.

My inability to live in Chile, being the country where the crime took place, is unexplainable to anyone, but is a damage that will be with me forever, as my family is there.

Understandably, there is lack of communication that the family will never be able to overcome, as we are all adults and my youngest son will soon turn 40. It pains me to have been responsible for the destruction of their youths, in such a particular way, and the harm also inflicted on my grandchildren.

The Soria case has had national and international repercussions, also because the Mulchén Brigade is implicated in the crimes on Orlando Letelier and Mrs. Moffit, General Prat and Mrs. Sofia Cuthbert, the attempted murder of Bernardo Leyton and his wife, Mrs. Ana Fresno, coordinate by Mr. Townley, and the tentative assassination of Carlos Altamirano, Volodia Teitelboin, Pascal Allende, and DINA ordered Michael Townley to carry out all of these.

Every time the media speaks of these cases, the Soria case is mentioned. In all legal documents regarding Human Rights in those cases, the murder of Carmelo Soria is mentioned.

In the daily press, when there is news of legal aspects of other cases, such as the cases against Pinochet by Juez Guzman, there are allusions to aspects of the Soria trial. And in literature, practically all writers knew Soria personally or by reference, so the case appears in their books, creating ambivalent feelings within the family.

The terror of a murder, of which we know almost every detail, has not allowed us to live normally since July 14, 1976. It will accompany us until our deaths, expressing itself in the ways I have pointed out. This is referred to in all of the publications and studies I have mentioned. We have become a family damaged forever.

We are, after 27 years, reopening the trial for the third time in Chile, and as before, there will be a struggle between justice and needs of the State, and we, as a family will newly suffer the consequences of the unfolding of tangled political-judicial process, because of the odd idea of asking for justice and ending with impunity in the Soria case.

State Duty Stamps: Euros 0.15
Seal of Notary Public Luis Sanchez Marco - Madrid.
O3/2004


     The present writ corresponds to the original document in our records, to which text I will refer to, if necessary, for all pertinent [legal] ends. And I issue this copy, for the declarant, having previously provided, for the seven pages therein, the lawfully acceptable type of paper of exclusive use for public records, with notarial paper series 5M and serial number 0269143, the last five [pages] in cronological order and the page herein, in Madrid on the twenty ninth of April of the year two thousand and four. I ATTEST.

        Signed (Illegible)

Seal of the General Association of Notary Publics of Spain
[under] the European Notarial Organization
N° 0047449633


Application of [additional] Tax. Additional Duty
Third. Law 8/1989 dated April 13
Document without [declared] value
Numbers of the Duties [applied]: 1,4, 5, 7
Tariff Rights:                        Euros + Additional Sum +
Value Added Tax (I.V.A)

289



**U.S. Department of Justice**

United States Marshals Service

---

*Washington, DC 20530-1000*

APR 2 5 2003

Michael E. Tigar
1025 Connecticut Avenue, N.W.
Suite 1012
Washington, DC 20036

RE: <u>Laura Gonzalez-Vera et al. v. Henry A. Kissinger et al.</u>

To whom it may concern:

Per your request, Michael Townley was served with a copy of the Consolidated Opposition to Defendants' Motion to Dismiss and Cross-Motion to Strike Certification of Scope of Employment, Memorandum in Support of the Consolidated Opposition and Cross-Motion, and Notice of Electronic Filing, Case Number 1:02CV02240.

Enclosed please find a copy of our affidavit which is submitted in lieu of the usual United States Marshals Return for reasons of security.  Please file this with the local court.

If we may be of further assistance, do not hesitate to contact me.

Sincerely,

Kearn J. Knowles
Chief
Witness Security Program

Enclosure

## UNITED STATES DISTRICT COURT
### DISTRICT OF COLUMBIA

## A F F I D A V I T

Laura Gonzalez-Vera et al.            )
                                      )
                                      )
                                      )
VS                                    )            **DOCKET NUMBER**
                                      )
Henry A. Kissinger et al.             )
                                      )            1:02CV02240
                                      )

I, KEARN J. KNOWLES, of full age, being duly sworn according to law, do depose and say that:

1) I am the Chief, Witness Security Program, United States Marshals Service, U.S. Department of Justice, Washington, D.C.

