**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

LAURA GONZÁLEZ-VERA, et al.,        )
                                    )        Civil Action
                    Plaintiffs,     )        Case No.  1:07-CV-995 (HHK)
          v.                        )
                                    )
MICHAEL VERNON TOWNLEY, et al.,     )        **ORAL HEARING REQUESTED**
                                    )
                    Defendants.     )
_____)

### PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs (also known as Petitioners under the applicable statute, 28 U.S.C. § 3523)

respectfully move, pursuant to Fed. R. Civ. P. 56, for summary judgment in this action, on the

issue of entitlement to appointment of a guardian to assist in locating the debtor's assets, as set

out in the attached Proposed Order.

Plaintiffs also pray that the Court permit Plaintiffs to supply, under seal, the names and

qualifications of proposed guardians, such information already having been provided to

representatives for government Defendants.

Plaintiffs also pray that the Court order Michael Vernon Townley to pay the costs which

are normally charged to debtors in addition to any other costs which are incurred as a result of

this action having been brought under 18 U.S.C. § 3523, including but not limited to

compensation to the guardian, or, in the alternative, enter judgment against the United States for

costs and fees reasonably incurred as a result of this action having been brought under 18 U.S.C.

§ 3523, including but not limited to compensation to the guardian.

In support of this Motion, Plaintiffs rely on the accompanying memorandum and

statement of undisputed material facts.

Plaintiffs request a prompt oral hearing on this Motion.

Plaintiffs reserve the right to seek additional relief, including disclosure of the guardian's report, and the rights provided to debtors under Fed. R. Civ. P. 69, when the guardian report is received.

Dated this 12th day of September, 2007.                    Respectfully Submitted,


                                                           /s/ Ali A. Beydoun_____
                                                           Ali Beydoun
                                                           D.C. Bar No. 475413
                                                           Michael E. Tigar
                                                           D.C. Bar No. 103762
                                                           Attorneys for Plaintiffs
                                                           4801 Massachusetts Ave, NW, Suite 206(c)
                                                           Washington, D.C.  20016
                                                           202-274-4088

Notice to:

Lisa Ann Olson
Attorney for Defendants
U.S. Department of Justice
20 Massachusetts Ave, NW
Room 7300
Washington, D.C.  20530


Michael Vernon Townley
Witness Security Program
c/o U.S. Marshal: Donald W. Horton
U.S. Courthouse
330 Constitution Ave., NW Rm. 1103
Washington, D.C.  20001

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served electronically, this 12th day of September, 2007 to:

Lisa Ann Olson
Attorney for Government Defendants
U.S. Department of Justice
20 Massachusetts Ave, NW
Room 7300
Washington, D.C.  20530

The following party was served via the U.S. Postal Service, prepaid first class, to

Michael Vernon Townley
Witness Security Program
c/o U.S. Marshal: Donald W. Horton
U.S. Courthouse
330 Constitution Ave., NW Rm. 1103
Washington, D.C.  20001

Dated this 12th day of September, 2007.                Respectfully Submitted,


/s/ Ali A. Beydoun_____
Ali Beydoun
D.C. Bar No. 475413
and Michael E. Tigar
D.C. Bar No. 103762
Attorneys for Plaintiffs
4801 Massachusetts Ave, NW, Suite 206(c)
Washington, D.C.  20016
202-274-4088

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LAURA GONZÁLEZ-VERA, et al.,    )
       )      Civil Action
      Plaintiffs,   )      Case No.  1:07-CV-995 (HHK)
    v.      )
       )
MICHAEL VERNON TOWNLEY, et al.,  )
       )
      Defendants.  )
       )

**MEMORANDUM OF POINTS AND AUTHORITIES IN
<u>SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>**

**<u>SUMMARY OF THE CASE</u>**

Plaintiffs file this Motion for Summary Judgment because, as a matter of law, pursuant to 18 U.S.C. § 3523, Plaintiffs are entitled to a court-appointed guardian to assist them in enforcing the Default Judgment against Defendant Michael Vernon Townley ("Townley").[1]  18 U.S.C. § 3523 (2007).  There is no genuine issue of any material fact in this case.  Plaintiffs hold a Judgment, entered by this Court on November 23, 2005 in the amount of $7,259,700.  The Attorney General has failed to comply with his statutory duty to help Plaintiffs enforce their Judgment after repeated requests.  Thus Plaintiffs' only hope of recovering their Judgment is to petition this Court for a guardian.

Subsequent to this Court issuing the Default Judgment against Townley, Plaintiffs contacted Townley's legal counsel at Dickstein Shapiro LLP ("Dickstein Shapiro") in an attempt to determine Townley's whereabouts for the purpose of enforcing said Judgment.  *See* Exhibit B, Email from Jeff Johnson, Defendant Townley's counsel at Dickstein Shapiro, to Erin L. Palmer

---

[1] Judge Henry H. Kennedy, Jr. of the U.S. District Court for the District of Columbia entered a Default Judgment in favor of Plaintiffs.  Exhibit A, Default Judgment, *González-Vera v. Kissinger*, Civil Action No. 1:02CV02240 (HHK) (Nov. 23, 2005).

for Plaintiff, (Sept. 12, 2006).  Townley's attorney refused to provide any relevant information

and cut off communications.  *See Id.*  On February 2, 2007, pursuant to 18 U.S.C. § 3523,

Plaintiffs sent an official written inquiry to the Attorney General, requesting confirmation as to

whether Townley remains in the custody of the U.S. Marshals Service Witness Security Program

("WSP"), and, if so, whether Townley had made reasonable efforts to comply with the Default

Judgment.  *See* Exhibit C, Letter from Plaintiffs' Counsel to Defendant Attorney General (Feb. 2,

2007).  The Attorney General failed to respond.  On April 12, 2007, Plaintiffs sent a second letter

restating their request for the Attorney General to comply with his 18 U.S.C. § 3523(a) duties to

assist Plaintiffs in enforcing their Judgment against Townley.  *See* Exhibit D, Letter from

Plaintiffs' Counsel to Defendant Attorney General (Apr. 12, 2007).  The Attorney General again

defied the statute by failing to respond.

 The facts necessary for the Court to grant relief are not in dispute and are supported by

the accompanying exhibits.  As required by 18 U.S.C. § 3523(b)(1)*,* Plaintiffs "hold[] a valid

judgment of a Federal or State court against a person provided protection under [18 U.S.C. §§

3521 *et. seq.*] and … sought to enforce the judgment by requesting the Attorney General to

disclose the identity and location of the protected person."  *See* Ex. A, C, D.  The Attorney

General, through his failure to respond to Plaintiffs' official requests, "has declined to disclose to

the [Plaintiffs] the current identity and location of the protected person [(Townley)] against

whom the judgment was entered."  18 U.S.C. § 3523(b)(3).  Therefore, Plaintiffs respectfully

request this Court to exercise its mandate, under 18 U.S.C. § 3523(b)(1), to appoint a guardian

who will assist Plaintiffs in enforcing this Court's Judgment against Townley.  Plaintiffs this day

have also filed a Motion for Pretrial Conference to discuss the qualifications and possible

candidates for the Court's consideration in appointing a guardian.  Plaintiffs' counsel has already

met with government counsel, and provided the government with the names of two individuals

who are well-qualified to serve as a guardian in an effort to achieve resolution in this matter. [2]

## FACTUAL BACKGROUND AS TO
## DEFENDANT MICHAEL VERNON TOWNLEY

In our Plaintiffs' Statement of Material Facts as to which There Is No Genuine Dispute,

we have set out only those facts strictly necessary to support summary judgment.  However, the

following facts are relevant to this action.  Every fact noted below can be proved by admissible

evidence, as noted.[3]  Authentication and original writing rules are satisfied as to the items listed.

Michael E. Tigar, counsel for Plaintiffs,  has been involved in litigation concerning Townley for

almost twenty years, and would be a competent foundational witness for the documentary

evidence.

Defendant Townley has admitted to creating and placing the bomb that killed Mr.

Orlando Letelier and Mrs. Ronni Moffitt in Washington, D.C. on September 21, 1976.  *See*

*Letelier v. Rep. of Chile*, 502 F. Supp. 259, 263 (D.D.C. 1980).  The U.S. Marshals Service

Witness Security Program ("WSP") granted Townley protection in exchange for his testimony

against two of his co-conspirators.  *Id.* at 262.  In 1979, Townley testified under oath that, as a

"civilian contract employee" of the Direccíon Nacional de Inteligencia  ("DINA"), he accepted

an assignment to murder Mr. Letelier.  *Id.* at 263.  Townley built a bomb and placed it beneath

---

[2]  One candidate is a retired IRS intelligence agent who continues to work on complex financial investigations, and who has agreed to contribute his time.  Another candidate is an FBI agent who is also a CPA and has been case agent on major investigations of financial fraud and public corruption.  Plaintiffs believe that their identities should be provided to the Court under seal, as prayed for in our motion.

[3]  The information would be admissible under one or more of the following rules of evidence: Judicial Notice of Adjudicative Facts, Fed. R. Evid. 201; Admission of a party opponent,  Fed. R. Evid, 801(d)(2); Record of regularly conducted activity; Fed. R. Evid. 803(6), Public record and report; Fed. R. Evid. 803(8); Statements in ancient documents, Fed. R. Evid. 803(16) (See Advisory Committee Note on the scope of this exception); Residual Exception, F. R. Evid. 807.

Mr. Letelier's car. *See id.* at 260. Three days later, the car exploded, killing Mrs. Moffitt and Mr. Letelier, who were riding in the vehicle at the time. *See id.* When asked about their deaths in a television news interview, Townley replied coldly, "[t]he mission was accomplished." Exhibit E, Transcript of Interview with Michael Vernon Townley, Channel 7 Chilean National Television (Aug. 16. 1993), at 147. After serving only half of a ten-year prison sentence for his conviction for the murder of Mr. Letelier and Mrs. Moffitt, Townley was released in 1983 and the U.S. Marshals provided him with a new identity, legal status, residence, and employment. *See Letelier,* 502 F. Supp. at 262 n.3; Ex. E at 147.

Since his early twenties, Townley has been involved in a number of money making ventures. In 1961, Townley began a career as a salesman in Chile, initially selling Collier's Encyclopedias. *See* John Dinges & Saul Landau, *Assassination on Embassy Row* 96 (1980). Within a few years, he moved on to a more lucrative position selling mutual funds for Investor's Overseas Services until the company collapsed amid charges of fraud. *Chile Expelling an American Wanted by U.S. in Assassination Case,* N.Y. Times, Apr. 7, 1978, at A3. Townley became known in Chilean social circles for poolside parties at his lavish home in La Reina. *See Dinges*, *supra*, at 96. Several years later, as Pinochet rose to power in Chile, Townley and his wife devised a plan to buy greatly undervalued Chilean real estate, opportunistically profiting from Chilean land owners who were abandoning their properties and fleeing the country in fear of increasing political unrest. *Id.* at 102. In 1974, Townley began working as a "civilian contract employee" with DINA. *Letelier*, 592 F. Supp. at 262. In addition to collecting a salary from DINA, Townley received valuable perks for his work. Ex. E at 132-33. For example, in 1975, DINA gave Townley a mansion in Lo Curro, Chile. *Id.* at 133-35. Townley purchased the home through Prosin Limited, a front company he created. *Id.* at 134 (revealing that the

company (referred to as PROSIM in television interview transcript (Ex. E)) was incorporated in the United States and then, as Townley explained, "in Chile, as a façade"). The company maintained an account in the Southeast First National Bank in Miami, Florida. Exhibit F, FBI Report on Directorate of National Intelligence (DINA) (Jan. 21, 1982), at 3 of Index.

DINA also rewarded Townley by paying his legal fees and providing financial support to his family between 1978 and 1979. Patrick E. Tyler, *Letter to Chile Aided Letelier Murder Figure; Man Jailed for Role in Letelier Murder Writes of Chilean Aid,* Wash. Post, Feb. 23, 1982, at A1. In 1993, Townley gave an interview to Channel 7 Chilean National television. *See* Ex. E. According to the reporter, the interview took eighteen continuous hours of work, twelve camera teams, and forty video tapes. *Id.* at 119. If Townley had received even $1,000 dollars in 1974 from any of these abovementioned sources, and had invested the money in a U.S. index fund, he could now have $31,746.50.[4]

In addition to Townley's entrepreneurial endeavors, many aspects of Townley's lifestyle indicate that he has access to financial resources. Townley is the son of a successful Ford Motor Company executive. David Burnham, *2 Cubans Guilty in Bomb Killing of Chilean Exile*, N.Y. Times, Feb. 14, 1979, at A1, A4. He is the father of two boys, born in 1964 and 1966,[5] *Chile Expelling an American*, *supra*, at A3, and has several stepchildren, *Dinges*, *supra*, at 96. Moreover, Townley has been represented by private counsel at Dickstein Shapiro, a top-dollar Washington, D.C. law firm. Nicholas M. Horrock, *American is Charged in Letelier's Slaying*, N.Y. Times, Apr. 26, 1978 at A1, A14 (stating that Seymour Glanzer of Dickstein Shapiro

---

[4] This calculation assumes an average stock market return rate of 11.8%, compounded annually, for thirty-one years.

[5] At least one of his sons, Brian Townley Callejas, attended Universidad de Chile where he received an undergraduate degree and a Doctorate in Geology. Academia Chinela de Ciencias, *Directorio de Investigadores: Townley Callejas, Brian*, *available at* http://www.academia-ciencias.cl/?module=investig&id=1402&task=show_persona

provided Townley's legal defense against criminal prosecution in connection with the murders of Mr. Letelier and Mrs. Moffitt). Even after entering the WSP, Townley continued to retain legal representation from Dickstein Shapiro. Ex. B (responding to Plaintiffs' request for assistance in executing the Default Judgment, and offering to submit a list of written interrogatories to Townley, thus revealing that the attorneys are in contact with the Defendant and willing to work on his behalf). *See also* Ex. E at 120 (referring to negotiations between the television station and Townley's attorneys).

Plaintiffs have a good faith basis to believe that Townley is not credible and cannot be trusted to report an honest account of his financial resources. Townley is a confessed liar, murderer, terrorist, and torturer, who has engaged in fraudulent activity and has a history of disregarding court orders and working for known money launderers. In addition to claiming responsibility for the murders of Mr. Letelier and Mrs. Moffitt, Townley has confessed to attempting to assassinate numerous others, including the former Vice President of Chile, Bernardo Leighton, and his wife Anita Fresno. Ex. E at 138-39. Townley left both individuals critically wounded, with severe and permanent brain damage and paralysis. Peter Kornbluh, *The Pinochet File* 170, 333 (1978). According to Townley's 1978 recollection of his role in DINA, he "dedicated [his] time almost exclusively to the development of 'SARIN,'" a chemical "of extreme toxicity," in a laboratory in his home. Exhibit G, Michael Vernon Townley's *"History of Actions in the DINA," (*Mar. 14, 1978) at 254, 261 (originally exhibited in Mem. in Supp. of Default J. against Michael Vernon Townley). SARIN was used to murder a real estate agent in Santiago as well as a DINA agent lying in a medical clinic with broken ribs. *Id.* Furthermore, Townley allowed DINA to use his home in Lo Curro, Chile to torture its victims. Ex. E at 141-

6

42. Townley also mobilized young Chileans to terrorize the Chilean government, for example, by teaching them how to create and use Molotov cocktails. Ex. E at 129-30.

Townley has a history of undertaking fraudulent activity and failing to comply with court orders. Between 1974 and 1978, Townley traveled to the United States under at least five aliases and carried passports from three different countries. *Horrock*, *supra*, at A1. Townley traveled to the United States to kill Mr. Letelier under the false name of Hans Peterson Silva, and upon his arrival, manipulated U.S. immigration records to make it appear that "Silva" had left the country prior to Mr. Letelier's assassination. *Letelier*, 502 F. Supp. at 262-64. Townley accomplished this by mixing the Immigration and Naturalization Service's Form I-94 (issued to him under the name of Silva upon his arrival to the United States) with a pile of I-94s collected from passengers departing for Spain on a Spanish airliner. *Id.*

In addition to using false identification and committing immigration fraud, Townley engaged in money laundering by creating a shell corporation to hide his financial funding from DINA. *See* Ex. E at 134. Furthermore, Townley's associates in the Chilean junta engaged in laundering money through U.S. banks. In fact, the DINA Police Chief General Manuel Contreras, one of Townley's direct superiors, Ex. E at 133, secretly withdrew $25,000 from his Riggs National Bank Account, laundered the money through a New York firm, and allegedly used the funds to pay the defense fees for Townley's co-conspirators in the murders of Mr. Letelier and Mrs. Moffitt, Timothy S. Robinson, *Letelier Murder Suspect Shifted $25,000 From D.C. Bank*, Wash. Post, Oct. 10, 1979, at A3. The extent of the financial fraud and theft by Townley's Chilean superiors and associates has just recently begun to emerge.[6]

---

[6] In 2005, a U.S. Congressional investigation of General Augusto Pinochet's U.S. bank accounts resulted in a comprehensive report stating "Riggs [Bank] ... had 28 Pinochet-related accounts and CD's ... and a twenty-five year relationship with Mr. Pinochet and his family, from 1979-2004."

Townley's long history of evading court summons, charges, and judgments, began during his days as a salesman in Chile in 1966. After a Santiago criminal court subpoenaed Townley's Investor's Overseas Services sales records and issued a warrant for his arrest, Townley fled to Miami, Florida. *Dinges*, *supra*, at 97. Because of Townley's history of flight from justice, when a U.S. attorney urged that Townley be held on $5 million bail in the *Letelier* criminal case, Judge Henry H. Kennedy, Jr., ordered Townley held without any bail at all. *Horrock*, *supra*, at A14. In another display of contempt for the judicial system, Townley failed to respond to a civil suit brought in U.S. courts against him by Mr. Letelier's widow. Similar to the underlying case in this matter, Mrs. Letelier's civil suit also resulted in a Default Judgment against Townley. *Letelier*, 592 F. Supp. at 261.

## STATEMENT OF APPLICABLE LAW

### I.  PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56

Rule 56 provides for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. To determine whether there is a "genuine issue of material

---

*Subcomm. on Investigations of the S. Comm. on Homeland Security and Governmental Affairs*, 109th Cong., *Money Laundering and Foreign Corruption: Enforcement and Effectiveness of the Patriot Act Supplemental Staff Report on U.S. Accounts Used by Augusto Pinochet* (Mar. 16, 2005), at 3. The report goes on to say that "[n]ine accounts had been opened in the name of third parties, all but one of whom were Chilean military officers." *Id.* at 4. Bank records show that these military officer accounts were used at times as conduits to transfer Pinochet funds. *Id.* The report analyzes Pinochet's ability to conceal and transfer millions of dollars for business use through a complicated network of hidden off-shore and domestic bank accounts. The Report concludes that, "[Pinochet's] secretive opening of multiple accounts at multiple U.S. financial institutions over the years presents a cautionary tale about the ease with which a determined individual can manipulate the U.S. financial system." *Id.* at 7.

fact" the court must look to the substantive elements of the law upon which the claim is based and decide whether there is any dispute as to facts that support or refute the claim and/or any defenses, and thus would affect the outcome of the case.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A district court may enter summary judgment *sua sponte* and without awaiting a response from the other party, "so long as the losing party was on notice that she had to come forward with all of her evidence."  *Celotex*, 477 U.S. at 326.  Furthermore, a court may grant summary judgment on any part of a claim, and need not rule on all issues in the case.  *See* Fed. R. Civ. P. 56(a).

To prevail on a motion for summary judgment, the moving party must show that the nonmoving party failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  The court must draw all reasonable inferences in favor of a nonmoving party and accept any evidence offered by the nonmoving party as true.  *See Anderson*, 477 U.S. at 255.  However, the nonmoving party must show more than "the mere existence of a scintilla of evidence," *id.* at 252, and cannot rely on mere allegations or conclusory statements, but "must set forth specific facts" that would allow a finding in its favor, *id.* at 256-57.  A moving party may prevail on a motion for summary judgment by pointing to the absence of evidence put forth by the nonmoving party.  *Celotex*, 477 U.S. at 325.  Summary judgment is particularly appropriate when the issues in the case are primarily legal rather than factual.  *See Wyo. Outdoor Council* v. *Dombeck*, 148 F. Supp. 2d 1, 7 (D.D.C. 2001) (citing *Crain v. Bd. of Police Comm'rs*, 920 F.2d 1402, 1405-06 (8th Cir. 1990)).

## II.    18 U.S.C. § 3523 ENTITLES PLAINTIFFS  TO A GUARDIAN

Individuals protected in the Witness Security Program are not shielded from civil liability and judgments.  In fact, it is the duty of the United States, and specifically the Attorney General, to ensure that protected individuals comply with any and all judgments against them.  *See* 18 U.S.C. §§ 3521, *et seq.*  Prior to 1984, individuals entering the WSP were required to sign a Memorandum of Understanding (MOU) stating that the U.S. Marshals Service would not protect them from creditors and that if a witness did not address his debts, the U.S. Government could disclose his location.[7]  However, at that point in time, the decision to disclose a witness' identity was discretionary and not often exercised.  As a result, innocent parties were often left without a remedy.  In response to these injustices, the U.S. Comptroller General issued a report in 1983, concluding that the informal policy of non-disclosure significantly diminished the ability of creditors to obtain actual relief and recommended that Congress take action to better balance the public's interest with respect to enforcing judgments against protected individuals.[8]  In 1984, Congress responded by amending the Organized Control Act of 1970, which governs the WSP.  *See generally Cooperstein*, *infra* note 7.  The amendments recognized the hardship borne by those who hold judgments against protected individuals for damages or child custody, but who cannot enforce those judgments because, as a direct result of government action, the person against whom the judgment was entered is impossible to find.  *Id.*  The new statute, 18 U.S.C. §

---

[7] *See* Karen S. Cooperstien, *Note: Enforcing Judgments Against Participants in the Witness Protection Program*, 36 Stan. L. Rev. 1017, 1021-23 (1984) (discussing the weaknesses of the Witness Protection Program and Organized Crime Control Act of 1970 and the resulting consequences for third parties).

[8] *See* GAO Report, *Changes Needed in the Witness Security Program*, *Report Of The Comptroller General Of The United States* 7 (1983), *reprinted in Hearings on H.R. 7039 Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the House Comm. on the Judiciary*, 97th Cong., 2d Sess. 308 (1982) (cited in Raneta J. Lawson, *Lying, Cheating and Stealing at Government Expense:  Striking a Balance Between the Public Interest and the Interests of the Public in the Witness Protection Program*, 24 Ariz. St. L.J. 1429, 1447 (1992)).

3523, squarely places the burden on the Attorney General of the United States to assist these innocent third parties in locating and enforcing civil judgments against protected individuals. Should the Attorney General fail to comply with his statutory duty to assist, a plaintiff may bring an action against a protected person within 120 days of a request to the Attorney General to disclose the identity and location of a protected person.  18 U.S.C. § 3523(b)(1).

When a judgment is entered against a person in WSP, 18 U.S.C. § 3523(a) provides that the Attorney General "*shall* determine whether the person has made reasonable efforts to comply with the judgment" entered against him and "*shall* take appropriate steps to urge the person to comply with the judgment."  (Emphasis added.)  The statute also allows the Attorney General to disclose the identity and location of the witness, without the U.S. Government incurring liability for such a disclosure, if the Attorney General finds that the witness "has not made reasonable efforts to comply with the judgment."  *Id.*  Such disclosure is limited to the purpose of recovering the judgment.  18 U.S.C. § 3523(a).