2) As Chief of the Witness Security Program, I am responsible for the administration of the activities of the United States Marshals Service in the U.S. Department of Justice Witness Security Program.

3) To the best of my knowledge and belief, Michael Townley was served with a Civil Summons and Complaint by a Deputy United States Marshal on January 09, 2003, at 12:30 P.M.

KEARN J. KNOWLES

City/County of Arlington
Commonwealth State of VIRGINIA
Sworn to and subscribed before me this 20th day
of February 2003 Witness my hand and official seal.
Khije M. funter, Notary Public
September 30, 2004
(Print your expiration date above)

Case 1:02-cv-02240-HHK   Document 19   Filed 08/29/2003   Page 1 of 1

Default - Rule 55A (CO 40 Revised-DC 02/00)

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LAURA GONZALEZ-VERA, ET AL
   Plaintiff(s)

   v.

Civil Action No.  02-2240 (HHK)

HENRY ALFRED KISSINGER, ET AL
   Defendant(s)

RE: MICHAEL VERNON TOWNLEY

## DEFAULT

It appearing that the above-named   defendant has   failed to plead or otherwise defend this action.

though duly served with summons and copy of the complaint on          1/9/03          , and an

affidavit on behalf of the plaintiff having been filed, it is this 29th  day of ___August___  2003  declared

that:  defendant is    in default.

NANCY MAYER-WHITTINGTON, Clerk

By: _Belinda Solomon_____
                Deputy Clerk

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LAURA GONZALEZ-VERA, et al.,

    **Plaintiffs,**

    v.

HENRY ALFRED KISSINGER, et al.,

    **Defendants.**


LT1-5-2006116695-1

Civil Action 02-02240 (HHK)


LT2-0-0-2

### ORDER FOR DEFAULT JUDGMENT
### AGAINST DEFENDANT MICHAEL VERNON TOWNLEY

The court considered plaintiffs Carol Mitchell and Laura González-Vera's

application for entry of a default judgment against defendant Michael Vernon

Townley under Rule 55(b)(2) of the Federal Rules of Civil Procedure (#26). After

considering the papers submitted in connection with the application, the papers on

file in this action, and the authorities cited, the court finds as follows:

1. Default was entered against Defendant Michael Vernon Townley on

August 29, 2003.

2. Defendant Townley is not a minor, an incompetent person, or a current

member of the military service.

3. Defendant Townley did not appear in this action.

**ECF
DOCUMENT**
I hereby attest and certify that this is a printed copy
of a document which was electronically filed with the
United States District Court for the District of Columbia.
Date Filed: _11-23-05_
NANCY MAYER-WHITTINGTON, CLERK
By: _Michael Darby_ 8-25-0(

4. Plaintiffs have established that defendant Townley is liable to plaintiffs

Aaron Lloyd and Laura González-Vera for damages in the amount of $7,259,700.



**THEREFORE, IT IS ORDERED** that:

1. Default judgment be entered against the defendant as follows:

$7,259.700 for damages.

2. This judgment shall bear interest at the judgment rate from the date of entry until paid.

3. All relief not expressly granted is denied.

Dated this 23rd day of November, 2005.

Henry H. Kennedy, Jr.
United States District Judge

Doc# 2006116695 Fees:$26.50
08/25/2006    10:41AM Pages 2
Filed & Recorded in Official Records of
WASH DC RECORDER OF DEEDS LARRY TODD

$    20.00
$    6.50

RECORDING
SURCHARGE

2

# AMERICAN UNIVERSITY
### W A S H I N G T O N , D C

February 2, 2007

The Honorable Alberto Gonzales
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

>   RE:  Request for enforcement of default judgment against Defendant Michael Vernon
>   Townley, in the case of *Gonzalez-Vera v. Kissinger et al.*, issued on November 23, 2005

Dear Attorney General Gonzales:

I am writing in regard to enforcement of a default judgment in the amount of $7,259,700 issued
by Judge Kennedy of the United States District Court for the District of Columbia on November
23, 2005. According to an affidavit from Kearn J. Knowles, the Chief of the Witness Security
Program, Defendant Michael Vernon Townley was served with a Civil Summons in the case of
*Gonzalez-Vera v. Kissinger et al.* on January 9, 2003. I am writing to inquire whether Defendant
Townley remains in the witness protection program. If the Attorney General's office confirms
that the Defendant remains a protected person, I formally request assistance in enforcing this
judgment pursuant to 18 U.S.C. § 3523.