When the Attorney General refuses to disclose the identity and location of the witness against whom a judgment is held, the party holding the judgment is entitled to bring an action for effective relief in the U.S. District Court where the judgment is held.  18 U.S.C.§ 3523(b)(1). "Upon a determination (A) that the petitioner holds a judgment entered by a Federal or State court and (B) that the Attorney General has declined to disclose to the petitioner the current identity and location of the protected person against whom the judgment was entered, the court *shall* appoint a guardian to act on behalf of the petitioner to enforce the judgment."  18 U.S.C. § 3523(b)(3) (emphasis added).  The court must then "furnish the guardian with a copy of the order of the appointment," and the "Attorney General *shall* disclose to the guardian the current identity and location of the protected person and any other information necessary to enable the guardian

11

to carry out his or her duties under this subsection." *Id.* (emphasis added).  Subsections (4) and

(5) of 18 U.S.C. § 3523 lay out the duties and powers of the guardian in seeking to enforce the

judgment against the protected person.  Nowhere in the language of the statute does Congress

contemplate a jury trial, thus the determinations required by section 3523(b)(3) may be made

adequately and fairly by a judge alone.  *See* 18 U.S.C. § 3523.


### LEGAL STANDARD APPLIED TO THE FACTS OF THIS CASE

**I.     THE ATTORNEY GENERAL'S FAILURE TO DISCLOSE
         MICHAEL VERNON TOWNLEY'S CURRENT LOCATION
         AND IDENTITY ENTITLES PLAINTIFFS TO A GUARDIAN
         TO ENSURE ENFORCEMENT OF THE JUDGMENT**

As a matter of law, pursuant to 18 U.S.C. § 3523, Plaintiffs are entitled to a court-

appointed guardian to assist them in enforcing this Court's Judgment against Townley.  There is

no genuine issue as to any material fact that (A) Plaintiffs hold a Default Judgment against

Townley in the U.S. District Court for the District of Columbia for $7,259,700; and (B) the

Attorney General has declined to disclose Townley's current location and identity to Plaintiffs.

Defendants are unable to provide evidence that sufficiently raises doubt as to either element.

Therefore, Plaintiffs are entitled to a summary judgment granting a guardian as a matter of law.

The Attorney General failed to meet his obligation to facilitate Townley's compliance

with the Judgment without additional litigation.  As required by 18 U.S.C. § 3523, Plaintiffs first

sought the assistance of the Attorney General in collecting their Judgment from Townley.  On

February 2, 2007, Plaintiffs wrote to the Attorney General, asking him to fulfill his legal

obligations by 1) determining whether Townley had made reasonable efforts to comply with the

Judgment; and 2) urging Townley to comply with the Judgment.  Ex. C.  Plaintiffs also requested

that if the Attorney General determined that Townley had not made reasonable efforts to comply

with the Judgment, the Attorney General disclose Townley's current identity and location to Plaintiffs for the sole and exclusive purpose of enforcing their legal rights, as permitted by 18 U.S.C. § 3523(a). *Id.*

The Attorney General failed to respond to Plaintiffs' appeal for assistance under the law. On April 12, 2007, Plaintiffs sent a second letter requesting the Attorney General's assistance in enforcing the Judgment against Townley and emphasizing that they preferred to reach an agreement on the matter rather than litigate. Ex. D. The Attorney General again failed to answer whether he had determined that Townley had made reasonable efforts to comply with the Judgment, and also failed to disclose Townley's current location and identity.

The Attorney General's disregard for his legal obligations under 18 U.S.C. § 3523(a) forced Plaintiffs to bring the current action, to which they are entitled under 18 U.S.C. § 3523(b)(1). Plaintiffs filed their complaint on June 1, 2007, within 120 days of their initial February 2 letter as prescribed by 18 U.S.C. § 3523(b)(1). Complaint, *González-Vera. v. Townley*, Civil Action No. 1:07CV00995 (HHK) (June 1, 2007). Pursuant to 18 U.S.C. § 3523(b)(2), Plaintiffs notified the Attorney General of their action by naming him as a defendant on the complaint. *Id.* Service on the Attorney General was effective on June 19, 2007. Exhibit H, Confirmation of Service of Plaintiffs' First Amended Complaint on Defendant Attorney General (June 19, 2007). The Attorney General was then required to appear in this action and to 1) confirm whether Townley is a protected person; and 2) confirm that Plaintiffs requested Townley's identity and location for the purpose of enforcing the Judgment. 18 U.S.C. § 3523(b)(2). In spite of these obligations, the Attorney General has not yet responded.

Plaintiffs have undisputedly met the two 18 U.S.C. § 3523(3) requirements that compel this Court to appoint a guardian to enforce the Judgment against Townley. First, the Plaintiffs

hold a valid Judgment against Townley, entered by the U.S. District Court for the District of Columbia. Ex. A. Second, the Attorney General has failed to disclose Townley's current identity and location. There is no genuine issue as to any material fact on either point and Plaintiffs are entitled to a guardian as a matter of law. The Court should enter summary judgment for the Plaintiffs and grant a hearing in order to appoint a guardian. Plaintiffs this day have also filed a Motion for Pretrial Conference to discuss qualifications and candidates for the Court's consideration in appointing a guardian. Plaintiffs' counsel has already met with government counsel and provided the government with the names of two individuals who are well-qualified to serve as a guardian,[9] in an effort to achieve resolution in this matter.

## II.    JUSTICE WILL NOT BE SERVED WITHOUT A GUARDIAN TO ENFORCE PLAINTIFFS' JUDGMENT

In the absence of a court-appointed guardian, Plaintiffs are without a means of enforcing the Judgment against Townley, and thus without an effective remedy for the wrongs he inflicted. Justice requires the Court to appoint a guardian to enforce the Plaintiffs' Judgment. The U.S. District Court for the District of Columbia awarded Plaintiffs the Judgment when Townley failed to respond to claims that he collaborated in the torture and death of Carmelo Soria Espinoza in violation of international, domestic, and Chilean law. Ex. A. Townley defaulted in spite of being properly served. Exhibit I, Affidavit, signed by Kearn J. Knowles (Sept. 30, 2004) (confirming service of summons on Defendant Townley, in *González-Vera v. Kissinger*, Civil Action No. 1:02CV02240 (HHK)). Moreover, he has confessed his complicity in the acts upon which the initial action is based. Ex. G. at 254, 261. This Court awarded a Judgment to Plaintiffs on November 23, 2005. Ex. A. Nearly two years later, Townley continues to ignore judicial authority and Plaintiffs remain without compensation for their suffering.

---

[9] *See supra* note 2 for description of potential guardians put forth by Plaintiffs' counsel.

Congress expressly intended for persons in the Witness Security Program to meet their legal obligations and comply with any judgments against them. Plaintiffs reasonably believe that Townley has the financial capacity to pay, at least in part, the Judgment against him. However, this case necessitates a guardian to conduct an in-depth, credible assessment of Townley's assets and ensure that he complies with the Judgment to the fullest extent that he is capable. Anything short of a thorough debtors examination and Townley making payments on the Judgment would seriously undermine Congressional intent, and indeed the authority of this Court, and also leave Plaintiffs without any effective remedy.

## A. ALLOWING TOWNLEY'S PROTECTED STATUS TO IMMUNIZE HIM FROM A CIVIL JUDGMENT VIOLATES EXPRESS CONGRESSIONAL INTENT

Congress never intended for the WSP to shield protected persons from civil judgments against them. When Townley entered the WSP in 1978, enrollees were required to sign a Memorandum of Understanding (MOU) with the Justice department. The MOU explicitly stated that the U.S. Marshals Service "WILL NOT SHIELD witnesses from civil or criminal litigation initiated prior to or subsequent to entry in the Program." (Emphasis in original). MOU *reprinted in Witness Protection Program: Hearings Before the Subcomm. on Administrative Practice and Procedure of the S. Judiciary Comm.*, 95th Cong., 2d Sess. 233 (1978) (hereinafter 1978 Hearings). Further, "[a]ll court orders which are directed to the witness must be immediately brought to the attention of the ... Marshals Service." *Id.* at 237. The MOU included a form for the witness to list existing court orders against them and designate a named party to receive service of process on their behalf. *Id.* at 245. These provisions indicate that, even before 1984, Congress and the U.S. Marshals Service were committed to ensuring that protected individuals did not live beyond the reach of the judicial system, but instead complied with their legal obligations and any judgments against them. Given that Townley entered the WSP in 1978, he

would have also been required to sign an MOU that, per the terms of his protection, required him to comply with any judgments and/or debts against him.

The Witness Security Reform Act of 1984 (hereinafter 1984 Act) codified the MOU requirement and charged the Attorney General with ensuring that protected individuals complied with legal obligations and civil judgments against them.  The Act, codified at 18 U.S.C. § 3523(d)(1), states:

> Before providing protection to any person under this chapter, the Attorney General shall enter into a memorandum of understanding with that person. Each such memorandum of understanding shall set forth the responsibilities of that person, including-- ...(D) the agreement of the person to *comply with legal obligations and civil judgments against that person*. (Emphasis added).

In adopting the 1984 Act, the House of Representatives explicitly sought to protect persons such as Plaintiffs in this action.  Its Report addressing the 1984 Act highlights the "vexing problem of a citizen who has a civil cause of action against a protected person who is stymied in his efforts to litigate because he cannot learn his new identity or whereabouts of the potential defendant." H.R. Rep. No. 98-1030, 98th Cong., 2d Sess. *reprinted in U.S. Code Cong. & Ad. News*, 3182, 3549 (1984) (emphasis added).  The Report continues, "*[i]t is not the intent* of the witness relocation and protection program *to deprive otherwise innocent persons of their right to litigate civil claims for damages*; however, a balance must be struck to ensure protection of the witness. Subsection (c) [later codified as 18 U.S.C. § 3523(b)] seeks to strike such a balance." *Id.*  18 U.S.C. § 3523(b) achieves this balance by guaranteeing plaintiffs a guardian after the Attorney General has refused to help enforce a judgment against a protected person.  The guardian's duty is to proceed with all reasonable diligence and dispatch to enforce plaintiffs' rights under the judgment while maximizing, to the extent practicable, the safety and security of the protected person.  18 U.S.C. § 3523(4).  Upon order of this Court, the Attorney General is required to

disclose Townley's current location and identity to the guardian in order to assist the guardian in carrying out this duty.  18 U.S.C. § 3523(3).

Congressional intent to hold WSP participants responsible for their legal obligations is also manifest in provisions directly addressing family support payments.  Under 18 U.S.C. § 3521 (b)(1)(d), the Attorney General may provide a protected individual with payments to meet basic living expenses.  18 U.S.C. § 3521(b)(2) mandates that deductions *shall* be made to any such funds to satisfy a protected person's family support obligations pursuant to a State court order. (Emphasis added).  Any payment Townley currently receives could be similarly garnished to meet his court-ordered financial obligations to the Plaintiffs.

The Court must not deprive Plaintiffs of their right to civil damages.  In accordance with Congressional intent, fundamental notions of justice, and Townley's express commitment upon entering the WSP, this Court should appoint a guardian to enforce the Judgment.

**B.  PLAINTIFFS HAVE A GOOD FAITH BASIS TO BELIEVE THAT TOWNLEY HAS ASSETS; A GUARDIAN IS NECESSARY TO BRING CREDIBILITY TO A FINANCIAL ASSESSMENT TO MAKE A FINAL DETERMINATION**

Plaintiffs have a good faith basis to believe that Townley has the means to pay at least part of the damages he owes.  There is also reason to doubt Townley's credibility in reporting his assets.  A guardian is required to conduct an in-depth investigation of Townley's finances, develop a complete and accurate report, and determine a fair and reasonable payment plan for Townley to compensate the victims of his crimes, per this Court's Judgment.

**1.  Townley likely possesses assets that would allow him to pay all or part of the Judgment against him**

Townley has a long history of money-making schemes.  As noted above, Townley has profited from fraudulent investment schemes.  *Chile Expelling an American Wanted by U.S. in Assassination Case, supra*, at A3.  He benefited from the political unrest in Chile by seizing real

estate from fleeing Chileans, *Dinges*, *supra*, at 102, and worked as a "civilian contract employee" for DINA for more than a decade. *Letelier*, 502 F. Supp. at 262. He was well compensated for this work, which took him around the world on missions of torture and assassination, and even received a mansion for his troubles. Ex. E at 134-35.

Townley continued to acquire money after his 1978 entry into the WSP. In 1993, he gave an interview to a Channel 7 Chilean National television reporter. Ex. E. The interview took 18 hours of continuous work, twelve camera teams, and forty video tapes, and Townley was likely well compensated for the time he took to share his sordid past. *Id.* at 119. If Townley had invested even a minimal amount of his 1974 funds, he would have considerable gains by 2007.[10] A guardian is necessary to conduct an investigation into such possible assets and profits and create an accurate picture of Townley's overall financial holdings.

Other aspects of Townley's life indicate that he has access to financial resources. As noted above, Townley retained expensive private counsel at Dickstein Shapiro for his defense in the Letelier case, and the firm continues to represent him. *See* Ex. B. As reported in the 1978 Hearings, the MOU governing when Townley entered the program specified that "[w]itnesses may appoint private counsel to settle debts on their behalf. Payment of private counsel is the sole responsibility of the witness, and the U.S. Marshals Service assumes no responsibility for payment of private counsel." 1978 Hearings at 236. Moreover, 18 U.S.C. § 3521 governs what the Attorney General may offer protected individuals and contains no provision for private counsel fees. Given that Townley currently retains Dickstein Shapiro as his private legal counsel and that the U.S. Marshal Service does not assist with private legal expenses, Townley likely has a source of income with which to pay his legal fees.

---

[10] *See supra* note 4 for a sample calculation.

### 2. Townley's demonstrated lack of credibility necessitates a guardian for an accurate assessment of his assets

Plaintiffs have good faith reason to doubt Townley's credibility in reporting his assets. He has a history of dishonesty and a guardian will bring credibility to the financial evaluation. As laid out above, Townley has fraudulently obtained passports and other documents using false identification. Ex. E at 142. Furthermore, Townley has demonstrated repeated disregard for human life and dignity. In addition to admitting to the murders of Mr. Letelier and Mrs. Moffitt, *id.*, Townley has confessed to attempting to assassinate numerous others in Chile and around the world, *id.* at 135, 138-39. For years, he secretly created the deadly poison Sarin in his home laboratory. Ex. G at 261. He also allowed the DINA to use his home in Lo Curro, Chile, as a house of torture. Ex. E at 141-42. Townley's flagrant cruelty and contempt for the value of human life casts doubt on his credibility in reporting assets to fulfill Plaintiffs' Judgment. A guardian will bring integrity to the financial evaluation and restore Plaintiffs' dignity by ensuring their compensation for Townley's complicity in the torture and death of Carmelo Soria Espinoza.

### 3. Townley's demonstrated contempt for the judicial system necessitates a guardian to ensure his compliance with Plaintiffs' Judgment against him

Townley has a history of flagrant disregard for the judicial system, including evading court summons, charges, and judgments. In response to a subpoena and arrest warrant issued by the Santiago Criminal Court in Chile, Townley fled to Miami. *Dinges*, *supra*, at 97. While in the United States, Townley continued to ignore judicial authority. When Mr. Letelier's widow brought a civil suit against him, Townley ignored it and defaulted. *Letelier*, 502 F. Supp. at 261. In the underlying action, Plaintiff González-Vera sought justice for the torture and death of Carmelo Soria Espinoza. Townley again ignored the judicial process and defaulted. Ex. A. A

guardian is needed to hold Townley accountable for his actions and protect judicial authority and the integrity of the WSP.

## PLAINTIFFS' RIGHT TO SEEK FURTHER RELIEF

Plaintiffs reserve the right to seek further relief depending on the findings of the guardian or information obtained in discovery and/or as the Court deems just and necessary. Pursuant to Rule 69-I, a judgment creditor may engage in all discovery procedures authorized by Rules 26-37. Fed. R. Civ. P. 69. Plaintiffs also reserve the right to compel discovery and disclosure of the assets of a non-party if it is determined to be appropriate. *Falicia v. Advanced Tenant Services, Inc.*, 235 F.R.D. 5, 8-9 (D.D.C. 2006) (discovery is permissible when the parties are closely related and a "reasonable doubt" has been raised concerning "the good faith of the transfer" of assets between the two). Depending on the results yielded by this process, Plaintiffs may seek a writ of attachment, or in the event they find a third party owing money to Townley, a writ of execution or a writ of garnishment. *See Heller Healthcare Finance, Inc. v. Columbia Hospital for Women Medical Center, Inc.,* No. 02-1857, 2004 WL 2451407 (D.D.C. 2004).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Summary Judgment and enter the attached proposed Order pursuant to LCvR 7(c), providing for a conference to nominate and appoint a guardian, and establish procedures for receiving and disclosing the guardian's report.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LAURA GONZÁLEZ-VERA, et al., ) | |
| ) | Civil Action |
| Plaintiffs, ) | Case No.  1:07-CV-995 (HHK) |
| v. ) | |
| ) | |
| MICHAEL VERNON TOWNLEY, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

**PLAINTIFFS' STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE DISPUTE**

Pursuant to Federal Rule of Civil Procedure 56, and Local Civil Rules 7.1(h) and 56.1, Plaintiffs, Laura González-Vera, et al., respectfully submit the following statement of material facts as to which there is no genuine issue:

1.   Defendant Townley is a former agent of the Direccíon Nacional de Inteligencia ("DINA"),  the Chilean government's intelligence branch under General Augusto Pinochet Ugarte.  *See Letelier v. Republic of Chile*, 488 F. Supp. 665, 666, 666 n.1 (D.D.C. 1980).

2.   Defendant Townley entered the Witness Security Program in or about 1978, as part of an agreement to testify against his co-conspirators in the assassination of former Chilean Foreign Minister Orlando Letelier and his assistant, Ronni Moffitt, in Washington, D.C., on September 21, 1976.  *Letelier*, 488 F. Supp. at 666 n.1.

3.   On November 13, 2002, Plaintiffs sued Defendant Townley and others for complicity in the torturing and killing of numerous people, including Carmelo Soria.  *See* Complaint, *González-Vera v. Kissinger*, 127 S.Ct. 1356 (2007) (Civil Action No. 1:02CV02240).

4.   Due to his status as a Witness Security Program participant, Defendant Townley was served a copy of the *González-Vera* Complaint through the U.S. Marshals Service on Jan. 9,

2003.  Exhibit I, Affidavit, signed by Kearn J. Knowles (Sept. 30, 2004) (confirming service of summons on Defendant Townley, in *González-Vera v. Kissinger*, Civil Action No. 1:02CV02240 (HHK)).

5.  In spite of being represented by counsel and having been served with process, Defendant Townley defaulted.  Default was entered August 29, 2003.  A copy of the Declaration of Default is attached and by this reference incorporated herein.  Exhibit J.

6.  On November 23, 2005, Judge Henry H. Kennedy, Jr., of this Court, awarded Plaintiffs a Default Judgment against Defendant Townley.  A copy of that Judgment is attached and by this reference incorporated herein.  Exhibit A.

7.  On February 2, 2007, Plaintiffs attempted to utilize 18 U.S.C. § 3523 to enforce the Default Judgment and sent a letter to the Attorney General, referencing his statutory obligation to aid in locating Defendant Townley and collecting the Judgment.  A copy of the letter is attached and by this reference incorporated herein.  Exhibit C.

8.  After not receiving any response, Plaintiffs sent a second letter to the Attorney General on April 12, 2007, a copy of which is attached and by this reference incorporated herein. Exhibit D.  Plaintiffs' counsel followed up with several telephone calls to senior Department of Justice officials to inquire as to the status of their request.


Dated this 12th day of September, 2007.          Respectfully Submitted,

                                                 /s/ Ali A. Beydoun_____
                                                 Ali Beydoun
                                                 D.C. Bar No. 475413
                                                 Michael E. Tigar
                                                 D.C. Bar No. 103762
                                                 Attorneys for Plaintiffs
                                                 4801 Massachusetts Ave, NW, Suite 206(c)
                                                 Washington, D.C.  20016
                                                 202-274-4088

## <u>CERTIFICATE OF SERVICE</u>

       I HEREBY CERTIFY that a copy of the foregoing was served electronically, this 12th day of September, 2007 to:

Lisa Ann Olson
Attorney for Government Defendants
U.S. Department of Justice
20 Massachusetts Ave, NW
Room 7300
Washington, D.C.  20530

The following party was served via the U.S. Postal Service, prepaid first class, to:

Michael Vernon Townley
Witness Security Program
c/o U.S. Marshal: Donald W. Horton
U.S. Courthouse
330 Constitution Ave., NW Rm. 1103
Washington, D.C.  20001


Dated this 12th day of September, 2007.       Respectfully Submitted,



       /s/ Ali A. Beydoun_____
       Ali Beydoun
       D.C. Bar No. 475413
       Michael E. Tigar
       D.C. Bar No. 103762
       Attorneys for Plaintiffs
       4801 Massachusetts Ave, NW, Suite 206(c)
       Washington, D.C.  20016
       202-274-4088

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

LAURA GONZÁLEZ-VERA, et al.,   )

                                )           Civil Action

            Plaintiffs,     )           Case No.  1:07-CV-995 (HHK)

           v.               )

                                )

MICHAEL VERNON TOWNLEY, et al.,  )

                                )

           Defendants.    )

_____)

## <u>ORDER</u>

The Court has considered Plaintiffs' Motion for Summary Judgment and associated documents, and finds as follows:

1.  Based on the Department of Justice's communications with counsel for Plaintiffs, Defendant Michael Vernon Townley remains in the Witness Security Program.

2. Plaintiffs hold a Judgment against Defendant Michael Vernon Townley issued by this Court.

3.  Defendant Attorney General has declined to disclose Defendant Michael Vernon Townley's current identity and location.

Therefore, the Court hereby

GRANTS Plaintiffs' Motion for Summary Judgment to the extent set forth in this ORDER;

ORDERS a conference to appoint a guardian to act on behalf of Plaintiffs to enforce the Judgment;

ORDERS Plaintiffs to submit, under seal, the names and qualifications of proposed guardians to the Court;

ORDERS the Clerk to furnish the appointed guardian with a copy of the Order of Appointment;

ORDERS the Attorney General to disclose to the guardian the current identity and location of Michael Vernon Townley and any other information necessary to enable the guardian to carry out his or her duties under 18 U.S.C. § 3523;

ORDERS  Michael Vernon Townley to pay the costs which are normally charged to debtors in addition to any other costs which are incurred as a result of this action having been brought under 18 U.S.C. § 3523, including but not limited to compensation to the guardian, or, in the alternative, ENTERS JUDGMENT against the United States for costs and fees reasonably incurred as a result of this action having been brought under 18 U.S.C. § 3523, including but not limited to compensation to the guardian.


Dated this _____ day of _____, 2007.    _____
                                              The Honorable Judge Henry H. Kennedy, Jr.
                                              UNITED STATES DISTRICT JUDGE

Default Judgment, *González-Vera, et al. v. Kissinger et al.*,
Civil Action No. 1:02CV02240 (HHK) (Nov. 23, 2005).

# Exhibit A

to Memorandum of Points and Authorities and Statement Of
Material Facts As To Which There Is No Genuine Dispute
in Support of Plaintiffs' and Motion for Summary Judgment

in
*González-Vera, et al. v. Kissinger, et al.*
Civil Action Case No. 1:07CV00995 (HHK)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LAURA GONZALEZ-VERA, et al., |  |
| Plaintiffs, | LT1-5-2006116695-1 |
| v. | Civil Action 02-02240 (HHK) |
| HENRY ALFRED KISSINGER, et al., |  |
| Defendants. | LT2-0-0-2 |

## ORDER FOR DEFAULT JUDGMENT
## AGAINST DEFENDANT MICHAEL VERNON TOWNLEY

The court considered plaintiffs Carol Mitchell and Laura González-Vera's

application for entry of a default judgment against defendant Michael Vernon

Townley under Rule 55(b)(2) of the Federal Rules of Civil Procedure (#26). After

considering the papers submitted in connection with the application, the papers on

file in this action, and the authorities cited, the court finds as follows:

1. Default was entered against Defendant Michael Vernon Townley on

August 29, 2003.

2. Defendant Townley is not a minor, an incompetent person, or a current

member of the military service.