Section 3523 governs the enforcement of civil judgments against protected persons to whom the
Attorney General served notice of process. Section 3523(a) states in pertinent part:

>   "If a judgment in such action is entered against that person the Attorney General
>   *shall* determine whether the person has made reasonable efforts to comply with
>   the judgment. The Attorney General *shall* take appropriate steps to urge the
>   person to comply with the judgment. If the Attorney General determines that the
>   person has not made reasonable efforts to comply with the judgment, the Attorney
>   General *may*, after considering the danger to the person and upon request of the
>   person holding the judgment disclose the identity and location of the person to the
>   plaintiff entitled to recovery pursuant to the judgment." (emphasis added).

In accordance with the above language, I respectfully request the following:

>   1.)    That the Attorney General investigate and determine whether Defendant
>   Townley has made reasonable efforts to comply with the judgment.



# AMERICAN UNIVERSITY
### W A S H I N G T O N ,   D C

2.)    If Defendant Townley has not made reasonable efforts to comply with the judgment, that the Attorney General take appropriate steps to urge Defendant Townley to do so.

3.)    If it is determined that Defendant Townley has not made reasonable efforts to comply with the judgment, that the Attorney General disclose the identity and location of Defendant Townley to Plaintiffs' counsel. Disclosure would be for the sole and exclusive purpose of enforcing the Plaintiffs' legal rights against the Defendant.

Should the Attorney General deny disclosure of the current identity and location of the protected person, section 3523(b) directs persons in my position to bring an action against the protected person in U.S. District Court within 120 days. I would prefer to confer with whomever is responsible for executing the inquiry to work out an agreed solution rather than litigating the issue. I respectfully request the responsible person with authority call me at their earliest convenience. Thank you for your assistance.

Regards,

*michael e tigar / ΔΔB*

Michael E. Tigar
Attorney for Plaintiffs
DC Bar No. 103762
Professor of Law
UNROW Clinic/ Washington College of Law
4801 Massachusetts Avenue, N.W.
Suite 206(c)
Washington, D.C. 20016

Enclosures
cc:    Jeff Johnson, Partner
       Dickstein Shapiro LLP

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LAURA GONZALEZ-VERA, et al.,

Plaintiffs,

v.

HENRY ALFRED KISSINGER, et al.,

Defendants.



LT1-5-2006116695-1

Civil Action 02-02240 (HHK)



LT2-0-0-2

## ORDER FOR DEFAULT JUDGMENT
## AGAINST DEFENDANT MICHAEL VERNON TOWNLEY

The court considered plaintiffs Carol Mitchell and Laura González-Vera's application for entry of a default judgment against defendant Michael Vernon Townley under Rule 55(b)(2) of the Federal Rules of Civil Procedure (#26). After considering the papers submitted in connection with the application, the papers on file in this action, and the authorities cited, the court finds as follows:

1. Default was entered against Defendant Michael Vernon Townley on August 29, 2003.

2. Defendant Townley is not a minor, an incompetent person, or a current member of the military service.

3. Defendant Townley did not appear in this action.

**ECF DOCUMENT**

I hereby attest and certify that this is a printed copy of a document which was electronically filed with the United States District Court for the District of Columbia.
Date Filed: _11-23-05_

NANCY MAYER-WHITTINGTON, CLERK

By: _Michael Darby_  8-25-06

4. Plaintiffs have established that defendant Townley is liable to plaintiffs Aaron Lloyd and Laura González-Vera for damages in the amount of $7,259,700.



**THEREFORE, IT IS ORDERED** that:

1. Default judgment be entered against the defendant as follows:

$7,259.700 for damages.

2. This judgment shall bear interest at the judgment rate from the date of

entry until paid.

3. All relief not expressly granted is denied.

Dated this 23rd day of November, 2005.