3. Defendant Townley did not appear in this action.

**ECF**
**DOCUMENT**
I hereby attest and certify that this is a printed copy
of a document which was electronically filed with the
United States District Court for the District of Columbia.
Date Filed: *11-23-05*
NANCY MAYER WHITTINGTON, CLERK
By: *Michael Darby 8-25-0*

4. Plaintiffs have established that defendant Townley is liable to plaintiffs

Aaron Lloyd and Laura González-Vera for damages in the amount of $7,259,700.



**THEREFORE, IT IS ORDERED** that:

1. Default judgment be entered against the defendant as follows:

$7,259.700 for damages.

2. This judgment shall bear interest at the judgment rate from the date of entry until paid.

3. All relief not expressly granted is denied.

Dated this 23rd day of November, 2005.

Henry H. Kennedy, Jr.
United States District Judge

Doc# 2006116695 Fees:$26.50
06/25/2006    10:41AM Pages 2
Filed & Recorded in Official Records of
WASH DC RECORDER OF DEEDS LARRY TODD

$    20.00
$    6.50

RECORDING
SURCHARGE

2

Email from Jeff Johnson, Defendant Townley's counsel at Dickstein Shapiro, to Erin L. Palmer for Plaintiff, (Sept. 12, 2006).

# Exhibit B

to Memorandum of Points and Authorities
in Support of Plaintiffs' Motion for Summary Judgment

in
*González-Vera, et al. v. Kissinger, et al.*
Civil Action Case No. 1:07CV00995 (HHK)

# FW: Michael Townley

**Erin Palmer <erinlouisepalmer@hotmail.com>**            04 September 2007 14:09
To: strunke@gmail.com
Cc: castillovj@aol.com


Erin Louise Palmer
erinlouisepalmer@hotmail.com


>From: "Johnson, Jeff" <JohnsonJ@dicksteinshapiro.com>
>To: erinlouisepalmer@hotmail.com
>CC: "castillovj@aol.com " <IMCEAMAILTO-castillovj+40aol+2Ecom@dsmo.local>
>Subject: Michael Townley
>Date: Tue, 12 Sep 2006 10:25:38 -0400
>
>Dear Ms. Palmer:
>
>I am responding to Ms. Castillo's email to my partner, Barry Levine.
>Please be advised that neither Mr. Levine nor anyone else in this firm
>entered an appearance for Mr. Townley in connnection with the case
>brought against Henry Kissinger, et.al.   That should be understood in
>light of the fact that you took a default judgment.  As you may know,
>Mr. Townley entered the U.S. Marshall's Service's Witness Protection
>Program many years ago.  Therefore, it is not appropriate for you to
>simply demand a debtor's examination.  As you may also be aware, Mr.
>Townley provided multiple affidavits to Mr. Tigar's firm in connection
>with the civil judgment entered against him in the case of Letelier, et.
>al. v. The Republic of Chile, et. al.  Several years later an
>independent examiner appointed by the court  also provided a full report
>to Mr. Tigar's firm.  All of these exercises demonstrated that Mr.
>Townley has no means to satisfy any judgment, never mind the
>multi-million dollar default judgment which you have apparently
>obtained.  If you are not familiar with these facts please consult with
>Mr. Tigar.  Therefore, apart from confirming that Mr. Townley has not
>recently won the lottery or otherwise inherited some fortune, we can see
>little point (and a security risk for Mr. Townley) in your request for a
>debtor's examination.  We would be willingly to arrange for Mr. Townley
>to respond to written questions that are directed to updating the
>information previously provided.  As in the past, that response would be
>by affidavit.  If this approach is of interest please advise.
>
>Jeff Johnson
>
>Please note my new contact information:
>
>Dickstein Shapiro LLP
>1825 Eye Street, N.W.
>Washington, D.C. 20006

>(202) 420-2201 (fax)
>johnsonj@dicksteinshapiro.com
>
>
>-------------------------------------------------------
>This e-mail message and any attached files are confidential and are
>intended solely for the use of the addressee(s) named above. This
>communication may contain material protected by attorney-client, work
>product, or other privileges. If you are not the intended recipient or
>person responsible for delivering this confidential communication to the
>intended recipient, you have received this communication in error, and any
>review, use, dissemination, forwarding, printing, copying, or other
>distribution of this e-mail message and any attached files is strictly
>prohibited. Dickstein Shapiro reserves the right to monitor any
>communication that is created, received, or sent on its network.  If you
>have received this confidential communication in error, please notify the
>sender immediately by reply e-mail message and permanently delete the
>original message.
>
>To reply to our email administrator directly, send an email to
>postmaster@dicksteinshapiro.com
>
>Dickstein Shapiro LLP
>http://www.DicksteinShapiro.com
>==============================================================================

_____

Kick back and relax with hot games and cool activities at the Messenger
Café. http://www.cafemessenger.com?ocid=TXT_TAGHM_SeptHMtagline1

Letter from Plaintiffs' Counsel to
Defendant Attorney General (Feb. 2, 2007).

# Exhibit C

and to Memorandum of Points and Authorities and Statement Of
Material Facts As To Which There Is No Genuine Dispute
in Support of Plaintiffs' Motion for Summary Judgment

in

*González-Vera, et al. v. Kissinger, et al.*
Civil Action Case No. 1:07CV00995 (HHK)

# AMERICAN UNIVERSITY

### W A S H I N G T O N, D C

February 2, 2007

The Honorable Alberto Gonzales
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

> RE: Request for enforcement of default judgment against Defendant Michael Vernon Townley, in the case of *Gonzalez-Vera v. Kissinger et al.*, issued on November 23, 2005

Dear Attorney General Gonzales:

I am writing in regard to enforcement of a default judgment in the amount of $7,259,700 issued by Judge Kennedy of the United States District Court for the District of Columbia on November 23, 2005. According to an affidavit from Kearn J. Knowles, the Chief of the Witness Security Program, Defendant Michael Vernon Townley was served with a Civil Summons in the case of *Gonzalez-Vera v. Kissinger et al.* on January 9, 2003. I am writing to inquire whether Defendant Townley remains in the witness protection program. If the Attorney General's office confirms that the Defendant remains a protected person, I formally request assistance in enforcing this judgment pursuant to 18 U.S.C. § 3523.

Section 3523 governs the enforcement of civil judgments against protected persons to whom the Attorney General served notice of process. Section 3523(a) states in pertinent part:

> "If a judgment in such action is entered against that person the Attorney General *shall* determine whether the person has made reasonable efforts to comply with the judgment. The Attorney General *shall* take appropriate steps to urge the person to comply with the judgment. If the Attorney General determines that the person has not made reasonable efforts to comply with the judgment, the Attorney General *may*, after considering the danger to the person and upon request of the person holding the judgment disclose the identity and location of the person to the plaintiff entitled to recovery pursuant to the judgment." (emphasis added).

In accordance with the above language, I respectfully request the following:

1.)    That the Attorney General investigate and determine whether Defendant Townley has made reasonable efforts to comply with the judgment.

# AMERICAN UNIVERSITY

W A S H I N G T O N ,  D C

2.)    If Defendant Townley has not made reasonable efforts to comply with the judgment, that the Attorney General take appropriate steps to urge Defendant Townley to do so.

3.)    If it is determined that Defendant Townley has not made reasonable efforts to comply with the judgment, that the Attorney General disclose the identity and location of Defendant Townley to Plaintiffs' counsel. Disclosure would be for the sole and exclusive purpose of enforcing the Plaintiffs' legal rights against the Defendant.

Should the Attorney General deny disclosure of the current identity and location of the protected person, section 3523(b) directs persons in my position to bring an action against the protected person in U.S. District Court within 120 days. I would prefer to confer with whomever is responsible for executing the inquiry to work out an agreed solution rather than litigating the issue. I respectfully request the responsible person with authority call me at their earliest convenience. Thank you for your assistance.

Regards,

*michael e tigar / ssb*

Michael E. Tigar
Attorney for Plaintiffs
DC Bar No. 103762
Professor of Law
UNROW Clinic/ Washington College of Law
4801 Massachusetts Avenue, N.W.
Suite 206(c)
Washington, D.C. 20016

Enclosures
cc:    Jeff Johnson, Partner
        Dickstein Shapiro LLP

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

LAURA GONZALEZ-VERA, et al.,

Plaintiffs,

v.

HENRY ALFRED KISSINGER, et al.,

Defendants.



LT1-5-2005116695-1

Civil Action 02-02240 (HHK)



LT2-0-0-2

## ORDER FOR DEFAULT JUDGMENT
## AGAINST DEFENDANT MICHAEL VERNON TOWNLEY

The court considered plaintiffs Carol Mitchell and Laura González-Vera's application for entry of a default judgment against defendant Michael Vernon Townley under Rule 55(b)(2) of the Federal Rules of Civil Procedure (#26). After considering the papers submitted in connection with the application, the papers on file in this action, and the authorities cited, the court finds as follows:

1. Default was entered against Defendant Michael Vernon Townley on August 29, 2003.

2. Defendant Townley is not a minor, an incompetent person, or a current member of the military service.

3. Defendant Townley did not appear in this action.

4. Plaintiffs have established that defendant Townley is liable to plaintiffs Aaron Lloyd and Laura González-Vera for damages in the amount of $7,259,700.

**ECF
DOCUMENT**

I hereby attest and certify that this is a printed copy
of a document which was electronically filed with the
United States District Court for the District of Columbia.
Date Filed: _11-23-05_
NANCY MAYER-WHITTINGTON, CLERK
By: _Michael Darby  8-25-06_



THEREFORE, IT IS ORDERED that:

1. Default judgment be entered against the defendant as follows:

$7,259.700 for damages.

2. This judgment shall bear interest at the judgment rate from the date of entry until paid.

3. All relief not expressly granted is denied.

Dated this 23rd day of November, 2005.

Henry H. Kennedy, Jr.
United States District Judge

Doc# 2006116695 Fees:$26.50
08/25/2006    10:41AM Pages 2
Filed & Recorded in Official Records of
WASH DC RECORDER OF DEEDS LARRY TODD

$                20.00
$                6.50

RECORDING
SURCHARGE

2

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

A F F I D A V I T

Laura Gonzalez-Vera et al.      )
                              )

VS                           )       DOCKET NUMBER

Henry A. Kissinger et al.      )

                              )       1:02CV02240

I, KEARN J. KNOWLES, of full age, being duly sworn
according to law, do depose and say that:

1) I am the Chief, Witness Security Program, United
States Marshals Service, U.S. Department of Justice, Washington,
D.C.

2) As Chief of the Witness Security Program, I am
responsible for the administration of the activities of the United
States Marshals Service in the U.S. Department of Justice Witness
Security Program.

3) To the best of my knowledge and belief, Michael Townley
was served with a Civil Summons and Complaint by a Deputy United
States Marshal on January 09, 2003, at 12:30 P.M.

KEARN J. KNOWLES

City/County of Arlington
Commonwealth/State of VIRGINIA
Sworn to and subscribed before me this 20th day
of February 2004. Witness my hand and official seal.
Notary Public

September 30, 2004
(Print your expiration date above)

Letter from Plaintiffs' Counsel
to Defendant Attorney General (Apr. 12, 2007).

# Exhibit D

to Memorandum of Points and Authorities
in Support of Plaintiffs' Motion for Summary Judgment

in
*González-Vera, et al. v. Kissinger, et al.*
Civil Action Case No. 1:07CV00995 (HHK)

# AMERICAN UNIVERSITY

W  A  S  H  I  N  G  T  O  N  ,   D  C

UNROW CLINIC

April 12, 2007

The Honorable Alberto Gonzales
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

      RE:  Request for enforcement of default judgment against Defendant Michael Vernon Townley in the case of *González-Vera v. Kissinger, et al.*, issued on November 23, 2005

Dear Attorney General Gonzales:

      As a follow up to my letter of February 2, 2007, I am informing the Attorney General's office that I seek to enforce a default judgment, in the amount of $7,259,700, issued by Judge Kennedy of the United States District Court for the District of Columbia.  Although the Department of Justice returned a certified mail receipt, I am still awaiting a timely response.

      If the Defendant remains a protected person, I again formally request assistance in enforcing this judgment pursuant to 18 U.S.C. § 3523.  According to our most recent information, an affidavit from Kearn J. Knowles, Chief of the Witness Security Program, Defendant Michael Vernon Townley was served with a Civil Summons in the case of *González-Vera v. Kissinger, et al.* in January 2003.  It is necessary that you respond to my previous inquiry and inform me whether Defendant Townley remains in the witness protection program.

      Section 3523 governs the enforcement of civil judgments against protected persons to whom the Attorney General served notice of process.  Section 3523(a) states in pertinent part:

      If a judgment in such action is entered against that person the Attorney General *shall* determine whether the person has made reasonable efforts to comply with the judgment.  The Attorney General *shall* take appropriate steps to urge the person to comply with the judgment.  If the Attorney General determines that the person has not made reasonable efforts to comply with the judgment, the Attorney General *may*, after considering the danger to the person and upon request of the person holding the judgment disclose the identity and location of the person to the plaintiff entitled to recovery pursuant to the judgment. (emphasis added).

In accordance with the above language, I again respectfully request the following:

1.  That the Attorney General investigate and determine whether Defendant Townley has made reasonable efforts to comply with the judgment.

WASHINGTON COLLEGE OF LAW

4801 MASSACHUSETTS AVENUE, NW   WASHINGTON, DC  20016

# AMERICAN UNIVERSITY

W A S H I N G T O N ,   D C

2. If Defendant Townley has not made reasonable efforts to comply with the judgment, that the Attorney General take appropriate steps to urge Defendant Townley to do so.

3. If Defendant Townley has not made reasonable efforts to comply with the judgment, that the Attorney General disclose the identity and location of Defendant Townley to Plaintiffs' counsel. Disclosure would be for the sole and exclusive purpose of enforcing Plaintiffs' legal rights against Defendant Townley.

Should the Attorney General deny disclosure of the current identity and location of the protected person, section 3523(b) directs persons in my position to bring an action against the protected person in U.S. District Court within 120 days of the request to the Attorney General. Pursuant to the statute, I am prepared to file a complaint in the United States District Court for the District of Columbia on June 1, 2007, so that my clients may execute their default judgment. If the Attorney General continues to fail to respond, I reserve the right to name him as a defendant under 28 U.S.C. § 1361. I would prefer to work out an agreed solution with whoever is responsible for executing the inquiry rather than litigating the issue. Again, I respectfully request the responsible person with authority call me at their earliest convenience. Your response is due by June 1, 2007.

Sincerely,

*michael e tigar / AdB*

Michael E. Tigar
Attorney for Plaintiffs
D.C. Bar No. 103762
Professor of Law
UNROW Clinic/ Washington College of Law
4801 Massachusetts Avenue, N.W.
Suite 206(c)
Washington, D.C. 20016
(202) 274- 4088

Enclosures
cc:   Mr. Jeffrey Johnson, Partner
      Dickstein Shapiro LLP

      Mr. George B. Walsh, U.S. Marshal
      United States Marshal Service

# AMERICAN UNIVERSITY

W A S H I N G T O N ,  D C

UNROW CLINIC

Mr. David Margolis, Associate Deputy Attorney General
United States Department of Justice

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LAURA GONZALEZ-VERA, et al.,

Plaintiffs,

v.

HENRY ALFRED KISSINGER, et al.,

Defendants.


LT1-5-2006116695-1

Civil Action 02-02240 (HHK)


LT2-0-0-2

## ORDER FOR DEFAULT JUDGMENT
## AGAINST DEFENDANT MICHAEL VERNON TOWNLEY

The court considered plaintiffs Carol Mitchell and Laura González-Vera's

application for entry of a default judgment against defendant Michael Vernon

Townley under Rule 55(b)(2) of the Federal Rules of Civil Procedure (#26). After

considering the papers submitted in connection with the application, the papers on

file in this action, and the authorities cited, the court finds as follows:

1. Default was entered against Defendant Michael Vernon Townley on

August 29, 2003.

2. Defendant Townley is not a minor, an incompetent person, or a current

member of the military service.

3. Defendant Townley did not appear in this action.

**ECF
DOCUMENT**
I hereby attest and certify that this is a printed copy
of a document which was electronically filed with the
United States District Court for the District of Columbia.
Date Filed: _11-23-05_
NANCY MAYER-WHITTINGTON, CLERK
By: _Michael Darby_ _8-25-0(_

4. Plaintiffs have established that defendant Townley is liable to plaintiffs

Aaron Lloyd and Laura González-Vera for damages in the amount of $7,259,700.



**THEREFORE, IT IS ORDERED** that:

1. Default judgment be entered against the defendant as follows:

$7,259.700 for damages.

2. This judgment shall bear interest at the judgment rate from the date of

entry until paid.

3. All relief not expressly granted is denied.

Dated this 23rd day of November, 2005.

Henry H. Kennedy, Jr.
United States District Judge

Doc# 2006116695 Fees:$26.50
08/25/2006   10:41AM Pages 2
Filed & Recorded in Official Records of
WASH DC RECORDER OF DEEDS LARRY TODD

                                          20.00
                                    $      6.50
                                    $
RECORDING
SURCHARGE

2

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

A F F I D A V I T

Laura Gonzalez-Vera et al.                )
                                          )
                                          )
                                          )
VS                                        )        DOCKET NUMBER
                                          )
Henry A. Kissinger et al.                 )
                                          )        1:02CV02240
                                          )

    I, KEARN J. KNOWLES, of full age, being duly sworn
according to law, do depose and say that:

    1) I am the Chief, Witness Security Program, United
States Marshals Service, U.S. Department of Justice, Washington,
D.C.

    2) As Chief of the Witness Security Program, I am
responsible for the administration of the activities of the United
States Marshals Service in the U.S. Department of Justice Witness
Security Program.

    3) To the best of my knowledge and belief, Michael Townley
was served with a Civil Summons and Complaint by a Deputy United
States Marshal on January 09, 2003, at 12:30 P.M.

_____
KEARN J. KNOWLES

City/County of ARlington
Commonwealth/State of VIRGINIA
Sworn to and subscribed before me this 7th day
of February 2003. Witness my hand and official seal.
Kaye M. Tinlic, Notary Public
September 30, 2004
(Print your expiration date above)

Transcript of Interview with Michael Vernon Townley,
Channel 7 Chilean National Television (Aug. 16. 1993).

# Exhibit E

to Memorandum of Points and Authorities
in Support of Plaintiffs' Motion for Summary Judgment

in
*González-Vera, et al. v. Kissinger, et al.*
Civil Action Case No. 1:07CV00995 (HHK)

# RECORD OF VIDEO TRANSCRIPT

At Santiago, on .............. in compliance with the order issued by the Honorable Supreme Court on page 2,520, we hereby proceed with the transcription of the video tape which is currently held by this court and which contains the interview given by MICHAEL TOWNLEY to the reporter for Channel 7 of National Television, Mr. Marcelo Araya E., and which was broadcast by said television channel on August 16 of nineteen ninety three years, as part of the "Special Report" program, broadcast by Mr. Juan Guillermo Vivados.

**MR. VIVADOS:** Good evening ladies and gentlemen, welcome to this exceptional edition of "Special Report", the confessions of a murderer, the interview to the former agent, who confessed to being guilty of the crime of ORLANDO LETELIER, North American MICHAEL TOWNLEY, this shall be the only topic which we will cover today, and which we will review together with the author of the report, journalist MARCELO ARAYA ESCOTORIN. Good evening, MARCELO, you have been the author of, we could say, one of the most important stories covered by the media, in the last years, in our country. Was it very difficult to get this witness account?

**MR. ARAYA:** Pretty difficult. Try to imagine that it is now fifteen years of silence from the main suspect in the LETELIER case, a decade and a half of silence from who was the author, the witness and accomplice of this series of events which will obviously go down as pages in Chilean history. For us, MICHAEL TOWNLEY has been a legendary man and many people were interested as he will never deliver a direct narration of what happened, yet we felt we had a journalistic obligation, an obligation which could not be denied and this is why we attempted the task.

**MR. VIVADOS:** And not only did you attempt it but you fully achieved it, you tried until you got it MARCELO and you did it in the purest style of "Special Report". We wish to use this opportunity to warn the public and specifically the media, both national and foreign, that this is an exclusive interview belonging to National Television and therefore, all of its distribution and exhibition rights are reserved, this means that this interview may not be reproduced in whole or part under penalty of law.

We stop now and will return to deliver this awaited journalistic document.

Eighteen continuous hours of work, twelve camera teams, 40 video tapes, this is what we could say it took for the taping of the sessions, yet to get MICHAEL TOWNLEY himself, must have taken great production work, and contacts, MARCELO.

**MR. ARAYA:** And more than that JUAN GUILLERMO, it took two years of intense work as you said, as truth be told, all this began as you said in 1991, when we needed to produce a good report on the LETELIER case and the only witness account which we were not able to get at the time was that of MICHAEL TOWNLEY himself, the doors had been closed to prevent accessing him. Nonetheless, the last thing one looses as the

119

saying goes, is patience, so we insisted, on an unbreachable position, and due to so much insistence, in November of last year we received a Fax from TOWNLEY himself, stating that he would confirm the possibility of giving this interview, through telephone contact.

**MR. VIVADOS:** Now this interview, the interview with MICHAEL TOWNLEY, has four segments, which we should warn our audience about, the first, will basically show the man and the attempts to get to him and the remaining three refer to the activities which the former agent carried out in our country. Let us get to know now this mythical character who has broken 15 years of loaded silence for "Special Report", through this first telephone contact.

**MR. TOWNLEY:** This is MIGUEL speaking, MICHAEL, from the United States, I would like to talk to you a bit more regarding the Fax which you sent to my attorneys office.

**MR. ARAYA:** MICHAEL TOWNLEY, the agent, the criminal, has decided to break his silence and invites Special Report to establish a new contact at some point in the State of Florida, in the United States. It is yet to be determined where this will take place and many security measures have been put in place in response to the fears of the former DINA agent. So many conditions undoubtedly increase the mythical image of the murderer of the former Chancellor ORLANDO LETELIER.

How much will he have changed in relation to the photographs through which we have known him? What answers will he give in response to our claim on his nefarious actions?

During 1991the same reporting team traveled to the United States in order to develop a complete report on the LETELIER case, months later in another "Special Report", Cuban JOSE DIONISIO SUAREZ was interviewed from the North American jail of Talahasee, who had been found guilty of having set off the bomb installed in the car of ORLANDO LETELIER.

And, naturally, the interview with MICHAEL TOWNLEY, became indispensable in order [to deliver to the Chilean public], a broader vision of the facts and their authors, for obvious reasons the mission was kept secret and no more than five people in Chile known of it, a mission in any case as intriguing as any of those of TOWNLEY's, although not half as lethal or insidious as those in which he participated.

The last time he left Chile, he left with his hands shackled. The former DINA agent was illegally expelled, by order of the Supreme Court.

Two FBI agents escorted him after meeting up with him at the Ecuatoriana Airplane resting on the landing strip of Santiago's "Merino Benitez" airport on that [fateful] Saturday, April 8, 1978.

120

After several negotiations between authorities from the Chilean Military Government, represented by then Minister of Government, GENERAL CESAR RAUL BENAVIDES, the Undersecretary ENRIQUE MONTERO M. and the legal advisor MIGUEL ALEX SCHWEITZER, and the Delegation of North American justice, both sides decided on the delivery of MICHAEL TOWNLEY.

We can summarize our journey to Florida as two days of travel and a third day of waiting, before we knew of the place, day and time of the much awaited meeting.

And in this way, on a February day of 1993, somewhere in the idyllic [State of] Florida, in the United States, birthplace of liberty and punishment, "Special Report" was establishing its first contact with enigmatic MICHAEL TOWNLEY. Security is what this former secret agent is most concerned with, and he demands meeting at high sea before delivering his truth.

Fourteen years have gone by since the Military Government delivered you to the FBI, you have been found guilty of murder, or better said, for conspiracy in a murder, you have had to be in jail in your country. With your new life, you might perhaps now forgotten your criminal past, however, at this moment you are giving us this interview, facing Chilean public opinion. What is your motive? Perhaps to re-live such so much guilt, [and ensuing] suffering which took place in our country due to your existence?