<div align="right">
Henry H. Kennedy, Jr.
United States District Judge
</div>

Doc# 2006116695 Fees:$26.50
08/25/2006    10:41AM Pages 2
Filed & Recorded in Official Records of
WASH DC RECORDER OF DEEDS LARRY TODD

$                    20.00
$                     6.50

RECORDING
SURCHARGE

2

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

A F F I D A V I T

Laura Gonzalez-Vera et al.                )
                                          )
                                          )
                                          )
                                          )
VS                                        )        DOCKET NUMBER
                                          )
Henry A. Kissinger et al.                 )
                                          )        1:02CV02240
                                          )
                                          )

I, KEARN J. KNOWLES, of full age, being duly sworn
according to law, do depose and say that:

1) I am the Chief, Witness Security Program, United
States Marshals Service, U.S. Department of Justice, Washington,
D.C.

2) As Chief of the Witness Security Program, I am
responsible for the administration of the activities of the United
States Marshals Service in the U.S. Department of Justice Witness
Security Program.

3) To the best of my knowledge and belief, Michael Townley
was served with a Civil Summons and Complaint by a Deputy United
States Marshal on January 09, 2003, at 12:30 P.M.

KEARN J. KNOWLES

City/County of Arlington
Commonwealth/State of VIRGINIA
Sworn to and subscribed before me this 20th day
of February 2004 Witness my hand and official seal
Kings Will Tucker, Notary Public
September 30, 2004
(Print your expiration date above)

# AMERICAN UNIVERSITY
### W A S H I N G T O N ,   D C

UNROW CLINIC

February 2, 2007

Mr. George B. Walsh, U.S. Marshal
U.S. Courthouse
3rd & Constitution Avenue, N.W.
Room 1103
Washington, D.C. 20001

      RE: Request for enforcement of default judgment issued on November 23, 2005 against
      Defendant Michael Vernon Townley in the case of *Gonzalez-Vera v. Kissinger, et al.*

Dear Mr. Walsh:

I am writing concerning enforcement of a default judgment in the amount of $7,259,700 issued
by Judge Kennedy of the United States District Court for the District of Columbia on November
23, 2005. According to an affidavit from Kearn J. Knowles, the Chief of the Witness Security
Program, Defendant Michael Vernon Townley was served with a civil summons in the case of
*Gonzalez-Vera v. Kissinger, et al.* on January 9, 2003. A copy of the civil summons and the
default judgment is attached to this letter. Please inform me whether Defendant Townley
remains in the witness protection program. If Defendant Townley remains in the program as a
"protected person," I request assistance in enforcing this judgment pursuant to 18 U.S.C. § 3523.

Section 3523 governs the enforcement of civil judgments against protected persons to whom the
Attorney General served notice of process. Section 3523(a) states in pertinent part:

      "If a judgment in such action is entered against that person the Attorney General
      *shall* determine whether the person has made reasonable efforts to comply with
      the judgment. The Attorney General *shall* take appropriate steps to urge the
      person to comply with the judgment. If the Attorney General determines that the
      person has not made reasonable efforts to comply with the judgment, the Attorney
      General *may*, after considering the danger to the person and upon request of the
      person holding the judgment disclose the identity and location of the person to the
      plaintiff entitled to recovery pursuant to the judgment." (emphasis added).

In accordance with the above language, I respectfully request the following:

      1.)    That you investigate and determine whether Defendant Townley has made
      reasonable efforts to comply with the judgment.

      2.)    If Defendant Townley has not made reasonable efforts to comply with the
      judgment, that you take appropriate steps to urge Defendant Townley to do so.

# AMERICAN UNIVERSITY

W  A  S  H  I  N  G  T  O  N  ,    D  C

UNROW CLINIC

3.)    That you disclose the identity and location of Defendant Townley to Plaintiffs' counsel, subject to a reasonable protective order. Disclosure would be for the sole and exclusive purpose of enforcing the Plaintiffs' legal rights against the Defendant.

Should you deny disclosure of the current identity and location of the protected person, section 3523(b) directs persons in my position to bring an action against the protected person in U.S. District Court within 120 days. Given the statutory requirement that your Department participate in any such litigation, it seems preferable to work out an agreed upon solution rather than litigating the issue. Please ensure that someone with the authority to resolve this matter call me at their earliest convenience. Thank you for your assistance.