**MR. TOWNLEY:** This is a question which is not a question, it's a multiple question. What moves me to be here is the same thing which I told you in my letter by Fax before.

With everything that has taken place in these years, there are certain men, amongst them Mr. MANUEL CONTRERAS, who have eluded their sense of honor, their ego, their own vanity with that of the country as the nation, persons who have shielded themselves behind the honor of the institutions to which they belong or have belonged, people who have shielded themselves behind the name of their own country and who use the name of the institutions of the country to hide their guilt, their responsibilities, who have never been men enough to stand up and say, yes I did this, the country is not responsible for my acts, I am the one who did them.

I have done so during the trials here and I say, following the orders I received to cooperate in the investigation of the death of ORLANDO LETELIER, I declared myself guilty, I was in the United States, North American prisons, and at every moment, I have waited for GENERAL CONTRERAS, Mr. PEDRO ESPINOZA to take on their responsibilities and free the country, the national patrimony of the country, as the respectability of the nation does not belong to a hero, and say, sirs, it was us, and let the country move forward, it is now time that they answer all of the questions, the concerns.

**MR. ARAYA:** A questions which everybody has, and is due to the fact that you have become a sort of legend, is to ask who is MICHAEL TOWNLEY, you now have a new

121

identity and have lived with different identities, even before.

**MR. TOWNLEY:** I was taught to live with different identities, and this was done by *Unidad Popular* as a necessity in order to be able to return to Chile first, and then in the DINA because my work required it.

**MR. ARAYA:** But changing identities many times also represents carrying over value changes, cultural changes.

**MR. TOWNLEY:** But why does changing one's name have to change the values, the values do not change, the man is a piece of paper.

**MR. ARAYA:** But one reviews your history and you see a calm young man who on another day is an adult who is willing to kill.

**MR. TOWNLEY:** Every soldier in every war, has gone to war willing to kill. In the period of the years 1973, '74 and '75 the feeling within the Armed Forces, within the people who actively took a stance before ALLENDE's people, both the people on the left, as the people on the right or center, those who opposed it saw and saw themselves as enemies.

**MR. ARAYA:** But, you could have lived a tranquil life in the United States, yet, this *force majeure.*

**MR. TOWNLEY:** There were, there were, there were moments in the year 1972, in which I truly thought that this, not this, this is not good for the children, it is not good for me, we better take everything and leave the country. That was a possibility, and had we done it, there would have been no DINA, there would have been no MICHAEL TOWNLEY, as you put it, a "legend".

The fact that you or another consider me a legend makes me bow my head, it is a burden, I do not feel a legend, I feel a person who has committed terrible wrongs, I feel a person who.

**MR. ARAYA:** Criminal?

**MR. TOWNLEY:** I have done criminal things, but within the context of that time, it is what needed to be done, it is not an excuse, it is not a justification, but there were Chileans of the MIR, of ultra-left groups in Europe, purchasing guns, moving explosives, training to return to Chile to kill people.

This was a subversive war, it doesn't matter where it comes from, I belonged to what is now considered to be and what I now see in foresight as what could also be called a terrorist right wing group, which was not camouflaged, but covered with a mantle of legality, covered with an institutional mantle, formed by Officers from

122

different institutions, the Army, the Navy, Air Force, Investigations, Police, civilians, yet all of the people in the beginning, at the star, held extremely high ideals.

I will not say that there were not people who did not see the intelligence services, not only those who formerly belonged to the DINA, and other military intelligence services in the same way, there were people whose character was not well formed who liked to give pain to others, this happens, unfortunately it happens. And that it took place in Chile, it obviously took place in Chile.

**MR. ARAYA:** What attitude should we take before a man who has been able to plot murders, what to think of him who in the past, as he confesses, was a loyal agent of the most feared secret police in Chile, and is today willing to intimidate his Bosses, without any fear.

There is nothing that could have allowed us to foresee what end would befall this *gringo* born 50 years ago in the United States, who would later on become MICHAEL TOWNLEY. Nonetheless it did seem it was going to be violence. In 1957 his father, is destined to the furthest country in South America, to open a Ford automobile plant, in Casa Blanca.

Back then, MICHAEL TOWNLEY, was 14 years old, and was the oldest of 3 brothers, the family boarded to arrive in Valparaiso on April 7, 1957, when CARLOS IBAÑEZ OCAMPO concluded a stormy second stint in the government of Chile.

**MR. TOWNLEY:** The first thing I saw of Chile was the violence, when we came as a family from the United States we came by ship, the Santa Maria I think was the name of the ship, and during our trip my mom would read us the history of Chile, the country as a Republic, as a democratic republic, one of the greatest, one of the best in the history of South America.

And we arrived and the gates are opened about seven in the morning and the first thing I hear is gunshots, the thing got bigger and when this episode ended, I think from what they said back then, 200, 330, 400 people died.

**MR. ARAYA:** Despite the fact that his parents and siblings left the country, MICHAEL TOWNLEY settled down in Santiago, because he had acquired a romantic attachment, after dropping out of his studies. What followed was a passionate love affair between MICHAEL TOWNLEY and MARIANA CALLEJAS which led to their marriage on July 22, 1961.

MARIANA INES CALLEJAS, the last of five siblings, was born in Rapel, within the 6th Region, 10 years before her newfound North American soul mate was born.

123

Who was MARIANA CALLEJAS, for you, at this moment in time?

**MR. TOWNLEY:** A fascinating woman, a woman who had lived in Israel, who had, had lived in the United States, who had a broad mind, open, very well read.

**MR. ARAYA:** A cultural factor in Chilean society is that we are not used to a man marrying a woman older than him, than you.

**MR. TOWNLEY:** I would say that is your problem.

**MR. ARAYA:** That is, the men are used to giving the orders at home, what took place at the decision level, for instance.

**MR. TOWNLEY:** I think that in our life, between MARIANA and I, in almost everything that was a daily decision, the decisions were made by me, I wore the pans tin the family and there was no difference in that sense, regarding important decisions such as we are going to the United States and will be there for a couple of years, but we will come back to Chile, this was not a question of a decision, MARIANA was going to return to Chile, and that was final.

**MR. ARAYA:** The life of the TOWNLEY-CALLEJAS in Florida was that of relative normalcy, though not easy. In addition to MARIANA's three children the couple had two more, and to remain stable in a family with five children, in the United States, is no easy task.

**MR. TOWNLEY:** They never blamed you?

**MR. TOWNLEY:** There is no point in blaming, that they have been, they accept me, they can absolutely disagree with things I have done, things I have been involved with, but this leaves, hmm,,does not change the fact that for my parents I am their son, that for my children I am their father, and loving has nothing to do with agreeing or disagreeing with the facts.

**MR. ARAYA:** You think that because of this, you were not a criminal, that they did not see one in this man.

**MR. TOWNLEY:** This is something that you should ask them.

**MR. ARAYA:** What made these family values break down?

**MR. TOWNLEY:** Whether they think that I am a criminal or not, it is not my place to answer that.

**MR. ARAYA:** And 1970 arrived, and in Chile the presidential elections favored Marxist candidate SALVADOR ALLENDE.

124

**MR. TOWNLEY:** She returned with the children, shortly after the election, she left me there from the elections from which Mr. ALLENDE was elected, and we settled that I would stay behind to sell the house, move the things, change them and do whatever was necessary to return.

**MR. ARAYA:** You say that you were a tranquil man, a stranger to politics, however, you went and offered your services to the CIA, why, what did you expect, what was your purpose in all that.

**MR. TOWNLEY:** Let us suppose for a moment that you have a democratic upbringing that you have been forming in your head all of your youth and with a dread of communists, a fear of Marxism, of the hydrogen bomb and everything else.

And suddenly, they tell you, look you are going to go to a country where they just elected a Marxist government, communist, one of the big fears.

**MR. ARAYA:** And you offer to spy in that country?

**MR. TOWNLEY:** No, I did not offer to spy.

**MR. ARAYA:** What was the offer?

**MR. TOWNLEY:** In the year 1970, when I knew I would return to Chile, I opened the phone book, looked under CIA, bah?, there, they had a telephone number there, I picked up the phone, dialed and told the gentleman that I was returning to Chile, that my wife, my children were going to Chile, and as there was a Marxist government, governing in Chile at that time, I offered myself as a person if they needed to deliver documents, provide information, that if anyone needed a place to go, or be, I would be in Chile.

[They asked me] "Do you know where you'll be?" [I answered] "Look, at this time I don't know, but as every citizen I am required to register at the Embassy, at the Consulate, if you need to locate me, locate me there".

**MR. ARAYA:** Despite everything, in Chile, MICHAEL TOWNLEY tells us, he did not become involved with any political parties, and a year had to go by before the forces opposing the SALVADOR ALLENDE government could count the North American as a part of their ranks.

**MR. TOWNLEY:** In 1972, the tear gas bombs exploded everywhere, I saw an old man, a group of policemen, big guys hitting a poor old man who all he had done was to bang on a pot with a spoon, there near Providencia, near MANUEL MONTT, no sorry, further up, a bit further up from PEDRO DE VALDIVIA.

That was something that, [I felt like] I can't stay out of this and look on, I

125

live here, I have settled down in Chile, and I was being left behind, ... and it was time to, it was the time of the big events, as they say, the time was "now". I either oppose this or am neutral, [so] I decided that I should get started.

**MR. VIVADOS:** We have seen the first segment of this exclusive interview with MICHAEL TOWNLEY, carried out by journalist MARCELO ARAYA.

MARCELO, what was your first impression, when you met him, was it hard to go beyond the barrier of the unknown, of facing a character who has committed crimes.

**MR. ARAYA:** Well, I will once again go back to the history o how we built this news report of the LETELIER case, two years ago, in this opportunity we presented an interview with General MANUEL CONTRERAS, I personally went to the Military Hospital, in an interview that lasted approximately two hours, without a camera, in a confidential manner.

And I remember that he indicated that if I ever ran into TOWNLEY, I should be very careful as he was a dangerous man, he was a treacherous man, very disagreeable, and with that background I traveled to the United States, I went with JUAN CARLOS SEGOVIA, CRISTIAN MEDEL, the camera crew, in order to see if we were able to carry out our first attempt to contact him.

We received the telephone contact, the code name was FREDY, a person who was going to pick me up at the Hotel, there in Miami, the person arrived and he took me for about three or four hours through the Florida highways, until suddenly we stopped at a luxury hotel.

We went into the lobby and there was this person in disguise, he had gained weight and looked older, but was obviously him, MICHAEL TOWNLEY, the person who provoked so much fear, I thought for a moment I am before the most wanted, most dangerous man, but it the first moment I was met by someone whose actions did not answer at all to the things that had been said to me about MICHAEL TOWNLEY.

**MR. VIVADOS:** And from what we have been able to see, it is hard to reconcile the idea of a criminal with your interviewee up to this instant, MARCELO.

In the next stage, MICHAEL TOWNLEY will show us his first clandestine and conspiratorial steps in Chile's political life. A short break and we will be back.

**MR. VIVADOS:** MICHAEL TOWNLEY, the confessions of a murderer in this extraordinary edition of "Special Report". MARCELO, in this contact which you had with him, he accepts his condition, that incredible burden of knowing himself to be a criminal.

126

**MR. ARAYA:** And even if he did not see himself as a criminal, JUAN GUILLERMO, the important thing is to know, or understand that he carries a double burden, besides the moral one, the physical burden and we were able to see that in the different security measures that he undertook.

He asked us amongst other things not to set a date, not to set a place, but he also changed every two or three hours the place where we were to meet in order to carry out the interview.

Undoubtedly, he carries a great moral and physical burden as I was indicating, regarding the great fear of having committed crimes and today he lives in fear of revenge, which is as likely to come from one corner as another, but he lives with this.

**MR. VIVADOS:** Let us know then how TOWNLEY entered the DINA, and his first activities in our country.

**MR. ARAYA:** The break after the first part of the interview had taken about two hours, TOWNLEY is obsessed with security, and asks us for a new meeting place, a walk allows our camera crew to know the area and confirm that the world is indifferent and ignorant of our interview.

The former agent has provided for everything, and seeing that before 24 hours go by we must part, due to security reasons, he presumes that the next period of questions will be longer and without breaks.

MICHAEL TOWNLEY is worried, he insists that General CONTRERAS still has unconditional supporting staff that could give him a hard time given this interview, and is afraid to be recognized by one of the tyrants. For a moment he nervously shuffles with the pending period, and demands that we place ourselves in the context of the time, SALVADOR ALLENDE, the first Marxist who holds power through free elections.

But with only one third of the votes, there are two thirds who do not with his transformations, bit by bit chaos takes over the country and institutions undergo a crisis, a dearth of resources, unbridled inflation, unrest and violence he tells us, are what Chileans lived with then.

The return of MARIANA CALLEJAS, had taken place just one day before the murder of the Commander in Chief of the Army of Chile, RENE SCHENIDER, executed by an Ultra Right Commando on that October 22nd of 1970, after her arrival before that of her husband, she is immediately transferred to the resistance work against ALLENDE's government, she had made contact with young people from the resistance to ALLENDE's government, she had contacted young people from the Right Wing Movement PATRIA Y LIBERTAD, lead by attorney PABLO RODRIGUEZ.

127

He, returns to Chile on January 8, 1971.

**MR. TOWNLEY:** MARIANA became a member of PATRIA Y LIBERTAD, and I followed PATRIA Y LIBERTAD, but I am not a nazi and will never be one either.

**MR. ARAYA:** However, you worked with them.

**MR. TOWNLEY:** I worked with them, I worked with people from the DC, I worked with people from the Conservative Party, I worked with the National Party, with everyone.

**MR. ARAYA:** Amongst the most remembered missions of the TOWNLEY CALLEJAS couple, during the *Unidad Popular*, is signaling the broadcasting of Radio LIBERACION, and this was a radio transmitter installed in a Austin mini belonging to MICHAEL TOWNLEY, you both would go out driving in the streets of the Barrio Alto and every five minutes would broadcast anti-ALLENDE proclamations, interfering in the frequencies of the conventional radios.

**MR. TOWNLEY:** The radio was, it was given to me and I cannot honestly remember by whom.

**MR. ARAYA:** I can't believe that?

**MR. TOWNLEY:** No, I don't remember.

**MR. ARAYA:** ...

**MR. TOWNLEY:** I don't think that it came from PATRIA Y LIBERTAD. The radio itself did not work.

**MR. ARAYA:** MARIANA CALLEJAS was in charge of the formal aspects of the broadcast.

**MR. TOWNLEY:** We began at eight at night and ended at eight thirty, then we began again at nine till nine thirty.

**MR. ARAYA:** Five minutes?

**MR. TOWNLEY:** Five minutes of transmission. I remember once we were even hungry, and we stopped at a Chicken Stop and the broadcast was pre-recorded, on tape, and it was only a question of pressing a button and it would broadcast while we ate chicken, while we broadcast right there.

**MR. ARAYA:** The spaces included comments taken from the speeches of well known

politicians such as that of the now deceased Head of State EDUARDO FREI MONTALVA, or the work from famous journalists such as HERMOGENES PEREZ DE ARCE.

**MR. TOWNLEY:** I had no access to the information that PEREZ DE ARCE or other journalists had had. I told him, you have something, write something that you would want to come out on the radio, it isn't anything special, nothing out of this world, any other radio ham would have done exactly the same.

**MR. ARAYA:** Many people you may say, but only a few would think to do something which at bottom was crazy.

**MR. TOWNLEY:** But why crazy? You are a journalist, and today if they tell you, look everything you say today will be censored next month, you will say, you will speak, you will only comment on what we allow you to say, you would accept that.

**MR. ARAYA:** One of the moral myths that you held in your anti-communist fight, in your struggle against the Government of the *Unidad Popular*.

**MR. TOWNLEY:** Within the exceptional things that we had thought of doing was a huge sign of the *Unidad Popular*, at the top of the SAN CRISTOBAL hill, which all of Santiago saw, and we had the idea of exploding the bases so that it would fall and we went up there and studied it, and I looked at it from every angle, and I realized that there were couples who sat in benches underneath it, and that if we blew it there would be too much trouble of it falling on top of people, so we didn't do it.

**MR. ARAYA:** This was a bigger plan, let's say, were there smaller targets that you blew up?

**MR. TOWNLEY:** Not at the time of the *Unidad Popular*.

**MR. ARAYA:** But.

**MR. TOWNLEY:** I did not do things with explosives.

**MR. ARAYA:** You trained the young people at PATRIA Y LIBERTAD?

**MR. TOWNLEY:** Train?

**MR. ARAYA:** Muu, teach them tactics, use of weapons.

**MR. TOWNLEY:** No, not use of weapons, I had no weapons.

**MR. ARAYA:** Molotov?

129

**MR. TOWNLEY:** Molotov, yes, I manufactured Molotov, we manufactured the molotov's, we had them in a box and people would come get them.

**MR. ARAYA:** You don't think that was an immoral act?

**MR. TOWNLEY:** It was an act at the level of thousands and thousands of people in Chile, you don't remember the buses on fire, of the left and the right.

**MR. ARAYA:** At the beginning of 1973 the political, social and economic crisis in the country was becoming intolerable, the opposing media and particularly the radio broadcasting stations were continuously closed down, Channel Thirteen on television played a special role before the State media, which is why the audiovisual signal of its affiliate in Concepcion began to suffer from interceptions.

A commando belonging to PATRIA Y LIBERTAD tries to eliminate the interference and in the operation a painter, JORGE HENRIQUEZ GONZALEZ, dies from a lack of oxygen.

**MR. TOWNLEY:** I had detected the location, the place, we called a group of people from PATRIA Y LIBERTAD, in Santiago, they came, this is the place, there it is, and the intervention was made with a group of young people from PATRIA Y LIBERTAD.

**MR. ARAYA:** That is, you don't blame yourself for that murder?

**MR. TOWNLEY:** No.

**MR. ARAYA:** You do not accept the charges, because to this day this charge is held against you.

**MR. TOWNLEY:** No, I do not accept those charges.

**MR. ARAYA:** You were not involved in any way with that?

**MR. TOWNLEY:** I passed down the information, from where the intervention was coming, eh, the electronic one, I passed it onto the staff that the Catholic University, and to the Commando group, if you wish to call it that way, from PATRIA Y LIBERTAD.

**MR. ARAYA:** The entire TOWNLEY CALLEJAS family met in Miami once again, which is the time when you wished to strike a new beginning, yet, before 6 months had gone by, what you had waited and worked for, for so long, from your political perspective took place in Chile, the Military Coup.

**MR. TOWNLEY:** We went out to buy a bottle of champagne, we had some Chilean friends in Miami and we partied in the streets, half of Miami was out, and they were mostly Latin Americans at the time, they went out into the streets, there was, everybody,

they honked horns, it was happiness.

**MR. ARAYA:** The country was living a time of great tension after the military coup, the states of repression and the commands were the law.

The Government Junta, comprised of General AUGUSTO PINOCHET, Admiral JOSE TORIBIO MERINO and General GUSTAVO LEIGH, and the General Director CESAR MENDOZA, for the Police Force of Chile, constituted the top brass, the highest authority.

By then, the TOWNLEY CALLEJAS family had returned to Chile, MARIANA being the first to do so, according to the records of the international police, MICHAEL TOWNLEY, had never entered Chile, at least not in the dates he says he did, he already had fallen into the habit of using another identity.

TOWNLEY, it was now........... it does not exist anymore.

**MR. TOWNLEY:** Yes.

**MR. ARAYA:** ... ...

**MR. TOWNLEY:** Real person, very good person, I imagine he has been harmed enough by that act of friendship.

**MR. ARAYA:** He knows his name has been involved.

**MR. TOWNLEY:** If I'm not mistaken, I'm sure the FBI questioned him and all sorts of things, he is a very nice person, a good person, of whom I took advantage in order to return to Chile.

**MR. ARAYA:** On November 12, 1973, according to the statement of General (retired) MANUEL CONTRERAS, he took on the direction of the DINA, even though at that time he was only a Colonel, and he was not the titleholding Director.

This secret organization, centralized the intelligence operations of Chile over those of the armed institutions, even though these were directed by Officers who held higher ranks to that of CONRERAS SEPULVEDA.

The DINA was created by Law Decree 521 and had to answer to the Government Junta, at the beginning and later directly to General PINOCHET. At the beginning of 1974, the DINA was structuring its staff, according to TOWNLEY, without his knowledge, he was already known to one of the Officers of the DINA, Commander PEDRO ESPINOZA BRAVO, Intelligence Officer, who during *Unidad Popular* tried unsuccessfully to detect the installations of Radio LIBERACION.

131

When he heard of TOWNLEY as the person he had been searching for, and hearing of his return to Chile, he became interested in him, and contacted him directly at home.

**MR. TOWNLEY:** And that is how I met Commander ESPINOZA, and we later became friends, we talked, we spoke of his point of view during *Unidad Popular*, of our point of view during *Unidad Popular*, and after drinking a few pisco sours, and we had dinner at his house a couple of times, he and his wife came to ours two or three times for dinner, and we began to develop a friendship.

Commander ESPINOZA, him, I met in a completely different way, nothing to do with DINA, nothing to do, however, a social relationship which began to develop, back then around April, May of the year 1974.

**MR. ARAYA:** Why have you searched these three different dates? That is, you talk about November, August.

**MR. TOWNLEY:** One day I entered a more formal relationship in the DINA, in November, when it was already the beginning of December, to purchase electronic materials of electronic counter intelligence, equipment to detect hidden microphones, to radio transmitters hidden in an amplifier.

**MR. ARAYA:** Was the DINA in some way an economic improvement for you?

**MR. TOWNLEY:** The salaries that the DINA paid were never a luxury salary, nothing like it, this is even why my wife joined it, MARIANA.

**MR. ARAYA:** She also became a part of the DINA.

**MR. TOWNLEY:** Of course, so that there could be enough income to cover our minimum expenses.

**MR. ARAYA:** General MANUEL CONTRERAS says that you were a simple informant who needed to work under an agent.

**MR. TOWNLEY:** An informant is supposed to be a person who collects information, from the current work he is doing, he collects it and passes it on to the service.

**MR. ARAYA:** The DINA had a specific structure, and according to that General CONTRERAS states that you were not an agent of the DINA, because you did not have the credential that credited you as such.

**MR. TOWNLEY:** That is false, I did have it, my wife had it, I had it, my card was stolen from my house two days after I left illegally, expelled from Chile, my wife's card is now held by the FBI, it was introduced as evidence in the LETLIER case, and it was

provided to the Supreme Court during the extradition and the petition for the extradition of General CONTRERAS, around 1979, 1980.

It was also provided to the Court of Chile now, there are safe passes which are being presented as evidence in the case of Minister BAÑADOS, it is false.

**MR. ARAYA:** How were you assimilated within the DINA, and who was the person put in charge or command of you?

**MR. TOWNLEY:** At the beginning, in the first instance, my immediate boss was Commander and then Colonel ESPINOZA, Colonel ESPINOZA then passed me or assigned me, if you wish to say it that way, to then Major ITURRIAGA, EDUARDO ITURRIAGA NEUMANN.

**MR. ARAYA:** And what did he handle there?

**MR. TOWNLEY:** At that time, Commander ITURRIAGA was in charge of all the operations being carried out abroad, during my whole time or my entire career, if you wish to call it that, at the DINA, Commander ITURRIAGA was my direct superior.

**MR. ARAYA:** Under what circumstances did you meet General MANUEL CONTRERAS?

**MR. TOWNLEY:** I think that the first time I was introduced to him was at the General Headquarters, in the last floor upstairs and after the trip to the United States with the purchase of the elements of electronic counter intelligence.

**MR. ARAYA:** How did you gain his trust?

**MR. TOWNLEY:** How did I gain his trust?

**MR. ARAYA:** Yes.

**MR. TOWNLEY:** That is a question without an answer, no, its not that I never sought to gain his trust, I was assigned tasks, and I carried them out, and as any other Officer when Colonel CONTRERAS arrived, I would put my heels together, salute and await his orders.