Sincerely,

Michael E. Tigar
Attorney for Plaintiffs
DC Bar No. 103762
Professor of Law
UNROW Clinic/Washington College of Law
4801 Massachusetts Avenue, N.W.
Suite 206(c)
Washington, D.C. 20016

Enclosures
cc:    Jeff Johnson, Partner
       Dickstein Shapiro LLP

# AMERICAN UNIVERSITY

### W A S H I N G T O N ,   D C

April 12, 2007

The Honorable Alberto Gonzales
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

RE:  Request for enforcement of default judgment against Defendant Michael Vernon Townley in the case of *González-Vera v. Kissinger, et al.*, issued on November 23, 2005

Dear Attorney General Gonzales:

As a follow up to my letter of February 2, 2007, I am informing the Attorney General's office that I seek to enforce a default judgment, in the amount of $7,259,700, issued by Judge Kennedy of the United States District Court for the District of Columbia.  Although the Department of Justice returned a certified mail receipt, I am still awaiting a timely response.

If the Defendant remains a protected person, I again formally request assistance in enforcing this judgment pursuant to 18 U.S.C. § 3523.  According to our most recent information, an affidavit from Kearn J. Knowles, Chief of the Witness Security Program, Defendant Michael Vernon Townley was served with a Civil Summons in the case of *González-Vera v. Kissinger, et al.* in January 2003.  It is necessary that you respond to my previous inquiry and inform me whether Defendant Townley remains in the witness protection program.

Section 3523 governs the enforcement of civil judgments against protected persons to whom the Attorney General served notice of process.  Section 3523(a) states in pertinent part:

If a judgment in such action is entered against that person the Attorney General *shall* determine whether the person has made reasonable efforts to comply with the judgment.  The Attorney General *shall* take appropriate steps to urge the person to comply with the judgment.  If the Attorney General determines that the person has not made reasonable efforts to comply with the judgment, the Attorney General *may*, after considering the danger to the person and upon request of the person holding the judgment disclose the identity and location of the person to the plaintiff entitled to recovery pursuant to the judgment. (emphasis added).

In accordance with the above language, I again respectfully request the following:

1.  That the Attorney General investigate and determine whether Defendant Townley has made reasonable efforts to comply with the judgment.

# AMERICAN UNIVERSITY

W · A · S · H · I · N · G · T · O · N · ,   D C

2. If Defendant Townley has not made reasonable efforts to comply with the judgment, that the Attorney General take appropriate steps to urge Defendant Townley to do so.

3. If Defendant Townley has not made reasonable efforts to comply with the judgment, that the Attorney General disclose the identity and location of Defendant Townley to Plaintiffs' counsel. Disclosure would be for the sole and exclusive purpose of enforcing Plaintiffs' legal rights against Defendant Townley.

Should the Attorney General deny disclosure of the current identity and location of the protected person, section 3523(b) directs persons in my position to bring an action against the protected person in U.S. District Court within 120 days of the request to the Attorney General. Pursuant to the statute, I am prepared to file a complaint in the United States District Court for the District of Columbia on June 1, 2007, so that my clients may execute their default judgment. If the Attorney General continues to fail to respond, I reserve the right to name him as a defendant under 28 U.S.C. § 1361. I would prefer to work out an agreed solution with whoever is responsible for executing the inquiry rather than litigating the issue. Again, I respectfully request the responsible person with authority call me at their earliest convenience. Your response is due by June 1, 2007.

Sincerely,

*michael e tigar / ssB*

Michael E. Tigar
Attorney for Plaintiffs
D.C. Bar No. 103762
Professor of Law
UNROW Clinic/ Washington College of Law
4801 Massachusetts Avenue, N.W.
Suite 206(c)
Washington, D.C. 20016
(202) 274- 4088

Enclosures
cc:   Mr. Jeffrey Johnson, Partner
      Dickstein Shapiro LLP

      Mr. George B. Walsh, U.S. Marshal
      United States Marshal Service

# AMERICAN UNIVERSITY
W A S H I N G T O N ,   D C

UNROW CLINIC

Mr. David Margolis, Associate Deputy Attorney General
United States Department of Justice

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LAURA GONZALEZ-VERA, et al.,

Plaintiffs,

v.

HENRY ALFRED KISSINGER, et al.,

Defendants.