**MR. ARAYA:** January of 1975, the personal situation of MICHAEL TOWNLEY is practically consolidated, the best evidence for it is the clear denial of the statements by General CONTRERAS, that the DINA should purchase a mansion home in Lo Curro, for the numerous family of agent WILSON and his most secret operations.

The Argentinean Justice Administration states that the knowledge in electronics and explosives that TOWNLEY had, had been demonstrated in the murder of

13

General CARLOS PRATS, and his wife, TOWNLEY rejects the idea of his participation in the crime, but he indicates that thanks to him, Colonel CONTRERAS was able to confirm his authority at the DINA, over that of his enemies.

WILSON, ENGER and TOWNLEY, as he used to be called back then, has never accepted the charge of the crime of Buenos Aires, to this day, he has accepted though that his life changed during the installation of his family in the big house at Lo Curro. That privilege lets say, which is not awarded to any other Officer, indicates there must have been a great deal of trust in him.

**MR. TOWNLEY:** Its just that you are taking it as if this, eh, he bought me a house, my idea was to have a group, an entity, a brigade which Colonel CONTRERAS could trust, under the command, if not direct, very close to him and directly under his control through Colonel ESPINOZA, through Mayor ITURRIAGA, Commander ITURRIAGA today, in which the normal internal hierarchy of the DINA did not intervene.

That is, a secret entity, under the control of and for the use of the Director.

**MR. ARAYA:** What is the PROSIM?

**MR. TOWNLEY:** PROSIM was a corporation which I created, eh, here in the United States first, and we equally incorporated it in Chile, as a façade.

**MR. ARAYA:** The house in Lo Curro was purchased under that name?

**MR. TOWNLEY:** Exactly, I purchased it through a legal corporation, a constituted company.

**MR. ARAYA:** The people who sign it are Messrs. CASTRO, CATAÑEDA and SHMIT WENS.

**MR. TOWNLEY:** MIGUEL CASTRO CASTAÑEDA, was the name on the plaque, or the work name for the DINA service.

**MR. ARAYA:** Of who?

**MR. TOWNLEY:** Of EDUARDO ITURRIAGA NEUMANN, he worked under that name and was also known as ELIAS.

**MR. ARAYA:** And Mr. Shmit Wens?

**MR. TOWNLEY:** That was ROLANDO ACUÑA, he was the attorney and legal representative for the DINA service.

**MR. ARAYA:** What other resources were assigned to you in this opportunity, vehicles,

134

staff?

**MR. TOWNLEY:** At the beginning there was a class, a police sergeant, I knew him under the name of ROBINSON, he was a man who held the complete trust of Colonel ESPINOZA, HECTOR, was an infantry corporal, ESTER, was a sergeant in the Army, and there were also employees from the Ministry of National Defense.

**MR. ARAYA:** It was all regular staff, not retired lets say.

**MR. TOWNLEY:** No, every person was in active service, within his or her branch.

**MR. ARAYA:** The situation of the house in Villa Naranja in Lo Curro, is now completely clear thanks to Minister ADOLFO BAÑADOS' interrogation of the former owner, MIGUEL VIDAURRE. [In this way] he was able to establish that this house was purchased according to a Title Deed dated June 6, 1975, by DIEGO CASTRO CASTAÑEDA and RODOLFO SHMIT WENS.

Likewise, the Minister indicted and confiscated dozens of checks signed by General MANUEL CONTRERAS, for the operations of DINA, and one of these checks paid for the house in which TOWNLEY and his family lived since the beginning of 1975.

To the extent that the interview continues, new situations present themselves, of which our interviewee fights not to provide any details. He lived one of these episodes with his wife, MARIANA CALLEJAS, and it concerned his mission to Mexico.

**MR. TOWNLEY:** We left around February of the year 1975.

**MR. ARAYA:** Who assigned you the trip?

**MR. TOWNLEY:** This was directly assigned to us in the offices of the Director of the service of the DINA.

**MR. ARAYA:** That is, General CONTRERAS asked you to travel.

**MR. TOWNLEY:** General CONTRERAS, at that time, ordered me to travel and gave me the money for the trip.

**MR. ARAYA:** What was the mission?

**MR. TOWNLEY:** The mission was to engage with the meeting of socialist parties in the city of Mexico and specifically to search the death or the murder of CARLOS ALTAMIRANO.

**MR. ARAYA:** To eliminate people, you were willing to accept this?

**MR. TOWNLEY:** I accepted it.

**MR. ARAYA:** You accepted it, why?

**MR. TOWNLEY:** I had become subordinate to the command of the Institution to which I dedicated my work, I would not know everything, my position was not to make a decision or to take a position on every order I received, but to do what was in my power to meet the missions that were assigned to me.

**MR. ARAYA:** And this decision was so simple, to take it on and become a criminal.

**MR. TOWNLEY:** I have accepted the definition of criminal, and I have confessed a crime. I do not consider myself a criminal.

**MR. ARAYA:** Within which value contexts did you accept this?

**MR. TOWNLEY:** That at that time I was in a war, and I was part of an armed force, which was fighting a war.

**MR. ARAYA:** First in Miami, then in New Jersey, the couple tries to establish a relation with a Cuban group, which specifically was the Nationalist Cuban Movement NNC, which was a new organization with terrorist characteristics, and little known.

All of its leading members ... JOSE DIONISIO SUAREZ, both interviewed by "Special Report", en previous years had already been in Chile. You arrived in Miami and contacted a person, who gave you this contact, who informed you that this person existed?

**MR. TOWNLEY:** Mr. PEDRO ESPINOZA, Mr. PEDRO ESPINOZA, he ordered me to contact with a Mr. CROATA, and Mr. CROATA suggested that I talk with Mr. FELIPE RIVERAS, who was the ideological head of the Cuban Nationalist Movement, who from the very start told us, I am not the person in the operational part, you would have to speak with GUILLERMO LOBO, I called him, I requested if he would be willing to see me, and if he is willing to see us, he is willing to see us and we would have to go to New Jersey, which we did.

**MR. ARAYA:** I understand that you were not believed in the beginning.

**MR. TOWNLEY:** The Cubans?

**MR. ARAYA:** The Cubans, yes.

**MR. TOWNLEY:** No, of course not.

136

**MR. ARAYA:** What happened?

**MR. TOWNLEY:** They contacted us for a meeting on the next day at the hotel where I was staying, and GUILLERMO LOBOS appeared with SUAREZ and DIONISIO SUAREZ, and with another guy, I think his name was ARMANDO SANTANA, if I'm not mistaken, and they entered my room, he was armed, DIONISIO SUAREZ, he sat on a sofa, and my wife was with me, and he kept us both at gun point with a Colt 45 for almost 4 hours.

And I had a contact in the military mission in Washington, and in the end we called this gentleman, they had the telephone of the Embassy in Washington, they called, they asked to speak with the person whose name I had given them, they spoke with him and in the end they were happily satisfied with the confirmation that we were truly from Chile, we were DINA, we were known in Chile, and we did not belong to the CIA.

**MR. ARAYA:** But, despite the difficulties, the Cubans finally accepted, because the DINA offered them something which they could never have, which is what also happened later with the Italians, the broad support of an entire State.

**MR. TOWNLEY:** On the same day of the meeting… they had me at gun point there with a 45 caliber Colt, in the afternoon there was another member of the group, whom I never met, who gave me a paper bag and inside the paper bag there was a detonating cord, a detonator, there was C-4 EXPLOSIVE C-4 and there were detonators.

**MR. ARAYA:** In this way MICHAEL TOWNLEY, MARIANA CALLEJAS and Cuban VIRGILIO PAZ, traveled together to Mexico, on a sinister mission to eliminate former Chilean exiles, this list was headed by CARLOS ALTAMIRANO. However, they were late, none of the leaders was still there, but instead of causing indignation in the higher circles of the DINA, curiously, the three are given the authorization to remain for almost another month in the region.

**MR. TOWNLEY:** In the mission to Mexico, the order was that if we did not find ALTAMIRANO or TEITELBOIM, or the people which the Director wanted to be eliminated that we had to (Illegible) to this meeting, this meeting of socialist Marxist parties, in any way possible.

**MR. ARAYA:** … of the defense of General CONTRERAS, that states, how are we going to send a person who will get to Mexico, and arrives there late.

**MR. TOWNLEY:** Because this was not the mission on its own, we had already opened a relation with the AIBE company, in Florida, we had the possibility of certain equipment, there were certain types of radio walkie talkies, which we carried in a halter under the clothes in the armpits, and a transmitter was manufactured and designed inside

137

the purse of a woman, hidden with a microphone in the exterior which could not be seen, and they also ordered us to do a great deal of things other than just going to Mexico.

**MR. ARAYA:** Despite it all, the North American agent of the DINA, has the complete trust of General MANUEL CONTRERAS, as he states and is sent on new missions to Europe, some of which have to do with following important people, such as current President of the Republic PATRICIO AYLWIN.

**MR. TOWNLEY:** In 1975 when PATRICIO AYLWIN came to Europe, to Germany specifically to attend a session of the German Parliament and a Chilean Officer arrived to follow his steps, to see his contacts, see what he did, what he did, what he had done, with whom he had contact, etc.

**MR. ARAYA:** But Army Officers were not the only ones who cooperated with TOWNLEY. A former union leader of the Christian Democrats, who has been recently spotted evading the media in the Courts of Santiago, also collaborated with Townley.

**MR. TOWNLEY:** I knew him as PEDRO ROJAS, GUILLERMO RIVEROS, he provided copies of ... of the different work meetings of the groups in exile of the Christian Democrats, the Communist party, Socialist, MAPU, Radicals, etc.

**MR. ARAYA:** Was he a paid informant?

**MR. TOWNLEY:** Paid in that he received a salary, he was helped with expenses, he was helped in the (Illegible) of a town in Germany in Frankfurt, where it was more centralized and where he could work better in providing information, he was given a car, I would not say a paid informant in that sense, I would say he was more an informant whose expenses were reimbursed.

**MR. ARAYA:** On October 6, 1975, in Rome, Italy, an attempt is made on the lives of former Vicepresident of Chile BERNARDO LEIGHTON and his wife ANITA FRESNO, who were residents of that country.

**MR. TOWNLEY:** PEDRO ROJAS and GUILLERMO RIVEROS, we used them to find out the location of BERNARDO LEIGHTON, and thus a few days before the attempt to murder him, PEDRO ROJAS and GUILLERMO RIVEROS, we made them call BERNARDON LEIGHTON's apartment, PEDRO ROJAS thought that what we sought, what this was going to do was to frighten BERNARDO LEIGHTON.

**MR. ARAYA:** He did not imagine that you wanted to kill him?

**MR. TOWNLEY:** No, I don't think he ever knew of that.

**MR. ARAYA:** In what way did you participate in this case?

138

**MR. TOWNLEY:** My instructions at the time were to locate BERNARDO LEIGHTON, and in Italy to request the assistance of the Movement of the National Vanguard, an extreme right wing Italian group, headed by the gentleman of that time, who I knew as ALFREDO STEFANNO and request the aid of, their help just as that of the Cubans in the United States,... the elimination of BERNARDO LEIGHTON.

**MR. ARAYA:** Who gave you this instruction?

**MR. TOWNLEY:** This was EDUARDO ITURRIAGA NEUMANN.

**MR. ARAYA:** To what extent was BERNARDO LEIGHTON an enemy of the military government?

**MR. TOWNLEY:** We spoke of the possibility of a political union of the Christian Democratic Party and of the Italian Communist Party, the first of its kind in the world.

**MR. TOWNLEY:** Which would have been the first of its kind in the world and he was considered to be a highly respected person within both Italian and Chilean politics, respected by the Christian Democrats and respected by the Communist Party, this was BERNARDO LEIGHTON.

**MR. ARAYA:** GENERAL CONTRERAS indicates that this is just a bit of a figment of your imagination, that the neofascist group was never related to the DINA, and it could have not been contacted.

**MR. TOWNLEY:** You can ask that question, but I can't believe it! The Italians came to Chile with great plans and quite a few people.

**MR. ARAYA:** How many were there?

**MR. TOWNLEY:** About ten, they were housed in an apartment provided in the Torres de San Borja by DINA under the instructions of GENERAL PARERA, CARLOS PARERA, his code name in DINA was CRISTIAN. Mr. CRISTIAN, they were sent to Peru if I'm not mistaken it was through Argentina and Bolivia, back then in 1977, I think it was, at the end of 1976 again, to carry out intelligence work on the location of different groups and Peruvian Units, at this time we were close to the Pacific War anniversary and the military relations between at least the two countries were very tense, the Peruvians had been arming themselves with hundreds of Russian tanks, and there was a real fear and there were several operations on the intentions, the armament, the positioning of the armament, quality, etc.

**MR. ARAYA:** AIDO DISTEFANO, SEGANO DELA QUIAR? This is the name of the leader of the neofascist group, National Vanguard, which had been contacted by TOWNLEY, by request from MANUEL CONTRERAS himself.

**MR. TOWNLEY:** He had relations and direct contacts with MANUEL CONTRERAS, who had, had contacts with MANUEL CONTRERAS in Europe, in Spain, in person as according to what Mr. QUIAR? Said, a meeting between him, Colonel CONTRERAS and GENERAL PINOCHET in Spain, when the death of FRANCO, when GENERAL PINOCHET was there for FRANCO's funeral.

**MR. ARAYA:** The defense of GENERAL MANUEL CONTRERAS, has of course also denied every link with the neofascist group, what is more, the former Director of DINA has stated that they never carried out operations abroad, except to collect information. This document which is a copy of the original in the care of Italian District Attorney GEOVANNI SALVI, who researched the LEIGHTON case for the Second Chamber of the Court of Appeals in Rome, is categorical according to TOWNLEY.

**MR. TOWNLEY:** The objective of the document is to clarify regarding the request for an increase in budget, and comes from the DINA, and carries the signature of Mr. MANUEL CONTRERAS SEPULVEDA, who gives his compliments to His Excellency and is addressed to His Excellency, the President of the Republic. Pursuant to that agreed upon with Your Excellency, I hereby specify the reasons why I consider it essential to request an additional allotment of six hundred thousand dollars in the budget of this Directorate for this year. Point One, increase in the staff of the DINA assigned to diplomatic missions for Chile, in total, ten people, two in Peru, two in Brazil, two in Argentina, one in Venezuela, one in Costa Rica, one in Belgium and one in Italy. And the second point of the document, I will stay with this point which I consider the most important one. Additional expenses for neutralizing the main enemies of the Government Junta abroad, specially in Mexico, Argentina, Costa Rica, the United States, France and Italy.

**MR. VIVADOS:** The description of the activities carried out both in Chile and abroad, in this second segment of the exclusive interview with MICHAEL TOWNLEY. This document which we just finished presenting in the final part of this segment, MARCELO, seems to evidence some foreign actions.

**MR. ARAYA:** That's right, JUAN GUILLERMO, apparently, the issue is as follows, MICHAEL TOWNLEY is for GENERAL MANUEL CONTRERAS' greatest accuser, which is why what this former military man has to do is to prove that this man belonged to the CIA and worked undercover in the DINA, that is, the North American organization would be funding his activities, which is why this document is very important in the sense that it would prove that the DINA had foreign operations, and that important sums of money were assigned for the same.

**MR. VIVADOS:** Well, the truth is that every word, each time Townley Speaks, TOWNLEY surprises us anew, lets hope that no doubt the former DINA agent will have much more to tell us about these episodes in which he was the main actor.

(break)

14

Everyone knows that MICHAEL TOWNLEY is being tried by several courts in the United States in connection with his responsibility in the murder of the former Chilean Chancellor ORLANDO LETELIER as well as the death of RONNIE MOFFIT who accompanied the Chancellor. However, there are other legal suits in which his witness account is also claimed, MARCELO.

**MR. ARAYA:** That's right, JUAN GUILLERMO, one of the most controversial ones at this moment is that which corresponds to and is being carried out by Judge VIOLETA GUZMAN, in her position as Visiting Minister for the case of CARMELO SORIA, the former Spanish diplomat. On this topic, the North American has much to say, as he was an eye witness of his murder.

**MR. VIVADOS:** Well, the death of Spanish diplomat CARMELO SORIA and other crimes are now disclosed to us by MICHAEL TOWNLEY.

**MR. ARAYA:** During 1976, the unstopping wheel created by the absolute power of the DINA kept rolling and crushing any subversive attempt against the government of GENERAL PINOCHET. New brigades were created among which was that of Quetropillán, a name with which TOWNLEY himself christened his brigade.

**MR. TOWNLEY:** We were also known throughout as the Wasp Group Unit, as the Trosín Unit, or Prosín Ltd., all were names of the Unit which I commanded, which goes back to the question of agents or informants, I commanded a group, I later commanded a Brigade, a Unit, part of but separate from the Mulchen Brigade. The Mulchen Brigade was formed by young officers, Captains, Majors. At the end it was directed by Major GUILLERMO SALINAS, while at the beginning it comprised Captain JAIME LEPE, JORGE BELMAR, JORGE DELMAS, ARMANDO FERNANDEZ LARIOS and a Class officer, a Sub-Officer, Mayor AQUEBEQUI.

**MR. ARAYA:** Throughout, MICHAEL TOWNLEY has tried to refer to his cause to us as loyal, idealist and honest, even when he has committed crimes.

The murder of the Spanish diplomat CARMELO SORIA ESPINOZA, for instance, has no arguments which could be justified in arguing for military security. His dead body was found meters from his car which had fallen off a cliff, on the El Carmen channel in the commune of Conchalí, supposedly the product of a suicide act.

However, the result of the research investigations ordered by the Third Criminal Court of Santiago, which opened proceedings again after 16 years, was able to establish that CARMELO SORIA ESPINOZA was kidnapped by men dressed in civilian clothes, that July 15 of 1976, a few meters from his office in Huelén with Providencia, and that that night he was moved to the house on Via Naranja 4925 in the Lo Curro sector.

141

**MR. TOWNLEY:** That was a mission of the Mulchén Brigade, they did not have a place to take him to and they took him in his own car, they informed me that they were going to bring him to the house, that if there was a place separated from the hosue where they could keep him. Obviously this was ordered from the General Headquarters, they arrived, they held him and around midnight they killed him.

**MR. ARAYA:** You were present?

**MR. TOWNLEY:** I was in the house and in the moment that they killed him I was at the house, I knew what they were doing, I had been outside, I saw Mr. SORIA.

**MR. ARAYA:** I heard how you said how intelligence work which takes place all over the world must be developed seeking to avoid deaths and seeking to avoid cruelty, what happened this time, you had no chance to prevent this from taking place?

**MR. TOWNLEY:** I'm not certain if Mr. SORIA was tortured, I did not hear any screams, the times I saw him he had his hands tied and was blindfolded, that in itself is a mental torture.

**MR. ARAYA:** Some days after this crime against the Spanish diplomat took place, MICHAEL TOWNLEY had to travel to Paraguay.

**MR. TOWNLEY:** We met up there, on the foot of the Manquehue mountain.

**MR. ARAYA:** And what does Colonel PEDRO ESPINOZA say?

**MR. TOWNLEY:** And at that place he asks me if I would be willing to accept again a mission abroad and without telling me what, I said yes. Lieutenant FERNANDEZ was there with him at the same time. The order was to go to Paraguay where they would provide us with Paraguayan passports in order to proceed to the United States and from there, ARMANDO FERNANDEZ continued, we would go and follow up and carry out a mission to eliminate ORLANDO LETELIER.

**MR. ARAYA:** He told you that concretely?

**MR. TOWNLEY:** Yes.

**MR. ARAYA:** We need to eliminate ORLANDO LETELIER.

**MR. TOWNLEY:** Exactly.

**MR. ARAYA:** By the express order of whom?

**MR. TOWNLEY:** Colonel ESPINOZA, at that moment he is giving me the order, that is, one is within a military hierarchy and one does not ask him, well, and you received this

142

order from Colonel CONTRERAS and are you sure that Colonel CONTRERAS received the order from another guy, you get your orders from whomever has the right or superior command over you, and that was Colonel ESPINOZA.

**MR. ARAYA:** In Paraguay, you had to obtain Paraguayan passports and the corresponding visas from the Consular Section of the American Embassy under the names of JUAN WILLIAMS ROUSSE and ALEJANDRO ROMERAL JARA, however, the Ambassador of the United States then in Asunción, GEORGE WALTER LANDAU, becomes suspicious and rejects the applications, thus making the operation fail and forcing both Chilean agents to return on July 28.

TOWNLEY continued with his tasks, but according to what he confessed, he completely ignored that this proceeding was still being developed. On August 17, 1976, the DINA sends on a visit to the United States, Army Captains ROLANDO MOSQUERA JARPA and RENE RIVEROS VALDERRAMA, bearing legal Chilean passports, but with false identities, ALEJANDRO ROMERAL JARA and JUAN WILLIAMS ROUSSE, formerly used in Paraguay. This was obviously an operation to cover the Asuncion disaster.

Eight days later, on August 25, two other agents travel to the United States, they are Captain ARMANDO FERNANDEZ LARIOS again and MONICA LAGOS AGUIRRE, who used the name of LILIANA WALKER as a cover.

**MR. TOWNLEY:** There, around the end of August, the first week of September I get called by Colonel ESPINOZA and again we meet up at the feet of Manquehue and he tells me that, I think he had already been promoted to Captain, he was just, about to be promoted to Captain to FERNANDEZ LARIOS, ARMANDO- that he was already in the United States and that he had been carrying out work to find a house, the place of work and to individualize the routes, the cars; that is, to carry out some pre-operational intelligence work, that he had to come back due to health problems of a relative and needed for me to prepare for an immediate trip to the United States to receive the information and from there to proceed to once more request the assistance of the Cuban group, the Nationalist Cuban Movement in the United States and to help in the murder of ORLANDO LETELIER.

**MR. ARAYA:** On September 09 you travel to the United States, who provided you with a visa, the passport, how much money did they give you and who provided you with a ticket?

**MR. TOWNLEY:** The sum of money that they gave me was very, very small, the ticket was given to me, if I'm not mistaken, by the person who was in charge of documentation at the DINA, I knew him as TITO and two days before he had asked me for a passport photo which I delivered, I went to the headquarters, I turned it into the office of Colonel ESPINOZA, I arrived, I think on the same day before the trip, or on the day of the trip in order to get my ticket and I got my passport of a Chilean Officer.

143

**MR. ARAYA:** Where did you get it?

**MR. TOWNLEY:** At the office of Colonel ESPINOZA.

**MR. ARAYA:** Where was it located?

**MR. TOWNLEY:** In the general headquarters at Belgrado.

**MR. ARAYA:** At Belgrado.

**MR. TOWNLEY:** Yes.

**MR. ARAYA:** And the money?

**MR. TOWNLEY:** Colonel ESPINOZA himself gave it to me.

**MR. ARAYA:** You did not pay for your airfare.

**MR. TOWNLEY:** No, they were paid for, bought from SPRINTER.

**MR. ARAYA:** The DINA agent first contacts the Cubans in New Jersey, who without much enthusiasm accept to participate, but with the condition that it be MICHAEL TOWNLEY himself who should install the explosive artifact.

How was the issue that VIRGILIO PAZ and DIONISIO SUAREZ should accompany you dealt with and resolved?

**MR. TOWNLEY:** They opted in the end, ah, for that day. Time had gone by, gone by from the initial order given before going to Paraguay, it was that as much as possible the death of LETELIER should appear as an event in the street, a car running him over, a street assault, something like that, but something that if possible could pass as a criminal act or an accident and not a murder. What was spoken with the Cubans was that all of their expenses, the expenses incurred in this and the materials given for the mission would be returned to them, to VIRGILIO and I. What they gave us were truly explosives, TNT, a bit of C-4. VIRGILIO and the people from the Cuban Nationalist Movement had purchased a radio equipment which... the same which we had taken to Mexico, they let us borrow one of their kits for this mission.