Civil Action 02-02240 (HHK)



## ORDER FOR DEFAULT JUDGMENT
## AGAINST DEFENDANT MICHAEL VERNON TOWNLEY

The court considered plaintiffs Carol Mitchell and Laura González-Vera's application for entry of a default judgment against defendant Michael Vernon Townley under Rule 55(b)(2) of the Federal Rules of Civil Procedure (#26). After considering the papers submitted in connection with the application, the papers on file in this action, and the authorities cited, the court finds as follows:

1. Default was entered against Defendant Michael Vernon Townley on August 29, 2003.

2. Defendant Townley is not a minor, an incompetent person, or a current member of the military service.

3. Defendant Townley did not appear in this action.

**ECF DOCUMENT**
I hereby attest and certify that this is a printed copy of a document which was electronically filed with the United States District Court for the District of Columbia.
Date Filed: _11-23-05_
NANCY MAYER WHITTINGTON, CLERK
By: _Michael Darby 8-25-06_

4. Plaintiffs have established that defendant Townley is liable to plaintiffs Aaron Lloyd and Laura González-Vera for damages in the amount of $7,259,700.

**THEREFORE, IT IS ORDERED** that:

1.  Default judgment be entered against the defendant as follows:

$7,259.700 for damages.

2.  This judgment shall bear interest at the judgment rate from the date of

entry until paid.

3.  All relief not expressly granted is denied.

Dated this  23rd day of  November, 2005.


                                    Henry H. Kennedy, Jr.
                                    United States District Judge


Doc# 2006116695 Fees:$26.50
08/25/2006    10:41AM Pages 2
Filed & Recorded in Official Records of
WASH DC RECORDER OF DEEDS LARRY TODD

                                    $    20.00
                                    $     6.50

RECORDING
SURCHARGE

2

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

A F F I D A V I T

Laura Gonzalez-Vera et al.                )
                                          )
                                          )
                                          )
VS                                        )          DOCKET NUMBER
                                          )
Henry A. Kissinger et al.                 )
                                          )          1:02CV02240
                                          )

I, KEARN J. KNOWLES, of full age, being duly sworn
according to law, do depose and say that:

1) I am the Chief, Witness Security Program, United
States Marshals Service, U.S. Department of Justice, Washington,
D.C.

2) As Chief of the Witness Security Program, I am
responsible for the administration of the activities of the United
States Marshals Service in the U.S. Department of Justice Witness
Security Program.

3) To the best of my knowledge and belief, Michael Townley
was served with a Civil Summons and Complaint by a Deputy United
States Marshal on January 09, 2003, at 12:30 P.M.

KEARN J. KNOWLES

City/County of _Arlington_
Commonwealth/State of _VIRGINIA_
Sworn to and subscribed before me this _20th_ day
of _February 2004_. Witness my hand and official seal.
_Kaye M. Tucker_, Notary Public
_September 30, 2004_
(Print your expiration date above)



**Emily Strunk <strunke@gmail.com>**

# This is the Exhibit email from Jana to Keisler

**Maria A. del-Cerro <mdelcerro@gmail.com>**          **Thu, May 31, 2007 at 7:38 PM**
To: Emily Strunk <strunke@gmail.com>

---------- Forwarded message ----------
From: **Maria A. del-Cerro** <mdelcerro@gmail.com>
Date: May 14, 2007 1:18 PM
Subject: Follow up per your conversation with Michael Tigar
To: peter.d.keisler@usdoj.gov
Cc: Michael Tigar <metigar@gmail.com>, "Beydoun, Ali A" <aab@carrmaloney.com>

Dear Mr. Keisler,

     Per your conversation with Michael Tigar, please find attached copies of the two letters sent to the Honorable Attorney General Gonzalez, as well as copy of the default judgment referenced therein. Professor Tigar can be reached by email, metigar@gmail.com, or by cell phone at (202) 549-4229. Thank you for your attention and assistance with this matter.

Sincerely,

Jana del-Cerro

--
NOTE: This message may contain attorney-client/attorney work product privileged information. If you received this message in error, please inform the sender immediately. Any messages received in error should be deleted, and the sender expressly prohibits any unauthorized duplication or communication of this message, its contents or attachments. Thank you.

--
NOTE: This message may contain attorney-client/attorney work product privileged information. If you received this message in error, please inform the sender immediately. Any messages received in error should be deleted, and the sender expressly prohibits any unauthorized duplication or communication of this message, its contents or attachments. Thank you.

**3 attachments**

   **attachments.pdf**
   336K

Letter dated Feb. 2, 2007.pdf
56K

Letter dated April 12, 2007.pdf
66K