**MR. ARAYA:** Who prepared the bomb?

**MR. TOWNLEY:** That was prepared by me, in the presence of VIRGILIO; with the help of VIRGILIO and while DIONISIO looked on.

**MR. ARAYA:** You needed to purchase new elements?

144

**MR. TOWNLEY:** Several things were missing, things, small things and switches and a container to hold everything inside and tie it down.

**MR. ARAYA:** Easily acquired, right?

**MR. TOWNLEY:** Yes, of course, at any store.

**MR. ARAYA:** Where did you prepare it?

**MR. TOWNLEY:** In the room of a hotel in Washington.

**MR. ARAYA:** So, there was no fear back then for this experience you say.

**MR. TOWNLEY:** No, putting together the bomb no, it was not a problem. For an electric detonator to explode, you must have an electric current, as long as you don't connect it to electricity, the detonator does not explode. Regarding C-4, you could smash it with a hammer or even shoot it then and there and it does not explode, the same for TNT, it is very stable.

**MR. ARAYA:** How did you get to the place?

**MR. TOWNLEY:** In VIRGILIO's car, from New Jersey, around midnight, I simply got out of the car and went on foot through the street. When I arrived at the car, to the side of ORLANDO LETELIER'S car, I got out of the car quietly, waited a few minutes to make sure no one would scream or anything and hid under the car to attach the bomb.

**MR. ARAYA:** It was so simple for you.

**MR. TOWNLEY:** Yes it was an extremely easy job, to hold, tie, leave. None of this is physically challenging, anybody could do it, you, anyone, it is not a difficult job, if you are extremely nervous, at the time of moving the switch which gives the possibility of the current to reach the detonator, as this is the moment in which an accident was going to take place and an unexpected electric spark would take place, which would explode everything and obviously at that moment there was much concern and fear.

**MR. ARAYA:** Who decided that ORLANDO LETELIER needed to be eliminated with explosives, by detonating a car with a bomb?

**MR. TOWNLEY:** The final decision at the place where it took place was mine, following the final orders that he should be murdered no matter what, no matter what.

**MR. ARAYA:** [Both] General MANUEL CONTRERAS, and PEDRO ESPINOZA'S defenses have sought to make TOWNLEY's version incoherent; they state that the bomb

145

was switched as it is not possible that it could have remained for so long in the car without being activated, if it really was in good condition.

In fact... (*the following two paragraphs have been rendered illegible, there is a piece missing from both*).

... had the car blown into pieces as well as the lives of RONNIE MOFFIT and that of former Chilean Chancellor ORLANDO LETELIER.

**MR. ARAYA:** Did you know of the explosion?

**MR. TOWNLEY:** That same morning, after having spoken with VIRGILIO, yes.

**MR. ARAYA:** What did you feel at the time?

**MR. TOWNLEY:** That the mission had been accomplished, I was very upset with the death of RONNIE MOFFIT. Regarding Mr. LETELIER, ORLANDO LETELIER, that had been, I had not accepted it, but that was the objective, he was a soldier on one side of the fight and in that sense I had accepted that this was a fact and what I sought, in that sense the feeling is: mission accomplished and let us now worry about leaving the country, very upset by the death of RONNIE MOFFIT.

**MR. ARAYA:** Has this feeling changed today? What used to be a mission for you before, turned into a crime in the end.

**MR. TOWNLEY:** It became a crime, upon knowing that I had been used not in a mission dictated by the government, nor ordered by the maximum authority of the country. What I now think is that this was then a whim of the vanity or pride of GENERAL CONTRERAS. I think that the National Security Council and the people in authority who ordered that, provided for taking ORLANDO LETELIER's nationality and that is what they decided to do and I think that Colonel CONTRERAS, disgusted with that, that they were not going to do what he wanted, went ahead with his mission.

**MR. ARAYA:** How were you received, who did you report to?

**MR. TOWNLEY:** It was to Lieutenant Colonel ESPINOZA.

**MR. ARAYA:** General MANUEL CONTRERAS, did he ever express his congratulations?

**MR. TOWNLEY:** He never gave me a direct congratulation, but every time I went by, I saw him, [and] his treatment was always very cordial, smiles.

**MR. ARAYA:** Did you feel proud then?

146

**MR. TOWNLEY:** The mission was accomplished.

**MR. ARAYA:** There is a feeling after every mission.

**MR. TOWNLEY:** I agree.

**MR. ARAYA:** A mission was accomplished and therefore you were proud.

**MR. TOWNLEY:** The mission was accomplished, why can you be proud of the death of RONNIE MOFFIT, why don't you put it in these words.

**MR. ARAYA:** Because there are two people and you.

**MR. TOWNLEY:** But why don't you put it in those words, the mission was accomplished, I don't need to be proud of it.

**MR. ARAYA:** You tell me that you are not proud of the death of a single person.

**MR. TOWNLEY:** Yes.

**MR. VIVADOS:** MICHAEL TOWNLEY, was expelled from Chile at the beginning of 1978, he was judged and sentenced by the courts of the District of Columbia in Washington to ten years of imprisonment, MARCELO, was this sentence carried out?

**MR. ARAYA:** Not totally JUAN GUILLERMO, his sentence was reduced for good conduct and also for his cooperation with justice and he then claimed protection from the witness protection program, before spending five years in prison. He was freed in 1983 and the Network of Marshals and Sheriffs have provided him with a new legal status, a place to live, a new job and, of course, the absolute certainty that his anonimity would never be broken.

**MR. VIVADOS:** Very well, after a break we will return with the last part of this exclusive interview with MICHAEL TOWNLEY, in this extraordinary edition of "Special Report".

And thus we enter the last part of this exclusive interview with MICHAEL TOWNLEY, obtained by journalist MARCELO ARAYA. MARCELO, why did TOWNLEY not answer for (illegible) in which he is also said to be involved? The protection of American (illegible) also covers these proceedings?

**MR. ARAYA:** That's right, JUAN GUILLERMO, even though it is very hard to explain according to what our justice system is like. In the United States there is a witness protection program, which also works in favor of those who are delivering this information, that is, what has been informed cannot be used in other proceedings, excepting as an additional element, as one more piece of evidence, but the direct

147

testimony of the person who has testified is not necessary, and cannot be moved there, that is, I will give you the example of the case of BERNARDO LEIGHTON in Italy, where MICHAEL TOWNLEY was found to be guilty, nevertheless, the United States will never allow the extradition of this person to that country. This is why for the remaining situations which are being presented, MICHAEL TOWNLEY, has simply delivered the information, but will not be a direct witness of the facts.

**MR. VIVADOS:** And despite the fact that his testimony has become highly desirable for other cases which are being investigated both under Chilean justice as in other countries in which, according to Townley, he carried out missions for the DINA. His participation in other facts and his being expelled from Chile in the next part of this exclusive interview to MICHAEL TOWNLEY.

**MR. ARAYA:** Two years went by before there was any fresh news on the investigations carried out by the FBI on the double murder which took place in the North American capital, while the lives of the DINA agents continued without any changes, fraught with atrocities, including those of the head of the Quetropillán Brigade.

Among other actions, his Brigade was assigned to investigate the bankruptcy of Bank Osorno and La Union, owned by FRANCISCO CRUZAT and VITTORIO YACONI during 1977.

**MR. TOWNLEY:** The concern was that the funds were being passed to terrorist leftist groups.

**MR. ARAYA:** In order to achieve YACONI's delivery, TOWNLEY resorted to blackmail, kidnapping a personal friend of his. At the moment in which this took place, a priest, Father MARIO ZAÑARTU abandoned the apartment of the woman, thus becoming involved, even though TOWNLEY's version of the situation is different.

**MR. TOWNLEY:** Father ZAÑARTU did not participate in any act, they photographed Father ZAÑARTU next to two half naked women, yes, true, but as a trick.

**MR. ARAYA:** The say that this took place in your house, at Lo Curro.

**MR. TOWNLEY:** True. When they arrested YACONI's friend that evening, with the friend she lived with, who shared the apartment, Father ZAÑARTU was there to pressure them not to comment on that night, they did take pictures of him with two women who work in the DINA, who were half naked and they sat next to him, but there was no improper situation besides the photograph within the place where we had imprisoned him.

**MR. ARAYA:** The capture of YACONI, and the later negotiations carried out by the Mulchen Brigade for the DINA started to show the type of people who worked in it, even though they were Army Officers, which is what the North American agent is telling us.

148

**MR. TOWNLEY:** In order to get to Santiago, Mr. YACONI was taken to the general headquarters, he had an interview with Colonel ESPINOZA and we supposed that inside the briefcase which Mr. YACONI carried there were several thousands of dollars. A sum was talked about around 40 thousand dollars, which was left there with Colonel ESPINOZA and in the end, in the activities, the accusations which were there as I understand them, the accusation was limited to Mr. YACONI and other people whom he wanted to protect were left out of this business.

**MR. ARAYA:** 1978 arrives and the repercussions of the earthquake embodied in the murder that took place in Washington two years before, began to be felt in Chile, a country which seems to be used to the earth trembling, and now, to movement within the military garrisons.

The media published photographs of the presumed agents which were implicated with the crime, these were the photographs provided by TOWNLEY and FERNANDEZ LARIOS, to the Embassy of the United States and the Paraguayan passports when they attempted to obtain the corresponding visas.

You have always indicated that in order to see what was done with this problem, you met with General CONTRERAS, at Nico's Pizza, a place, a restaurant in Santiago, very public, however, General CONTRERAS says that it would be crazy for an Officer of his hierarchy to be able to do this, to meet publicly, having headquarters where he would be able to meet, in more secret places. How do you explain this?

**MR. TOWNLEY:** At the moment I was very worried whether I would be allowed to come out alive of this problem, obviously if I died, I , MICHAEL TOWNLEY, ARMANDO FERNANDEZ, in an accident, murder, disappearance, anything, the investigation would not have proceeded and General CONTRERAS would have been free to do anything, Colonel ESPINOZA, freed from all charges, there would have never been a solution.. I will not say that at this moment I was looking for, I do not want to make you believe that I was looking for the truth to be opened, that all crimes should be confessed, but no solution would have been found if I and ARMANDO FERNANDEZ had died, therefore, it would have been quite stupid of me to meet in a private place, under the control of General CONTRERAS and his staff. Commander VIANEL VALDIVIESO had called me, several days at night, before, (illegible), ordering me to appear a the corner of Bilbao and Pedro de Valdivia so I could be taken where the General (illegible) which I refused. The first time I had ever refused an (illegible) from my General CONTRERAS, I said no, that night not (illegible) place to meet and precisely because of that, I chose a (illegible), open, the meeting with the General was not inside Nico's Pizza, it was in the car next to it where I had friends of mine, friends of mine in the car were there as witnesses.

**MR. ARAYA:** What were you offered as protection?

149

**MR. TOWNLEY:** They asked me to give them my passport, and that they in turn would have it sealed which would show I had left the country, and had arrived from Brazil, I think where they wanted me to look legal, that is, make my arrival look legal, but I physically would go to the South of the country where I would remain privately, in the South until it blew over, until time went by and everything would be calm again.

**MR. ARAYA:** How were these last days before you were illegally expelled as you say from Chile?

**MR. TOWNLEY:** Once I had arrived at Investigations, which was around 7 in the afternoon, a decision arrived that I was not to be sent to Concepcion and that I was to be held at the General Investigation Headquarters. Even at that time I was not told I would be expelled, but it, it was the only obvious thing that could happen.

That night was very long, and I was again thinking at almost every moment that I was going to commit suicide that night, and I think I don't know anything else, I don't know who are the parties responsible for the fact that I was able to arrive at dawn alive, I thank them, every morning early one of the things that has stayed with me and that I will carry with me until my last day.

He told me that's why they went… and it hurts until now.

**MR. ARAYA:** Do you feel betrayed?

**MR. TOWNLEY:** …

**MR. ARAYA:** What can be demanded then from those responsible for the death of the former Commander in Chief of the Chilean Army, General CARLOS PRATS and his wife. The crime against the military man, is one of the first blamed on the DINA. The conspiracy took place in Buenos Aires, on September 30, 1974. The PRATS couple were returning to their apartment, carrying out their usual routine, it would be the last time.

The feeling is absolute in the double murder of Buenos Aires that DINA's prints were there, and that the style is TOWNLEY's, but he does not take the responsibility for this crime. Who was inside the DINA?

**MR. TOWNLEY:** General ZARA, at that time when I first met him he was a Major in DINA, he worked with EDUARDO ITURRIAGA NEUMANN, he was the second in command in the State Department. According to what I found out later, he was in Spain, he was in Italy, he was in many places, where later, where later I would arrive to in Europe…

**MR. ARAYA:** That is, he carried out foreign missions…

**MR. TOWNLEY:** Until he was destined to reparticion.

150

**MR. ARAYA:** We have spoken about (Illegible) who was also Director of the Army Parachute School?

**MR. TOWNLEY:** Exactly.

**MR. ARAYA:** He encountered (Illegible) groups that assisted in Buenos Aires, with the intent to (Illegible) CARLOS PRATS.

**MR. TOWNLEY:** He studied in Argentina and was in contact with a group of Chilean residents in Argentina, the same as EDUARDO ITURRIAGA.

**MR. ARAYA:** What was the main motive which determined the elimination of CARLOS PRATS?

**MR. TOWNLEY:** That with the death of General PRATS, his position as Director of the DINA was confirmed absolutely, Colonel CONTRERAS, and the Direction, the Director of the DINA is the central point, the central axis of the entire intelligence of Chile, where the Head of Intelligence of the Army, is a General of the Navy, is an Admiral, etc. That a Colonel was the Commander, was Director of the DINA service, word was that many, many Generals were upset with this fact.

**MR. ARAYA:** Did you know that the DINA intended to eliminate the Commander in Chief of the Chilean Army?

**MR. TOWNLEY:** There were several groups assigned by Colonel, Colonel CONTRERAS, to murder General PRATS.

**MR. ARAYA:** Were these groups paid?

**MR. TOWNLEY:** I heard that one group had gotten paid 20 thousand dollars, and they had not met their objective.

**MR. ARAYA:** Yet on September 30, 1974 you already did work for the DINA.

**MR. TOWNLEY:** I did electronic support work, as I said, I had known PEDRO ESPINOZA from way before.

**MR. ARAYA:** What mission were you carrying out at the time?

**MR. TOWNLEY:** I was purchasing electronic elements in Buenos Aires, I had been there twice back then.

**MR. ARAYA:** The murder of CARLOS PRATS and his wife, is also attributed to you.

151

**MR. TOWNLEY:** Yes.

**MR. ARAYA:** One (Illegible) that day that the murder took place, he was in (Illegible), he was fleeing the country that minute.

**MR. TOWNLEY:** (Illegible)

**MR. ARAYA:** (illegible) comes to associate then that you were involved in part of what (Illegible).

**MR. TOWNLEY:** (Illegible)

**MR. ARAYA:** (Illegible) then, he is the author of CARLOS PRATS.

**MR. TOWNLEY:** You are giving me your own conclusion.

**MR. ARAYA:** The... upon carrying out the operation to purchase the bombs which were placed in the car of ORLANDO LETELIER, has indicated that the hand is the same which murdered CARLOS PRATS.

**MR. TOWNLEY:** He says, if I'm not mistaken, that the hand that built the bomb in the test car which was provided by the FBI was the same which installed the bomb in the car of ORLANDO LETELIER, because the two cars were left in very similar conditions, pretty much the same.

If the fact that a bomb exploded in both cars in the United States, and a bomb exploded in the car of General PRATS, is similar, yes it is similar, but I do not see why they had to be from the same hand.

**MR. ARAYA:** It is indicated that it is one style, the same form, the characteristics are very similar, and in terms of installation, and in terms of effects.

**MR. TOWNLEY:** That is the opinion of...

**MR. ARAYA:** You, who at the time were in Buenos Aires, were not sure that someone else from DINA was there.

**MR. TOWNLEY:** I was going to meet EDUARDO ITURRIAGA in Buenos Aires.

**MR. ARAYA:** Did he indicate what mission he was carrying out?

**MR. TOWNLEY:** No.

**MR. ARAYA:** Are you willing to face these proceedings filed against you in Argentina?

152

**MR. TOWNLEY:** This is a question for which I have no answer, I do not give it.

**MR. ARAYA:** You make others suppose that you are not willing.

**MR. TOWNLEY:** No, that I already underwent the extradition proceedings, which were already followed in the United States, and that the extradition was denied.

**MR. ARAYA:** But this does not imply your innocence in this sense.

**MR. TOWNLEY:** It has been, it is a thing that has already gone through the courts in this country.

**MR. ARAYA:** In this sense, when you do not want to make a greater comment, it means that you are accepting your guilt.

**MR. TOWNLEY:** I don't want to say anything, the conclusions are yours.

**MR. ARAYA:** It's just that an innocent person will always be willing to be processed.

**MR. TOWNLEY:** The conclusions you draw are your own. You tell me that the (Illegible), in all days has always been just, (Illegible) mistake.

**MR. ARAYA:** Sorry, the main element of justice says that a person is innocent if they are willing to be processed.

**MR. TOWNLEY:** Justice fails quite frequently.

**MR. ARAYA:** Well, specifically, you claim to be innocent in these proceedings.

**MR. TOWNLEY:** When one is judged in advance by everyone, you are not going to put you head in the lion's mouth, I have no more comments on the subject, eh.

**MR. ARAYA:** Mr. MICHAEL TOWNLEY.

**MR. TOWNLEY:** I have no more comments on the subject.

**MR. ARAYA:** Then you claim to be innocent?

**MR. TOWNLEY:** I have no further opinions.

**MR. ARAYA:** You are not innocent?

**MR. TOWNLEY:** You have your conclusions, everyone has their conclusions outside of what I might say, if I were to claim my innocence, you would conclude otherwise, if I were to claim guilty, there would be another who would say no, everyone would accept

153

my guilt, they would be delighted, if I am going to claim innocence, the conclusions would be in another place, so this is a topic which I will not touch again.

**MR. ARAYA:** Just as you have said the truth in the LETELIER case, why cannot you say the truth regarding the PRATS case, if you are innocent in this case?

**MR. TOWNLEY:** Subject closed! Your conclusions.

**MR. ARAYA:** Mr. TOWNLEY, are you still afraid of death?

**MR. TOWNLEY:** There are people, there are persons who have... to... to my family, all, eradicate my blood from the earth I think was the phrase, the letter which I got, that was in 1978, these people are still alive, and I was a traitor, betrayer, I betrayed them, I am the traitor, and their honor their morality, their ethics, lets say that it would force them to try to kill me if my whereabouts, if the name I use here now was made public.

**MR. ARAYA:** This has been an important interview for me, however (illegible) it does not stop leaving a bitter aftertaste. (illegible) such a dramatic stage in the history of Chile, many families left with personal losses of (illegible) of the actions of the institution to which you belong.

(illegible).... A bit to take this first question again, this question which he spoke after 14 years despite the fact that you complied with your Sentence, were in prison, despite the fact that you might have forgotten your criminal past, today you are willing to speak to the Chilean public, to face Chile on what happened. What is the motive for all this?

**MR. TOWNLEY:** I have felt for years, even the first time I expressed this, -really in writing- in a letter to the Minister of the Supreme Court, around 1980- that if the Chilean Nation was being charged, for a crime, for an act that we would stop calling a crime, even though it would be an act which required an order, needed by the country, justified by the... that if they wanted, if wanted, the moment would arrive when all of this became public.

From a person who is responsible for this, from a person who has made the country and his Institution take on the charge, take on the responsibility for refusing to accept its own responsibility and this is General CONTRERAS. I have read the history of Chile, I am not very well read, I am not extremely knowledgeable, but from what I have read I have not been able to find a single person in the history of Chile who has been more noxious for the country than General CONTRERAS.

In 1978 when this all came to light, based on the investigation made here in the United States, all of the events and the details of the death of ORLANDO LETELIER, there was a moment in which General CONTRERAS should have stood and said, yes, truly, due to good, bad, indifferent and justified, not justified reasons. But I gave the order, I made sure the order was carried out, and the country is not responsible,

154

the armed institutions are not responsible, the institutions and the honor of the nation will not be stained or look bad within the community of nations.

I was the one, judge me, and do not judge the nation of Chile, as guilty for this crime. This needs to be clarified, it has to be clear who the responsible parties were, and if General CONTRERAS hides, it was my lot then, to speak out and say these things.

**MR. VIVADOS:** Thus ends the delivery of this exclusive journalistic testimony, with the interview with MICHAEL TOWNLEY, obtained by reporter MARCELO ARAYA, United States. MARCELO, at the end of the interview both interviewer and interviewee looked very tired, how long was the interview.

**MR. ARAYA:** It was two in the morning, this work was planned to be carried out in three days, however, different situations took us to develop it in only 18 hours, whereby this was very tedious, it was very tiring, but on the physical plane, the truth is that I was also exhausted by the topics, so many horrifying facts narrated so normally.

The truth is that they impressed me, but I am sure that we have also met with this obligation that journalism has, to report, report well, truthfully, I think we are closing the circle of several witness accounts, and that this one was prohibited for approximately 15 years, because we did not know this direct version from MICHAEL TOWNLEY, today has been made possible, and for all of the Chileans, to have a different element, another element to be able to better know an episode, or this stage in Chile's history.

**MR. VIVADOS:** No doubt MARCELO, from a journalistic point of view, this constitutes a great success. Congratulations for this achievement and thank you very much. MICHAEL TOWNLEY and the confessions of a murderer has been the report and interview carried out by journalist MARCELO ARAYA, which we have delivered in this extraordinary edition of "Special Report".

Our commitment is to come back to meet again in the normal edition, next Thursday at 21:50 minutes, until then and thank you very much, good evening.

The present task was concluded by its signature, for the evidence by the Minister and the Secretary of this Court.

I certify to having seen and listened to a video tape titled "Special Report Program C-17.- Interview to Michael Townley" and confirmed that the text of the previous document corresponds faithfully with the spoken scripts which are contained in said video tape, which is kept in care of the Office of the Secretary.- Santiago, June 4, 1996.-

Signed: (illegible)

155

This document is added to the official documents in compliance with resolution found on page 2521 of these proceedings.- Santiago, June 4, 1996.-

Signed: (illegible)

FBI Report on Directorate of National Intelligence (DINA)
(Jan. 21, 1982).

# Exhibit F

to Memorandum of Points and Authorities
in Support of Plaintiffs' Motion for Summary Judgment

in
*González-Vera, et al. v. Kissinger, et al.*
Civil Action Case No. 1:07CV00995 (HHK)

◀◀ **Main page**          **Next page** ▶

January 21, 1982

DIRECCION DE INTELIGENCIA NACIONAL
(DIRECTORATE OF NATIONAL INTELLIGENCE)
(DINA)

DINA was the name of the Chilean Intelligence
Service until late 1977, when it was renamed
the Centro Nacional de Informaciones (National
Information Center) (CNI).

Former Assistant United States Attorney Eugene M.
Propper, the chief prosecutor in the Orlando Letelier
assassination case, and author Taylor Branch are collaborating
in writing a book detailing the United States investigation of
the assassination of Orlando Letelier, the former Chilean
Ambassador to the United States, who was killed on
September 21, 1976, in Washington, D.C. Propper and Branch
advised that during their research they secured a number of
letters which were sent from the United States by
self-admitted DINA agent, Michael Vernon Townley, to Gustavo
Etchepare, his DINA/CNI "cut-out" in Chile. They made copies
of these letters available to the Federal Bureau of
Investigation (FBI) in September, 1981. In many instances the
letters were extremely cryptic and Townley utilized code words
and code names throughout. The subject matter of the letters,
among other topics, covered DINA activities circa 1974-1976.

Set forth below is a topical summary of information
contained in Townley's letters:

This document contains neither recommendations nor conclusions
of the FBI. It is the property of the FBI, and is loaned to
your agency; it and its contents are not to be distributed
outside your agency.

105-309859
1 - 105-789
1 - Mr. Monroe
1 - Mr. O'Malley
1 - Mr. Bresson
1 - Mr. Contonguay

ENCLOSURE

◀◀ **Main page**          **Next page** ▶

◀◀ **Main page**          ◀ **Previous page**          **Next page** ▶

TOPICAL SUMMARY OF INFORMATION 

## I. Disinformation Forwarded to Chile by Townley:

Throughout his letters, Townley furnished the recipients numerous items of disinformation which, for the most part, were self-serving. Townley obviously has attempted to minimize damage to his and his families interests as a result of information furnished by him to the U. S. Government concerning DINA operations. In some instances, it appears that Townley may have knowingly lied.

## II. Transmittal of Documents to CNI by Townley:

In several letters, Townley made veiled references to unspecified documents, which he apparently removed from the U.S. Attorneys Office, Washington, D. C., and forwarded to Chile. Specific examples of such communications are an undated letter from Townley to Chilean President Pinochet and a letter to Gustavo Etchepare dated 6/24/78. Townley was interviewed at FBIHQ on 10/20/81 by SAs L. Carter Cornick, Jr., and Robert W. Scherrer and was specifically asked to identify the documents he removed from the U.S. Attorneys Office, Washington, D. C., and forwarded to CNI in Chile. Townley claimed he could not specifically recall which documents he forwarded to Chile; however, he did admit that he forwarded the text of a declaration executed by U.S. Ambassador to Chile George W. Landau to CNI. Ambassador Landau's declaration was incorporated into the U.S. Government's extradition request to the Chilean Government for General Contreras, Colonel Espinosa and Captain Fernandez and became part of the public Chilean court record.

## III. Visit of Virgilio Paz to Chile during 1976:

In addition to information previously furnished by Townley during 1978 concerning Paz's visit to Chile, Townley, during interview on 10/20/81, advised that when Paz arrived in Chile in Spring of 1976 he brought with him a Colt .45 caliber automatic pistol, which was a special competition model. Townley advised that Paz claimed that this weapon had recently been used by the Cuban Nationalist Movement in a "hit" and that his purpose in bringing the weapon to Chile was to dispose of same. Townley advised that he witnessed Paz break the weapon into pieces with a sledge hammer and indicated that Paz subsequently disposed of the broken parts in Santiago. Townley claimed he had not furnished this information previously since he had completely forgotten the incident.

http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB8/ch02-02.htm          11/11/01

◀◀ **Main page**          ◀ **Previous page**          **Next page** ▶

IV.   Withholding of Potential Evidence by Townley:

In a letter dated 11/24/78 to General Orozco in Chile, Townley claimed that during August, 1978, when his attorney, Seymour Glanzer, turned over to the U.S. Government officials in Washington, D. C., Townley's false U.S. passport in the name of Kenneth Enyart, which Townley's wife had brought from Chile to the United States along with other documentation, Townley was able to remove a second unidentified passport and avoid having it turned over to the U.S. Government as evidence.

V.   Interception of Townley's Mail in Chile:

In several of his letters, Townley expressed concern that someone was intercepting his mail in Chile. Specific references in this regard are contained in Townley's letter to his wife dated 6/18/78 and in letters dated 3/17/79 and 6/29/79 to Gustavo Etchepare. In the latter communication, Townley informed Etchepare that his Chilean attorney, Manual Acuna, informed him that General Contreras was responsible for the interception of Townley's mail in Chile and that Contreras still had contacts in the Chilean Post Office who were in positions to continue intercepting Townley's mail. Townley's letters, which were intercepted by Contreras and subsequently utilized by him in the response to the U.S. Government's extradition requests, are identified below:

5/25/78 letter to his wife, 6/15/78 and 6/18/78 letters to Etchepare.

VI.   Townley's Concern Regarding the Prosin
      Limited Checking Account at the
      Southeast First National Bank, Miami Florida:

The above account was maintained at the Southeast First National Bank by Townley in order to transact DINA business. In the following letters from Townley to his contacts in Chile, Townley expresses concern that the U.S. Government will uncover damaging information (not further specified) against him and DINA:

12/14/78 letter to Manual Acuna, his 6/29/79, 8/23/79, 9/7/79 and 9/19/79 letters to Gustavo Etchepare.

In his 12/14/78 letter to Acuna, Townley suggested that someone in Chile be officially named as an agent for Prosin Limited. Townley added "It would be best if this person appear one day and thereafter disappear forever." Townley's reason for the foregoing suggestion was not clear.

-2-

◀◀ **Main page**          ◀ **Previous page**          **Next page** ▶

◀◀ **Main page**        ◀ **Previous page**        **Next page** ▶

In the other letters to Etchepare, listed above, Townley indicated that the Prosin Limited account would disclose checks reflecting payments to fugitive Virgilio Paz's wife. In addition, Townley also claimed that information contained in the Prosin Limited account might lead to the discovery of the whereabouts of fugitives Virgilio Paz and Jose Dionisio Suarez. Townley also expressed concern that information in the Prosin Limited account would lead to the discovery of details regarding "Project Andrea."

Records of the Prosin Limited account were subpoenaed through the U.S. Attorneys Office, Washington, D.C. in September, 1979. A thorough review of transactions in the account contained absolutely no information indicating payments to Paz's wife or any information that would assist in establishing the whereabouts of fugitives Paz and Suarez. The account contained no information related to "Project Andrea."

VII.  Visit of Chilean President Pinochet to Spain During November, 1975, with General Contreras Where They Met with "ALFA," an Italian Terrorist:

According to former Assistant U.S. Attorney Eugene M. Propper and author Taylor Branch, ALFA is identical with an Italian terrorist whose true name is Stefano Delle Chiaie.

Townley made reference to ALFA, although he did not disclose his true identity, in the following communications to Gustavo Etchepare:

Letters dated 4/26/79, 6/11/79, 6/16/79, 8/23/79, 8/29/79 and 9/2/79.

In his 4/26/79 letter to Etchepare, Townley, speaking of General Contreras, stated "There were meetings between him (Contreras), his Excellency (President Pinochet) and the Italians in Spain after Franco died. Also the Italians carried out numerous acts of military espionage against the Peruvians and Argentines not only in Europe, but also in Peru and Argentina."

In his 8/23/79 letter to Etchepare, Townley stated "I haven't spoken about the Italians. I have no idea where they are nor where they have been nor do I care to know! ALFA got mixed up with various people to do business in Argentina. Some of them had very bad backgrounds whom Argentine law enforcement agencies were seeking. Among other

-3-

◀◀ **Main page**        ◀ **Previous page**        **Next page** ▶

◀◀ **Main page**         ◀ **Previous page**         **Next page** ▶

communication, Townley requested information as to what happened
to "Daniel."

In another communication, Townley informed Etchepare
that Enrique Arrancibia traveled from Buenos Aires, Argentina, to
California during the Fall of 1977 on banking business for
ALFA.

According to Propper and Branch, both ALFA and "Daniel"
conducted operations on behalf of DINA.

VIII.  <u>Internal DINA Intrigues</u>:

Based on the content of several of Townley's
letters, it appears that CNI requested Townley and his wife
to provide any derogatory information that could be used
against General Contreras.  Townley expressed his reluctance
to provide such information and provided Etchepare with the
identities of former DINA personnel who had detailed personal
knowledge of irregularities and illegalities committed by
Contreras and other DINA officials.  In his 4/26/79 letter to
Etchepare, Townley provided the identities of the following
such individuals:

|  |  |
|---|---|
| Lima I | Garza |
| Hermes | Claudio |
| Halcon |  |

In the above letter, Townley informed Etchepare
that Colonel Valdivieso stole money from DINA accounts.
Townley also informed Etchepare that Sonia, last name not
mentioned, Valdivieso's DINA secretary, helped him to organize a
network of secretaries within DINA who reported everything coming
to their knowledge to Valdivieso.  In the same communication to
Etchepare, Townley also suggested that Valdivieso and Contreras
were involved in extorting money from ITT in Chile, as well as
the Racal Company in England in connection with contacts
participated in by these companies for the purchase of equipment
at the "Bloqueo de Maipu."

IX.  Townley's Concern Regarding the Assassination
     of Chilean Army General Carlos Prats and his
     Wife, Carmen, in Buenos Aires, Argentina on 9/30/74
     and the Attempted Assassination of Former Chilean
     Vice President Bernardo Leighton and his Wife,
     <u>Anita, in Rome, Italy, on 10/6/75</u>:

Retired Chilean Army General Carlos Prats Gonzalez
and his wife, Carmen, were assassinated in Buenos Aires on
9/30/74, when a bomb was detonated underneath their car as
they approached their residence.  At the time of his
assassination, General Prats had been critical of the
Pinochet Government for interfering in the Chilean

-5-

◀◀ **Main page**         ◀ **Previous page**         **Next page** ▶

◀◀ **Main page**         ◀ **Previous page**         **Next page** ▶

constitutional process and allegedly he was writing a book
documenting his criticisms.

Former Chilean Vice President Bernardo Leighton and
his wife, Anita, were shot several times in a downtown Rome
street on 10/6/75, as they approached their residence on
foot.  Leighton is a prominent member of the Chilean
Christian Democratic Party and at the time of his attempted
assassination in 1975, was an outspoken critic of the
Pinochet Government.

In numerous communications, which are listed below,
Townley expressed concern that the "Italians" and the
"Argentines" would submit Letters Rogatory seeking
information from him concerning the Prats assassinations and
the attempted assassination of the Leightons.  Townley
expressed fear that the "Italians," specifically ALPHA, and
General Contreras would provide information concerning the
attempted assassination of the Leightons which would
contradict what Townley might say in responding to Letters
Rogatory from the Italian Government, thereby placing Townley in
the position of perjuring himself.  Townley expressed similar
concern that unidentified elements of one of the Argentine
security services and Enrique Arrancibia would furnish
information concerning the Prats assassination, which would
contradict what Townley might say in responding to Letters
Rogatory from the Argentine Government, thereby placing Townley
in the position of perjuring himself.  Townley concluded that the
solution to his dilemma would be to take the Fifth Amendment in
responding to Letters Rogatory from the Italian and Argentine
Governments.  However, Townley noted that by taking the Fifth
Amendment, guilt on his part would be implied.

The letters in which Townley mentioned his concern
over Letters Rogatory from the Italian and Argentine
Governments concerning the Leighton and Prats matters are
listed below:

Letters to Gustavo Etchepare dated 6/23/78,
11/25/78, 4/18/79, 4/26/79, 6/4/79, 6/16/79, 6/22/79, 7/5/79,
8/13/79 and 8/23/79.  Letter to General Hector Orozco dated
11/24/78.

With regard to Enrique Arrancibia, this individual
is a former DINA agent, who resided in unofficial exile in
Buenos Aires as a result of his participation in the
assassination of Chilean Army Chief of Staff, Rene Schnieder.  He
was arrested by members of the Argentine Intelligence Service

-6-

◀◀ **Main page**         ◀ **Previous page**         **Next page** ▶

◀◀ **Main page**        ◀ **Previous page**        **Next page** ▶

shortly after Townley's expulsion from Chile to the United States in 1978 and charged with espionage against the Argentine Government.

X.   "Project Andrea"

        Refer to FBI letter to the Administrator, Federal Aviation Administration (FAA), dated 12/9/81, and accompanying memorandum for complete details. Supplemental data follows.

        In his letters, Townley suggested to Etchepare that the gas storage cylinders, which had been rented by DINA from a company in the United States, be purchased outright in order to avoid any additional problems involving the payment of rental charges to the company in the United States.

XII.  Visit by Guillermo Novo Sampol to Chile in 1976

Based on information provided by Propper and Branch
concerning an alleged planned kidnapping to be carried out in
Buenos Aires, Argentina, during the Summer of 1976 in which
the Cuban Nationalist Movement was to play a role, Townley
was interviewed concerning this allegation on 10/20/81 by SAs
Cornick and Scherrer.  Townley previously furnished
information during 1978 which indicated that Novo Sampol had
visited Chile during the Summer of 1976; however, Townley
stated that Novo's visit was not related to the Letelier
assassination and did not involve a violation of United
States law.

During interview with Townley on 10/20/81, he
advised that Novo Sampol visited Santiago, Chile while
Virgilio Paz was in Chile during June or July, 1976.  Townley
advised that Novo Sampol agreed to commit the Cuban
Nationalist Movement to participate in the kidnapping of an
unrecalled President of a Dutch bank in Buenos Aires,
Argentina.  According to Townley, civilian members of the
State Secretariat for Information (SIDE), one of the
Argentine intelligence services, had developed the Dutch
banker's secretary as a source and utilized information
provided by her to make tentative plans to kidnap the Dutch
banker and hold him for ransom.  Townley explained that the
Dutch banker and his secretary were having an affair and
customarily spent several hours during weekday afternoons
together at the same hotel, thereby assuring the civilian
members of SIDE of a definite location from which the Dutch
banker could be kidnapped.  Townley reported that the SIDE
civilian members believed it would be necessary to
assassinate the Dutch banker's driver, who customarily waited
for his employer at the hotel where the assignation
customarily took place.  Townley advised that Novo Sampol
provided $6,000 from the Cuban Nationalist Movement, which
was forwarded to the civilian members of SIDE in Argentina as
the Cuban Nationalist Movement's share toward the operational
expenses for the kidnapping operation.  Townley stated that
Novo Sampol, after returning to the United States, forwarded
a stock of paper to Townley in Chile, which was utilized to
print pamphlets in the name of "Grupo Rojo" (Red Group), a
nonexistent Argentine Marxist terrorist organization which
the civilian members of SIDE created in order to utilize this
group to claim credit for the kidnapping of the Dutch banker.
Townley advised that the "Grupo Rojo" pamphlets were printed in
Chile and forwarded to the civilian members of SIDE in Argentina,
where they were subsequently distributed in Mendoza and Cordoba

-8-

◀◀ Main page          ◀ Previous page          Next page ▶

in connection with bombings carried out by the SIDE civilian members. Townley noted that the purpose of utilizing the "Grupo Rojo" pamphlets in claiming credit for the bombings in Mendoza and Cordoba was to create the impression that the "Grupo Rojo" was a viable Marxist terrorist organization. Townley stated that Novo Sampol agreed to arrange for the pickup of the ransom for the Dutch banker in Europe and dispatched two unidentified Cuban Nationalist Movement members to establish necessary contacts in Europe to receive the ransom. Townley recalled that the ransom for the Dutch banker was to be paid in diamonds. Townley advised that the SIDE civilian members procrastinated in carrying out the kidnapping and indicated that the kidnapping never took place. Townley recalled that Novo Sampol traveled to Chile on a Braniff International Airways flight and returned to the United States via LAN-Chile. Townley advised that Novo Sampol utilized his true name to perform this travel; however, Townley arranged that Novo Sampol's entry into Chile and his departure not be entered into the records of the Chilean International Police in order to avoid the existence of documentation of Novo Sampol's travel.

XIII.    Interview with Michael Vernon Townley by
         Special Agents of the Federal Bureau of
         Investigation in Washington, D. C., on 10/20/81:

During interview with Townley by Special Agents of the FBI on 10/20/81 in Washington, D. C., Townley refused to provide any information concerning DINA operations, sources or methods that were mentioned in his letters, which were provided by Propper and Branch. Townley cited his agreement with the United States Government dated April 17, 1978, which required that he only furnish information to the United States Government relevant to violations of United States law or offenses committed in United States jurisdiction. Townley noted that he refused to answer any questions concerning DINA operations, sources or methods during the trial of the three Cuban defendants in the Letelier assassination, which took place in U.S. District Court, Washington, D. C., during early 1979, based on his agreement with the United States Government. Townley noted that his position was upheld by the presiding Judge and that he was not required to provide such information.

-9-

◀◀ Main page          ◀ Previous page          Next page ▶

◀◀ **Main page**      ◀ **Previous page**      **Next page** ▶

INDEX

| | |
|---|---|
| El Gerente | CNI Director General Odlanier Mena. |
| El Indio | CNI official Colonel Jeronimo Pantoja Henriquez. |
| Garza | Former DINA agent Jose Fernandez Schilling. |
| GAT | Grupo de Amigos de Townley (Code name for CNI financial support to Townley and his family). |
| Caballero | Former Dina Director General Juan Manuel Contreras Sepulveda. |
| Andrea | Code word for Chilean Government's nerve gas project. |
| Frank G. | Francisco (Frank) Gutay, U.S. citizen of Uruguayan origin. Owner of the American Business System Company in Georgia. He was an associate of Townley's in a computer company. |
| Mamo | General Contreras. |
| Tavo | Gustavo Etchepare. |
| Gustavo | Gustavo Etchepare. |
| Victor-Victor | Former DINA official Colonel Vaniel Valdivieso. |
| Los Picas or El Pica | Attorneys. |
| Contacto Regular | Term for Townley's DINA "cut-out" Gustavo Etchepare. |
| Ximena or Jimena | Secretary of Townley's U.S. Attorney Seymour Glanzer. |
| Roxana | Townley's former DINA Secretary Maria Rosa Alejandra Damiani Serrano. |
| Walter | Damiani's boyfriend or husband. |
| El Chico | Former DINA official Colonel Raul Iturriaga Neuman. |
| Franco | Generalissimo Francisco Franco, former ruler of Spain who died in 1975. |
| Sam | Townley's dog. |

◀◀ **Main page**      ◀ **Previous page**      **Next page** ▶

◀◀ **Main page**          ◀ **Previous page**          **Next page** ▶

| | |
|---|---|
| Luis Felipe | Former DINA Agent Enrique Arrancibia Clavel. |
| Pato | Townley's son-in-law. |
| Susie | Townley's step-daughter Susana Earnst. |
| La Flaca | Etchepare's wife. |
| ALFA | Italian terrorist Stefano Delle Chiaie, aka Alfredo di Stefano. |
| Daniel | Corsican terrorist and OAS member Albert Spaggiari. |
| Esteban | Townley's DINA driver and aide. |
| Hermes or H. | Eugenio Berrios, a chemical engineer who worked with Townley on Project Andrea and also was engaged in a parallel project for the Chilean Army. |
| Cuviches or Cubiches | Members of the Cuban Nationalist Movement. |
| City of Martin | Buenos Aires, Argentina. |
| Ches | Argentines. |
| Los viudos | Letelier's widow Isabel Letelier and Ronni Moffitt's widower Michael Moffitt. |
| mi viejo | Townley's father, J. Vernon Townley. |
| El Servicio | DINA or CNI. |
| El Fiscal | Former Assistant U.S. Attorney Eugene M. Propper. |
| Manuel or Manuel A. | Townley's Chilean Attorney Manuel Acuna. |
| Javier | Virgilio Paz Romero. |
| Pinocho | Chilean President Pinochet. |
| Cacho Acevedo | Possibly identical to former DINA officer Captain Hugo Acevedo Godoy. |
| Sonia | Secretary to former DINA official Colonel Daniel Valdivieso.  Sonia apparently ran a network of secretaries within DINA and assisted Valdivieso in gathering data on other DINA officials. |

-2-

◀◀ **Main page**          ◀ **Previous page**          **Next page** ▶

| | |
|---|---|
| Miranda C. | Sergio Miranda Carrington, General Contreras' attorney. |
| la pelota del otro lado | Former Legat, Buenos Aires, Calvin C. Clegg. |
| Fernando | Fernando Cruchaga, former LAN-Chile Station Manager, New York City. |
| Los vecinos | The Argentine Government. |
| Cafe rojo punto verde kilo or cafe rojo verde kilo (CR VK) | Secret support fund for the Townley family in Chile. |
| Chris | Townley's son. |
| Brian | Townley's son. |
| Armando | Former DINA officer Captain Armando Fernandez Larios. |
| Enrique A. | Former DINA agent Enrique Arrancibia Clavel. |
| Weck | James Weck, an attorney and family friend of the Townleys. |
| Pros. or Pro. | Prosin Limited bank account maintained by Townley at the Southeast First National Bank, Miami, Florida. |
| Ken | Kenneth Enyart – alias of Townley. |
| Andres W. | Andres Wilson – alias of Townley. |
| Los Gringos | The Americans. |
| alfa echo | Alfredo Etcheberry, Chilean attorney representing U.S. Government in Chile. |

The identity of the following individuals and the meaning of the following code names and code words were unknown to Propper and Branch and are being listed for reference purposes only.

| | |
|---|---|
| Canario | Identity unknown. Apparently involved in a computer business in Santiago, Chile at the University of Chile with Townley. |

-3-

◀◀ **Main page**          ◀ **Previous page**          **Next page** ▶

◀◀ **Main page**          ◀ **Previous page**

| | |
|---|---|
| Gaviota | Identity unknown. Apparently involved in a computer business in Santiago, Chile at the University of Chile with Townley. |
| Lobo | Identity unknown. An apparent DINA agent who had contact with Anital Lipthay, another DINA agent. |
| Roberto Smith or Roberto S. | Identity unknown. Appears to be connected with FBI and telephonically contacted Townley's sister in Westchester County, New York during 1979. |
| Honorato | Identity unknown. Possibly was a TV reporter. |
| DAG | Identity unknown. Possibly was a DINA agent. |
| Eugenio | A DINA agent who was a contact of ALFA. |
| Freddy | Identity unknown. Was a DINA agent who apparently was aware of details of bank accounts maintained in the U.S. by General Contreras. |
| Don Cristian | Identity unknown. Was the DINA control officer at DINA Headquarters who ran ALFA. |
| LIMA I | Identity unknown. Was a DINA agent who was aware of irregularities in the operation of DINA committed by General Contreras. |
| Claudio | Identity unknown. Was a DINA agent who was aware of irregularities in the operation of DINA committed by General Contreras. |
| Halcon | Identity unknown. Was a DINA agent who was aware of irregularities in the operation of DINA committee by General Contreras. |
| Elias | Identity unknown. May possibly have been a DINA agent. Apparently the investigation of Chilean Military Prosecutor Hector Orozco was damaging to his interests. |

There are numerous other code names, code words and nicknames in Townley's letters to which it was impossible to render any interpretation or meaning.

—4—

◀◀ **Main page**          ◀ **Previous page**

Michael Vernon Townley's "History of Actions in the DINA".

# Exhibit G

to Memorandum of Points and Authorities
in Support of Plaintiffs' Motion for Summary Judgment

in
*González-Vera, et al. v. Kissinger, et al.*
Civil Action Case No. 1:07CV00995 (HHK)

**Plaintiffs' Exhibit Y**
To Memorandum in Support of Default Judgment
Against Michael Vernon Townley

No. 1:02-CV-02240

# AFFIDAVIT

I, Eric B. Marcy, have held the position of Deputy Federal District Attorney since 1970, for the District of Columbia. Amongst the duties which I have carried out in said position, are the investigation and bringing to court of many cases due to infringements on the criminal federal laws of the United States. Since February of 1989 I have been assigned to the Section on Transnational and Principal Crimes of the Federal District Attorney's Office. Starting in April of 1989, I have been in charge of the investigation and the trial of Jose Dionisio Suárez and Virgilio Paz, who were charged in 1978 with the murder of the former ambassador to Chile in the United States, Orlando Letelier, and of his collaborator Ronni Moffitt. Within their respective cases, both Suárez and Paz have pleaded guilty of associating criminally to murder a foreign official, which constitutes an infringement of Section 1117 of Title 18 of the United States Code. I am currently in charge of the investigation and the trial of the remaining fugitives who are wanted by this country's authorities, Juan Manuel Contreras Sepúlveda (hereinafter, Manuel Contreras) and Pedro Espinoza Bravo (hereinafter referred to as Pedro Espinoza).

I have carefully examined the request of extradition that the United States presented to the Chilean Supreme Court on September of 1978, as well as Trial Exhibit Documents numbered A and 1 through 157, and in our files, and I attach them to the present affidavit by reference, as if they comprised a part of this document in their entirety.

In the course of our investigation, starting at the presentation of the extradition request of 1978, several important pieces of evidence have emerged, which not only involve Manuel Contreras and Pedro Espinoza in the murder of Orlando Letelier, but discover in detail the criminal cover carried out by Contreras and Espinoza and by other heads of the Chilean army.

FIRST, we have located four documents drafted by Michael Townley before he was exiled from Chile and before any representative of the United States Government began to talk to him about his participation in Letelier's murder. These four documents were drafted by Townley before he was exiled from Chile, so as to protect himself from the fugitives from justice Manuel Contreras and Pedro Espinoza, and prevent his exile from Chile.

The first document is nine pages long; it is dated March 14, 1978 and is titled: "History of actions in the DINA". In this document, Townley narrates how he got to know Pedro Espinoza and Manuel Contreras and how they hired him. Townley also narrates how Manuel Contreras ordered him to move to a house in Lo Curro and there setup a laboratory in order to manufacture the neurotoxic gas whose common name is "Sarin". Townley explains that at a latter date he was sent to the United States, Mexico and Europe in order to carry out criminal jobs for the DINA. This document provides a chronological narration of his association with the DINA and is attached to the present affidavit as Exhibit 1.

254

The second document is four pages long; it is dated March 13, 1978 and is titled: "Confession and accusation". It begins with the following words:

> In the first place, if there has been enough reason to open this envelope, I hereby accuse the Government of Chile of my death. Specifically, as the intellectual author of my death, I accuse general Manuel Contreras S. ...

Townley, immediately following, enumerates the tasks that he carried out for General Contreras while at the DINA, including the manufacture of the neurotoxic gas "Sarin" and its use in human beings, the coordination for the murder attempt of Bernardo Leighton in Rome in 1975, the kidnapping of Vitorio Yaconi (and others), and the murder of Orlando Letelier in September of 1976; this is attached as Exhibit 2.

The third document is five pages long; it is dated March 14, 1978 and is titled "Narration of the events at the death of Orlando Letelier on September 21, 1976". Townley describes in great detail his participation in the murder of Orlando Letelier and explains that his orders had been given him by Manuel Contreras through Pedro Espinoza; this document is attached as Exhibit 3.

The fourth document is only one page long; it is dated March 14 and is titled "Statement of identities". Townley lists in it all of the fictitious or false names he had used while working for the DINA (now, CNI); this document is attached as Exhibit 4.

I, the undersigned, received Exhibits 1 through 4 from Mariana Callejas and Townley in mid 1990, when I was preparing the trial of Jose Dionisio Suárez. Each one of these exhibits is a photographic copy of the hand written original; each one carries an original hand written notation which reads: "Legitimate copy"; each one carries the original signature of Michael Townley and an original inked fingerprint. Exhibits 1-A, 2-A, 3-A and 4-A are photocopies. Exhibits1 through 4 have been examined in the laboratory of the Federal Bureau of Investigations (FBI), and said examination has shown the fingerprints that appear on these documents to be the same as the known fingerprints of Michael Townley. We also attach a copy of the laboratory FBI report as Exhibit 5. Several lines from pages 2, 3 and 9 of Exhibit 1 ("History of Actions in the DINA") and of page 1 of Exhibit 2 ("Confession and accusation") are covered. The undersigned sent said Exhibit 1 and 2 documents to the FBI laboratory, where they were deciphered and the covered lines were photographed. Each one of these pages is followed by a photocopy of the corresponding photograph for Exhibit 1 (Laboratory No. 196) and 2 (Laboratory No. 197); the FBI laboratory report is attached as Exhibit 6.

SECOND, in 1982, Mariana Callejas and Townley delivered a copy of a five page letter, which was verified to have been written before their exile from Chile, from "J. Andres Wilson S."(pseudonym used by Michael Townley) to Manuel Contreras, which begins with the address to "Dear Don Manuel". This letter, it is also evident, was written before any agreement was reached with the United States; in it, the operative errors which

were made in the murder of Letelier are described, the cover which was incurred before the Chilean Supreme Court in response to the letters rogatory from the United States, and another attempt to obstruct the investigation in Chile and in the United States. This letter is attached to the present affidavit as Exhibit 7, and a photocopy of the same is presented as Exhibit 7-A.

THIRD, in 1982, Mariana Callejas and Townley delivered an account book corresponding to the period of January 1975 to December 1976. Mariana Callejas also delivered a large quantity of receipts for the construction of Townley's chemical laboratory (Andrea). This account book registers the records corresponding to said receipts. Almost the entire laboratory had been built by the end of March of 1976. This work was apparently carried out by two people: Martin Melian and Juan Espinoza. From the examination of the disbursements recorded in the account book, one can infer that the following people had been employed in Townley's brigade:

Mario, Esteban
Freddy (the first name is unknown) Janer (*hand written note: 223.6519 (Flabio)*)
Carlos Gonzales
Hector, Rafael Pacheco
Rafael Guzman
Nestor
Jose
Hermes
Bety

Under this account book, the following interesting entries appear:

1. Reimbursement for parking, Pudahuel airport, September 5 and 10, 1976.
2. Disbursement for "Andres" for the purchase of *pisco* on September 8, 1976, on the day that Townley left Chile to kill Letelier.
3. Reimbursement of funds for a return trip to Pudahuel on June 6, 1976, which might have corresponded to the arrival in Chile of Guillermo Novo.
4. Reimbursement for Hector for a trip to Pudahuel on September 18, 1976. This might have to do with the recovery of Peterson's passport, returned to Chile by Townley from the United States, via Lan Chile (the Chilean airline).
5. Reimbursement on August 8, 1976 for passport pictures. This might be linked to the photographs used by Townley for Peterson's passport.

These receipts are meant to correspond to the purchase of material for Townley's laboratory. In several of the same, the name of Hermes Bravo is written, whose address is set as Los Pensamientos 192, Santiago. Other receipts are written to Donal Guzman, Berúa 6989, Cisterna. There is also a receipt made out to the company "Consultec", the façade company which Townley had in Buenos Aires.

This account book carries important and current information regarding the income

and expenses which the Towneley's incurred while they were in the service of the DINA. A copy of said account book is attached as Exhibit 8. The receipts are attached as Exhibit 9.

FOURTH, in 1987, Armando Fernandez Larios resigned his position in the Chilean Army and contacted certain representatives of the United States, in order to solve his pending matters before the United States system of justice. We attach to this document, as Exhibit 10, a copy of the letter of resignation, dated January 21, 1987 and his letter of dismissal, of the same date, and related letters. This exhibit shows that some generals of the Chilean army, who had conspired with general Contreras in what has come to be called "Operation Masquerade", ordered Fernandez Larios to lie before the Chilean Supreme Court (chaired by magistrate Israel Bórquez). It also proves that Fernandez Lario attempted several times to get permission from his superiors in the Chilean army to take back the false testimony which he had been ordered to give before the Chilean Supreme Court. These requests to withdraw his statement were systematically denied, leaving Fernandez Larios no other option than to renounce from the Chilean army and find his own tribunal in which to testify to the truth, which did not exist in Chile. Fernandez Larios was not exiled from Chile, in contrast to Michael Townley. United States system of justice could not reach him as the Chilean Supreme Court had denied his extradition, based on the false statements of Manuel Contreras, Pedro Espinoza and Fernandez Larios himself, among others. Fernandez Larios chose to abandon his employment and pension in the Chilean Army and voluntarily submit to a murder trial in the United States.

After having resigned from the Chilean Army, Fernandez Larios met with certain representatives of the United States and narrated what he knew about the Letelier case, of how it had been covered and what his participation had been. This interrogation or questioning session, which took place before any agreement was reached between Fernandez Larios and the Office of the District Attorney of the United States, is attached in the Affidavit and Appendix A by Michael Kozak, which is given the name of Exhibit 11.

After the interrogation referred to in the paragraph above, Fernandez Larios and the Office of the District Attorney of the United States arrived at an agreement regarding his guilty plea in this matter, in order to resolve his case. This agreement is recorded in the official communication dated January 29, 1987, addressed to Fernandez Larios' attorney, Axel Kleiboemer, by the then Federal District Attorney, Joseph E. diGenova. This official communication is attached to this affidavit as Exhibit 12. On February 4, 1987, an indictment was presented before the Federal District Court of the District of Columbia in which Armando Fernandez Larios is accused on only one count: of having been an accomplice and covering the murder of a foreign officer, which is an infringement of sections 1116 a) and 3 of Title 18 of the United States Code; this is attached as Exhibit 13. On the same date, a statement of facts stipulated to by both sides, titled "Presentation of the Facts" was also filed. This document is sixteen pages long [in the original English text], and comprises an original narration of the facts known by both

Fernandez Larios as well as by the United States Office of the District Attorney, on the truth of which both agree. This is attached to this presentation as Exhibit 14. On May 6, 1987, the District Court sentenced Fernandez Larios, based on his guilty plea. A copy of the Ruling and Order of Reclusion is attached as Exhibit 15.

FIFTH, on April 11, 1990, Jose Dionisio Suárez was arrested in the Central District of Florida, after having fled from justice since 1978, and was returned to the District of Columbia. Once he found out the overwhelming force of the evidence held by the Office of the District Attorney against him, Suarez pleaded guilty of having associated in a criminal manner to murder a foreign official, an infringement on Section 1117 of Title 18 of the United States Code. On November 15, 1990, he was sentenced to twelve years in prison by Presiding Judge Aubrey Robinson. Exhibit 16 is attached to this document, and includes the copies of the corresponding formalities.

SIXTH, on April 23, 1991, Virgilio Paz Romero was arrested in the Meridian District of Florida, after having fled from justice since 1978, and was returned to the District of Columbia. Once he found out the overwhelming force of the evidence held by the Office of the District Attorney against him, Paz Romero pleaded guilty of having associated in a criminal manner to murder a foreign official, an infringement on Section 1117 of Title 18 of the United States Code. He will be sentenced on September 11, 1991 by Presiding Judge Aubrey Robinson. Exhibit 17 is attached to this document, and includes the copies of the corresponding formalities.

[signed]
Eric B. Marcy
Deputy Federal District Attorney

Signed and sworn before me on September ___ 1991.

_____
Aubrey E. Robinson, Jr.
First Magistrate
Federal District Court
of the District of Columbia

258

**"History of Actions in the DINA"**

Approximately in August of 1974 we met Commander (now Colonel) Pedro Espinoza, member of DINA, through the owner of the house we rented, Mrs. Monica Garcia Reyes de Silva (current secretary of the Vice-President of the ECA), who wanted to meet us because of our previous anti-Marxist and anti-UP acts. This contact turned into a friendship and into a job offer. In December of 1974, I was asked by the Director of the DINA -Colonel M. Contreras S.- to make a trip to the USA in order to purchase electronic counter-intelligence equipment, to be used for the protection of General Pinochet in his immediate trip to Peru for the Conference of Ayacucho (he did not go). I used a USA passport for this trip which I had obtained legitimately but with false data, [using] my [own] photograph and the name of Kenneth William Enyart (Enyart as the Surname). At the beginning of 1975 we had gone on to depend from the orders of Mayor Eduardo Iturriaga Neumann (now Commander and I received orders to go to Mexico with my wife, and attempt to locate Pedro Vaskovic, or Faisovich, or Mr. Hugo Vigorena and to eventually eliminate them .

We were given the sum of US$ 30,000.00 in order to go to the USA and make contact with anti-Marxist Cuban or other groups and acquire the necessary documentation, as well as materials, guns, explosives, equipment etc.

As a side note, in January of 1975 we had to leave our house in Pio X and we moved to Via Naranja N° 4925, Lo Curro, a house which my wife and I had found [and] which was bought by order of Colonel M. Contreras S. and given to us as a residence and workplace for a Chemistry Project which had been spoken of with Colonel Contreras and which he ordered to take place. This project was that of finding the manner in which to produce "SARIN", a poison of the family of the organic phosphates, developed during World War II and used as a weapon of national defense, or as a weapon of clandestine elimination (its effects can be confused with a heart attack). It is thus that during all of my following trips to Europe I kept working on this project and in my absences I purchased the most necessary equipment and materials. (Purchases from Galleakscomp and Co. in London, Fisher Scientific in the USA [Mr. Jose Santos in the New Jersey offices] and PRC in Orlando, Florida, etc.) (Note: this project yielded optimum results during Holy Week of 1976. – The house was bought from Angel Vidaurre by a start up company, and signed by Mr. Diego Castro Castañeda (a.k.a. Commander Eduardo Iturriaga N.) and Rodolfo Schmidt (now running for Justice Administration Major, Rolando Acuna, OEPD).

(Note: He says that General Manuel Contreras was relieved from his post as_____ from the CNI (in DINA) he informed me of his intention of giving us this house in Via Naranja N° 4925 as a gift. This did not (illegible) promises from my part such as _____ legal deficiencies in the first purchase agreement between Vidaurre and the embryotic company.

Legitimate copy

25 9

Going back to the beginning of 1975, we moved to Miami and contacted people from the Nationalist Cuban Liberation Front (ABDALA) and the Head of the Croatian Movement (an ex Yugoslav colonel, Vlado Sesca) and the MNC (Cuban Nationalist Movement). Our plan was to purchase a motor home and with forged documents and license plates plus the help of a person from one of these groups, proceed to Mexico in order to carry out the order. The contacts did not bear fruit, except for a good friendship with Colonel Sesca and future possibilities with his people in Europe and a referral by Felipe Rivero [through which we were able] to go to New Jersey to visit Guillermo Novo, Head of Actions of the MNC. I knew that he had recently been in Chile, with Dionisio Suarez and Dr. Orlando Bosch and that DINA had not begun a concession with them (this I knew by chance as I was in the office of Mr. Iturriaga N. when they let him know of the arrival of these people to Chile).

The results of this contact, even though it turned out to be nearly fatal for us, until the MNC accepted that we really were from the DINA and not infiltrated from the CIA, was that they gave us a man, and explosives to go to Mexico as well as blank New Jersey driver's licenses and blank birth certificates. In Miami I bought two pistols, a rifle and a radio transmitter-receptor equipment through Mr. Jorge Smith of Silmar Electronics of Miami to be used as a remote control in order to activate the explosion. We had the documents made out in the name[s] of Andrew and Anna Brooks and proceeded to go to Mexico in the motorized home. With the exception of being able to verify several facts which were known to us, we were not able to locate our targets and we left Mexico crossing the border at Laredo, having returned the materials. We left the remote radio equipment (Brand: Fanon Courier) in the hands of the attorney Luis Gutierrez Camarena, friend and collaborator of the Croatian Movement of Vlado Sesca and a friend of Stef Von Metyger. I suppose that these materials are still under the care of Mr. Gutierrez Esq.

Upon our return from Mexico, I received instructions to continue immediately to Frankfurt, Germany, with my wife (she insisted in returning to Santiago to see our children and then reunite with me in Europe at a latter date) and make contact with Pedro Rojas, a Chilean (This was his code name) who is a former union leader of the Central Worker's Union (Central Unica de Trabajadores) and who was delivering information of the UP in exile, and through him, to attempt to locate former representative Bernardo Leighton of the D.C. who lived in Italy, and persuade elements from the "Avanguarda Nazionale", a neo-fascist Italian group under the direction of "Alfredo" (real name: Di Steffano) to eliminate Bernardo Leighton. I dedicated the rest of 1975 to this, as well as to creating connections in Europe, opening communication routes, meeting intelligence tasks and goals, meeting requirements, purchasing explosive material, this through Mr. Francis de Somet D'Olbeche of the PRB firm in Brussels, Belgium—. Besides my wife, I also traveled with the same Cuban of the MNC who went with us to Mexico –. This Cuban is the same one who photographed the installations of British prisons in Northern Ireland, under my instructions, by orders received from the DINA in Santiago.

Legitimate copy.

Having returned to Chile towards the end of 1975, I dedicated my time almost exclusively to the development of "SARIN", finishing the laboratory here at home (this can be seen in what used to be the house and in the caretakers there) and the classification of similar products such as "SOMAN" and "TABUN" and other products of extreme toxicity, such as Clostridium Botolinic, saxtoxine and tetrodotoxine, etc.

At the beginning of 1976 a new Brigade was created called "Mulchen" of which my group formed a part called "Wasp". The "Mulchen" Brigade is under the orders of Captain Guillermo Salinas, who received his orders directly from Colonel Contreras (Commander Iturriaga had nominal command, but he was taking an Economics course in the University of Chile, so Captain Salinas substituted for him). This Mulchen Brigade was created for vast secret missions of elimination and other missions [which] depended on exclusive orders from Mr. Director Colonel Manuel Contreras Sepulveda. After the development and production of "Sarin" in April of 1976, the Mulchen Brigade was instructed in its use and, to my knowledge, has been used in at least two opportunities – one with a real estate agent in Santiago who lived on Holland and Providencia and the other, a staff member of DINA, who was involved in the theft of some vehicles for his own enjoyment along with his accomplice, an officer who, when they were trapped by the Police Service and physically pressured, incriminated his superior officers at the DINA. After being rescued by the DINA, he was hospitalized in DINA's "Londres" Clinic with broken ribs, and one night, people from Mulchen injected Sarin into the man's veins, and this man died almost instantly, without the medical doctors being able to tell that the death was not due to complications from the wounds the police had given him. The two deaths can be easily verified with a [Lab] exam of cholinesterase activity[1] and levels or [a test of] anti cholinesterase if the bodies were to undergo an autopsy.

Another operation carried out by the Mulchen Brigade was the kidnapping and murder of the Spanish United Nations Officer, Carmelo Soria. As there was no other place, they brought this gentleman to my house on the night in which they kidnapped him, and they killed him in the backyard using physical means. They later took him in a car, which they pushed off a cliff in the road between Pyramide and Chonchali. The kidnapping was done wearing uniforms from the Chilean Police force. – Besides the facts surrounding [the] Orlando Letelier [incident] which I deal with in a separate section as appendix "A", the only other important fact was the location of Vitorio Yaconi at the beginning of 1977 for which, his lover Silvia and her friend Paulina Bonati Cocha were both detained, and we had them secluded at my house for almost two weeks and it was through the lover that he was located in Buenos Aires and we were able to bring him back to Chile. I am aware that the DINA benefited with US$ 39,000.00 which Yaconi had with him.

Another incident towards the end of 1976 (December) was a mission that was to take place in Paris in combination with the Argentineans and the "Condor" Network, in order

to eliminate the daughter of journalist Hernandez Parker and "gato" Valenzuela, both of which were very high leaders of the MIR in Paris, and worldwide due to perfidy by the Argentineans while we waited (my wife and I) in Frankfurt, Germany. At that moment we learned that Carlos Altamirano was on his way to the first meeting of the Spanish Socialist Worker's Party in Madrid and they ordered us to move to Madrid, in order to eliminate him immediately. As this mission had been concluded we did not do this. We also worked on this last matter in Spain with the Italian "Alfredo" (Di Steffano) who happened to be there with his people at that moment. I am aware that I am forgetting many details and facts, but it must be considered that it has been four years since I was at the DINA (now the CNI).

I attach to all of this, photocopies of many documents which support my tale. The original documents are in the USA with my attorney, and my father, U. Townley will know which attorney to talk to in order to locate them.

I swear to the truth of all of the above.

Signed: Michael Townley
Michael Vernon Townley Welch
Identification Document No. 4.369.118-K Santiago/ Foreigner.

I swear I have always worked and acted on my own and under orders and with specific instructions from my superior officers at the DINA, and that the majority of the orders for missions abroad for eliminations were given by General (former Colonel) Manuel Contreras Sepulveda and developed in its details by the officers of the DINA subordinate to him.

Signed: Michael Townley
Michael Vernon Townley Welch
Identification Document No. 4.369.118-K Santiago/ Foreigner.

Legitimate copy

262

Confirmation of Service of Plaintiffs' First Amended Complaint
on Defendant Attorney General (June 19, 2007).

# Exhibit H

to Memorandum of Points and Authorities
in Support of Plaintiffs' Motion for Summary Judgment

in
*González-Vera, et al. v. Kissinger, et al.*
Civil Action Case No. 1:07CV00995 (HHK)

# CERTIFICATE OF SERVICE

I, Solomon Shinerock, hereby certify that on June 12, 2007, I served a true copy of the

foregoing Plaintiffs' Amended Complaint by certified mail, postage pre-paid, addressed to the

defendants as follows:

[Michael Vernon Townley, c/o]
U.S. Marshal Service
Witness Security Program
Attn: MOW
Washington, DC 20530


Alberto Gonzales
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, DC 20530-0001


The United States of America, c/o

Alberto Gonzales
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, DC 20530-0001


Attn: Civil Process Clerk
Office of the United States Attorney
555 Fourth Street, NW
Washington, DC 20530

_____
Solomon Shinerock

Washington, District of Columbia

Subscribed and sworn to before me, in my presence,

this 12ᵗʰ day of June, 2007

by Solomon Shinerock

Antoinette M. Hayes, Notary Public

My Commission Expires 11/14/2007

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

Michael E. Tigar
4801 Massachusetts Ave, NW
Suite 206c
Washington, DC 20016

---

SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Alberto Gonzales
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, DC 20530-0001

COMPLETE THIS SECTION ON DELIVERY

A. Signature

X _Ernest L. Parker_     ☐ Agent
                         ☐ Addressee

B. Received by (Printed Name)     C. Date of Delivery
JUN 1 8 2007                      6-18-07

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:         ☐ No

3. Service Type
   ☑ Certified Mail     ☐ Express Mail
   ☐ Registered         ☐ Return Receipt for Merchandise
   ☐ Insured Mail       ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)             ☐ Yes

2. Article Number
   (Transfer from service label)     7099 3400 0011 8491 3094

PS Form 3811, August 2001          Domestic Return Receipt          102595-02-M-1540

Affidavit, signed by Kearn J. Knowles (Sept. 30, 2004)
(confirming service of summons on Defendant Townley, in
*González-Vera, et al. v. Kissinger et al.*, Civil Action No. 1:02CV02240
(HHK)).

# Exhibit I

to Memorandum of Points and Authorities and Statement Of
Material Facts As To Which There Is No Genuine Dispute
in Support of Plaintiffs' Motion for Summary Judgment

in
*González-Vera, et al. v. Kissinger, et al.*
Civil Action Case No. 1:07CV00995 (HHK)

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

A F F I D A V I T

Laura Gonzalez-Vera et al.

VS                                         DOCKET NUMBER

Henry A. Kissinger et al.                1:02CV02240

I, KEARN J. KNOWLES, of full age, being duly sworn according to law, do depose and say that:

1) I am the Chief, Witness Security Program, United States Marshals Service, U.S. Department of Justice, Washington, D.C.

2) As Chief of the Witness Security Program, I am responsible for the administration of the activities of the United States Marshals Service in the U.S. Department of Justice Witness Security Program.

3) To the best of my knowledge and belief, Michael Townley was served with a Civil Summons and Complaint by a Deputy United States Marshal on January 09, 2003, at 12:30 P.M.

_____
KEARN J. KNOWLES

City/County of Arlington
Commonwealth/State of VIRGINIA
Sworn to and subscribed before me this 20th day
of February 2003 Witness my hand and official seal.
Kaye M. Hunter , Notary Public
September 30, 2004
(Print your expiration date above)

Declaration of Default (Aug. 23, 2003).

# Exhibit J

to Plaintiffs' Statement Of Material Facts
As To Which There Is No Genuine Dispute
in Support of Plaintiffs' Motion for Summary Judgment

in
*González-Vera, et al. v. Kissinger, et al.*
Civil Action Case No. 1:07CV00995 (HHK)

Default - Rule 55A (CO 40 Revised-DC 02/00)

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LAURA GONZALEZ-VERA, ET AL
     Plaintiff(s)

     Civil Action No.  02-2240 (HHK)

     v.

HENRY ALFRED KISSINGER, ET AL
     Defendant(s)

RE: MICHAEL VERNON TOWNLEY

### DEFAULT

It appearing that the above-named  defendant has   failed to plead or otherwise defend this action. though duly served with summons and copy of the complaint on          1/9/03       , and an affidavit on behalf of the plaintiff having been filed, it is this 29th  day of _____August_____  2003  declared that:  defendant is   in default.

NANCY MAYER-WHITTINGTON, Clerk

By: _____
               Deputy Clerk