UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LAURA GONZALEZ-VERA, et al.,           )
                                       )
                    Plaintiffs,        )
                                       )
v.                                     )           Civ. No. 07-995 HHK
                                       )
MICHAEL VERNON TOWNLEY, et al.,        )
                                       )
                    Defendants.        )
_____)

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS,
OR ALTERNATIVELY, FOR SUMMARY JUDGMENT**

**INTRODUCTION**

The judgment at issue in this case was entered against a participant in the Federal

Witness Security Program, 18 U.S.C. §§ 3521-3528 ("program" or "witness security program").

Its enforceability by the judgment-holder is limited by certain constraints in one provision of the

program's statutory scheme, 18 U.S.C. § 3523.  Those constraints reflect a careful balance struck

by Congress: it intended to keep its bargain to protect cooperating witnesses without rendering

them completely judgment-proof.  The statute therefore allows the enforcement of judgments

and the disclosure of a witness's location and identity only under prescribed circumstances

which do not exist here.

The program was designed to encourage the cooperation of witnesses whose critical

testimony in criminal cases would jeopardize their safety in the absence of federal protection.

Defendant Townley was such a witness in United States v. Sampol, 636 F.2d 621 (D.C. Cir.

1980), a murder case involving the assassination of the former Chilean ambassador to the United

States.  "Without Townley's testimony the government would not have had a case," 636 F.2d at

640, but as a result, Townley is potentially "a marked man for his entire life," id. at 679.  He

therefore receives federal protection for facilitating the government's prosecution of "one of the most monstrous international crimes in recent history." Id. at 629 n.3, 679.

The constraints of 18 U.S.C. § 3523 operate in this case not only to preclude the relief plaintiffs seek, but to preclude their suit entirely. The Court lacks jurisdiction to grant relief to plaintiffs under 18 U.S.C. § 3523, because the statute does not permit the enforcement of a judgment by non-residents of the United States. Neither plaintiff is a resident of the United States.

Furthermore, plaintiffs are entitled to neither the disclosure of defendant Townley's location and identity nor the appointment of a guardian on grounds that the Attorney General has not complied with the statute – because he has in fact fully complied. Upon request, the Attorney General helped plaintiffs to enforce the default judgment against defendant Townley by ascertaining his current financial situation, determining what payments he could reasonably make, and obtaining defendant Townley's agreement to make them. The statute requires nothing more.

Only when the Attorney General has not found reasonable efforts to comply with a judgment can a guardian be appointed who would then have access to the witness's location and identity, a situation that is not present here. A guardian is in any event not necessary because the Attorney General has thoroughly inquired into defendant Townley's finances using resources that would not even be available to a guardian. To further expose defendant Townley's whereabouts to a guardian, or plaintiffs, under these circumstances would only place his safety at risk and undermine the government's efforts to obtain testimony to support criminal prosecutions. For these reasons, defendants' motion to dismiss, or alternatively, for summary

judgment should be granted.

## BACKGROUND

Defendant Townley testified for the United States in United States v. Sampol, 636 F.2d at 629. See 18 U.S.C. § 3521(b)(1)(G). He was sentenced to ten years imprisonment in Sampol, and served five years in prison before he was released on parole, since which time his identity and location have been protected. Declaration of Stephen J. T'Kach ("T'Kach Dec.") ¶ 4 (Exhibit 1). Pursuant to his plea agreement, he has cooperated fully with the United States and provided information, including self-incriminating testimony, for nearly thirty years. Id. ¶ 4.

In this action, plaintiffs seek to enforce the default judgment entered against defendant Townley on November 23, 2005, in Gonzalez-Vera v. Kissinger, No. 1:02CV02240 (D.D.C.), for his collaboration in the death of plaintiff Soria.[1] Plaintiffs' Amended Complaint ¶ 2. On February 2, 2007, plaintiffs' counsel contacted the Attorney General for assistance in enforcing the judgment pursuant to 18 U.S.C. § 3523. Plaintiffs' Amended Complaint Exhibit F. Specifically, he asked the Attorney General to investigate and determine whether defendant Townley had made reasonable efforts to comply with the judgment. Id. In the event reasonable

---

[1] Prior guardianship proceedings regarding Mr. Townley took place in an earlier case, Letelier v. Republic of Chile, 502 F. Supp. 259 (D.D.C. 1980), in which the family of the former Chilean ambassador (whose murder was prosecuted in Sampol) sought civil damages from defendant Townley. Letelier was also initiated by the law firm of plaintiffs' current counsel, Michael Tigar, and resulted in a $5,062,854.90 million default judgment against defendant Townley in 1980. T'Kach Dec. ¶ 5. The plaintiffs in Letelier petitioned the Court in 1985 for the appointment of a guardian to enforce the judgment. T'Kach Dec. ¶ 5. Through the U.S. Marshals Service, the guardian conducted a deposition of defendant Townley in a secure location, and he requested and received full disclosure of defendant Townley's assets and liabilities. Id. The guardian's report was provided to Mr. Tigar's law firm in 1986; no assets were located and no payments were ordered; and the plaintiffs dismissed the proceedings without prejudice in 1987. Id.

efforts had not been made, plaintiffs' counsel asked the Attorney General to urge defendant

Townley to make reasonable efforts, and further asked that the identity and location of defendant

Townley be disclosed, id., which would amount to termination of his protection.

In response to this request, the Attorney General took several measures. On March 6,

2007, the Office of Enforcement Operations ("OEO"), Witness Security and Special Operations

Unit, asked the United States Marshals Service to advise defendant Townley that if he did not

take satisfactory steps to comply with the judgment within thirty days, his location and new

identity might be divulged. T'Kach Dec. ¶ 7. The Marshals Service so advised Mr. Townley on

March 13, 2007. Id. On April 5, 2007, the Director of the Witness Security Program, who is the

Attorney General's designee for such matters, id. ¶ 1, requested an update of defendant

Townley's financial situation from his former attorney, Jeff Johnson. Id. ¶ 7. In an April 30,

2007 response, Mr. Johnson provided a current affidavit from Mr. Townley describing his

present assets, debts, and income, as well as his financial history. Id. A few days later, the

Witness Security Program Director sought further information from Mr. Johnson about

defendant Townley's potential for satisfying the judgment. Id. Mr. Johnson provided the

information on May 17, 2007. Id. After receiving this material, and based on defendant

Townley's current economic circumstances, the Witness Security Program Director determined

that it was reasonable for defendant Townley to pay $75 per week until the judgment was

satisfied. Id. On June 1, 2007, the Director sent notice of that determination to defendant

Townley's counsel and to plaintiffs' counsel. Id.

On May 17, 2007, the Witness Security Program Director offered to meet with plaintiffs'

counsel. T'Kach Dec. ¶ 8. Plaintiffs' counsel arranged to meet with the Witness Security

Program Director, and did meet, on June 14, 2007.  Id.  In the interim, defendant Townley agreed

to pay the amount specified as long as his economic circumstances remained the same.  Id.  The

Director informed plaintiffs' counsel of this fact on at their meeting on June 14, 2007.  Id.  On

June 1, 2007, plaintiffs filed the present lawsuit.

## ARGUMENT

### A.    18 U.S.C. § 3523 DOES NOT PERMIT SUIT BY NON-RESIDENTS OF THE UNITED STATES

Pursuant to Fed. R. Civ. P. 12(b)(1), this action should be dismissed.  The Court lacks

subject matter jurisdiction because neither of the plaintiffs is a resident of this District, or for that

matter, of any district within the United States.[2]  Plaintiff have brought this action under 18

U.S.C. § 3523, which clearly indicates that individuals bringing suit under that provision must

reside in the United States.  It states as follows:

> Any person who holds a judgment entered by a Federal . . . court in his or her favor against a person provided protection under this chapter may, upon a decision by the Attorney General to deny disclosure of the current identity and location of such protected person, bring an action against the protected person in the United States district court in the district where the person holding the judgment . . . resides.

18 U.S.C. § 3523(b)(1) (emphasis added).

Under this statute, suit may be brought only in the district where the person holding the

judgment resides.  However, neither of the instant plaintiffs resides in any district within the

United States.  Plaintiff Gonzalez-Vera resides in Spain.  Complaint ¶ 4.  Plaintiff Soria was a

resident of Chile and Spain before his death.  Id. ¶ 5.  Mr. Soria must have been a resident of the

---

[2] Plaintiff erroneously asserts that venue is appropriate under 18 U.S.C. § 1651, an inapplicable statute governing piracy on the high seas.  See Plaintiffs' Amended Complaint ¶ 1.

United States in order for his estate to maintain an action under Section 3523.  The residence of plaintiff Soria's personal representative is irrelevant.  Cf. 28 U.S.C. § 1332(c)(2) (for purposes of diversity jurisdiction, "the legal representative of the estate of the decedent shall be deemed to be a citizen only of the same State as the decedent"); Lincoln Prop. Co. v. Roche, 546 U.S. 81, 93-94 (2005) (same).

    If Congress had intended to allow foreign residents to sue under 18 U.S.C. § 3523, it would plainly have indicated its intention to do so, as it did in connection with the related provisions for modification of child support and custody orders involving protected persons, 18 U.S.C. § 3524.  In Section 3524 Congress explicitly permitted plaintiffs to bring suit "in the District Court for the District of Columbia or in the district court for the district in which the child's parent resides."  18 U.S.C. § 3524(d)(1) (emphasis added).  Section 3524 thereby permitted any plaintiff, regardless of nationality or residence, to bring suit in the District Court for the District of Columbia, whereas 18 U.S.C. § 3523 plainly does not.  See Brown v. Gardner, 513 U.S. 115, 120 (1994) ("'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'") (quoting Russello v. United States, 464 U.S. 16, 23 (1983)) (internal quotation marks omitted).

    The legislative history of 18 U.S.C. § 3523 confirms that Congress intended the statute to benefit United States citizens, not non-resident foreign nationals.  The Senate Judiciary Committee explained the language that became 18 U.S.C. § 3523 as follows: "Subsection (C) deals with the occasional but vexing problem of a citizen who has a civil cause of action against a protected person. . . ." S. Rep. No.  98-225, at 411 (1983) (emphasis added); see also S. Rep.

No. 97-307, at 1106 (1981) (same language in predecessor bill).  Congress was manifestly

concerned with remedying a problem faced by citizens, so jurisdiction for suits under 18 U.S.C.

§ 3523(b)(1) is understandably limited to the district in which the plaintiff resides.[3]

### B.    PLAINTIFFS ARE NOT ENTITLED TO MANDAMUS OR ANY OTHER RELIEF

Summary judgment should be granted in defendants' favor because there are no genuine

issues of material fact, and defendants are entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(c).  There is no merit to plaintiffs' request for mandamus relief under 28 U.S.C. § 1361

compelling the Attorney General "to make all statutorily required efforts to urge Defendant

Townley to comply with the judgment, and to disclose the identity and location of Defendant

Townley either directly to Plaintiffs under protective order, or through a guardian ad litem."

Plaintiffs' Amended Complaint at 8.  28 U.S.C. § 1361 states that "the district courts shall have

original jurisdiction of any action in the nature of mandamus to compel an officer or employee of

the United States or any agency thereof to perform a duty owed to plaintiff."  It is well-

established that "the mandamus remedy is an extraordinary one, and it is to be utilized only

under exceptional circumstances."  Haneke v. Sec'y of Health, Educ. and Welfare, 535 F.2d

1291, 1296 (D.C. Cir. 1976); see also Hayakawa v. Brown, 415 U.S. 1304 (1974) (Douglas, J., in

chambers) (stating that the issuance of this "extraordinary writ" is "traditionally discretionary").

---

[3] Plaintiffs' counsel implicitly acknowledged the residency requirement in the enforcement proceedings stemming from Letelier v. Republic of Chile.  He asserted that the Court had jurisdiction to appoint a guardian under 18 U.S.C. § 3523 on  behalf of his law partnership, a plaintiff and judgment creditor in the suit, because that partnership was a "resident[] of the District of Columbia."  Isabel Morel de Letelier v. Townley, No. 85-0761 (D.D.C. 1985), Complaint ¶ 2.  Plaintiffs make no such assertion in the present case.  See Plaintiffs' Amended Complaint ¶ 1.

There are no exceptional circumstances here which warrant mandamus.

The witness security statute requires the Attorney General to determine whether defendant Townley has made reasonable efforts to comply with the judgment and to take appropriate steps to urge defendant Townley to comply with the judgment. 18 U.S.C. § 3523(a). If the Attorney General determines that defendant Townley has not made reasonable efforts to comply with the judgment, he may disclose defendant Townley's identity and location to plaintiffs after considering the danger to defendant Townley. Id.

The Attorney General, through his delegee, has fulfilled all of his statutory obligations. Upon receiving plaintiffs' February 2007 correspondence regarding the default judgment, the Attorney General's delegee for this purpose, who is the Director of the Federal Witness Security Program, promptly contacted defendant Townley to urge him to comply with the judgment or otherwise risk the disclosure of his identity and location. T'Kach Dec. ¶ 7. The Attorney General then obtained the detailed information he needed from defendant Townley's attorney regarding his finances. Id. This information included a sworn statement from defendant Townley concerning his financial history and current financial circumstances. Id. Based on this information, the Attorney General determined that defendant Townley should reasonably pay plaintiffs $75.00 per week in satisfaction of the judgment. Id. The Attorney General has obtained defendant Townley's agreement to make such payments until his retirement.[4] Id.

Given his determination that defendant Townley is willing to make reasonable efforts to comply with the default judgment, the Attorney General also determined that there was no

---

[4] When defendant Townley's retirement occurs (which is foreseeable since he testified for the government nearly 30 years ago), his financial situation could be reassessed.

reason to disclose his identity and location to plaintiffs.  See 18 U.S.C. § 3523(a).  Disclosure

would amount to a termination from the protection scheme, which is a drastic decision

committed to the Attorney General's sole discretion by Congress.  See 18 U.S.C. §§ 3523(a),

3521(f); United States v. Gigante, 187 F.3d 261, 262 (2nd Cir.), cert. denied, 528 U.S. 1023

(1999); Garcia v. United States, 666 F.2d 960, 963 (5th Cir.), cert. denied, 459 U.S. 832 (1982).

Since the statutorily mandated process has been complied with here, there is no basis for the

issuance of a mandamus.[5]

    In addition, mandamus will issue "only where the duty to be performed is ministerial and

the obligation to act peremptory and clearly defined."  United States ex rel. McLennan v.

Wilbur, 283 U.S. 414, 420 (1931); 13th Regional Corp. v. U.S. Dep't of Interior, 654 F.2d 758,

760 (D.C. Cir. 1980) (same).  The Attorney General has performed his ministerial duties under

18 U.S.C. § 3523 to urge defendant Townley to comply with the judgment and "determine"

whether he has made reasonable efforts to comply.  18 U.S.C. § 3523(a).  No mandamus could

properly issue to dictate what determination the Attorney General should make, or to require him

to disclose defendant Townley's location and identity, which are matters committed by statute to

the Attorney General's discretion.

---

[5] On the other hand, in a scenario not applicable to the present case, the Attorney General
may find that the protected person is not making reasonable efforts to comply with the judgment
but may nevertheless determine not to disclose the identity and location of such a gravely
threatened individual.  See 18 U.S.C. § 3523(a).  Prior to the enactment of the 1984 Witness
Security Reform Act, this situation would have left plaintiffs who held a judgment without
means to pursue their own civil remedies.  The 1984 revisions, however, authorized a court to
appoint a confidential guardian to whom the Attorney General must disclose the threatened
person's identity and location.  18 U.S.C. § 3523(b)(3).  This "vetted" guardian is then
authorized to pursue any available civil remedies on behalf of the plaintiffs holding a judgment -
- but without disclosing the identifying information to anyone.  Id. § 3523(b)(4).

Plaintiffs' request for the appointment of a guardian to act on their behalf to enforce the judgment should also be denied. See 18 U.S.C. § 3523(b)(3). The statute authorizes the appointment of a guardian only after the Attorney General determines that defendant Townley has not made reasonable efforts to comply with the judgment, and the Attorney General also declines to disclose the location and identity of defendant Townley. 18 U.S.C. § 3523(a), (b)(3)(B). Here, the Attorney General found that defendant Townley is willing to make reasonable efforts to comply with the judgment. Therefore, the appointment of a guardian would be improper. It would also render the Attorney General's determination under 18 U.S.C. § 3523(a) superfluous. See Qi-Zhuo v. Meissner, 70 F.3d 136, 139 (D.C. Cir. 1995) ([A]"ll words in a statute are to be assigned meaning, and that nothing therein is to be construed as surplusage.")

Moreover, the Attorney General, through his delegee, has thoroughly inquired into defendant Townley's financial situation. He arranged for and is intimately familiar with the financial baseline of protected witnesses in their new identities, i.e., their current housing, job training, and employment. See 18 U.S.C. § 3521(b)(1)(B), (D)-(F). His authorized officials are also best situated to know a protected person's financial history, assets, and social security account data before the identity change. Such background information is not generally available to a guardian. Moreover, the protected witness is statutorily obligated to truthfully disclose his civil debts to the Attorney General or otherwise risk the termination of his protection agreement – thereby endangering his own safety. See 18 U.S.C. § 3521(d)(1)(D). Thus, the Attorney General's means for eliciting a full disclosure of the protected witness's true financial situation are far more effective than those available to a guardian. For all of these reasons, it is unlikely

that the appointment of a guardian would uncover any new information.[6]

The appointment of another guardian would therefore serve no purpose except to further publicize defendant Townley's whereabouts, thereby unnecessarily increasing the threat to his safety. As the D.C. Circuit noted, "[t]he risk to [defendant Townley's] life continues from those he has exposed, and who continue at large, and this risk will exist as long as he lives and is able to testify." United States v. Sampol, 636 F.2d at 679. His identity and location should not be further revealed unless there is a compelling reason for doing so. No such reason exists here. See S. Rep. 98-225, at 411 ("There is no point in relocating a witness with a new identity if that identity will be made public.").

Most importantly, to expose defendant Townley to needless publicity, even minimally, would deter future witnesses from placing their own lives on the line and thereby undermine the functioning of the witness security program. The program was developed to facilitate the prosecutions that the government would otherwise have to forego if key witnesses refused to testify for fear of being murdered. S. Rep. 98-225, at 407. By protecting cooperative witnesses from reprisal, the program thereby enables the government to conduct an effective campaign against crime. See S. Rep. 98-225, at 408. Defendant Townley has provided valuable information to the United States under a plea agreement providing for his safety and protection. The disclosure of identifying information to another guardian could needlessly jeopardize his security, erode that agreement, and hinder the campaign against crime.

---

[6] In fact, in a prior case involving a default judgment against defendant Townley, Letelier v. Republic of Chile, the guardian's investigation of his finances led to a report that he had no assets and to a voluntary dismissal of the enforcement proceedings in 1987. (The appointment of a guardian in that situation was determined to be justifiable because Townley had just been released from prison and was making no effort to comply with the judgment.)

In addition, the appointment of guardians where none are authorized would be financially costly to the public. See 18 U.S.C. § 3523(b)(6) (stating that costs and compensation to a guardian may be paid by the United States).[7] During the last three decades, the Attorney General's designees have protected more than 8,000 witnesses, see United States Attorney's Bulletin, Vol. 55, No. 1, at 7 (January 2007) (Exhibit 2), virtually all of whom provided self-incriminatory testimony. If all of their victims obtained default judgments similar to the instant one and then obtained the appointment of guardians to perform financial audits where none were statutorily mandated, the judicial and other public resources required, the risks of further disclosure of new identities to unauthorized persons, and the costs would be enormous.

## CONCLUSION

For the foregoing reasons, in addition to those stated in defendants' opposition to plaintiffs' motion for summary judgment, defendants' motion to dismiss, or alternatively, for summary judgment, should be granted, and plaintiffs' motion for summary judgment should be denied.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney

VINCENT M. GARVEY
Deputy Director, Federal Programs Branch

**/s/ Lisa A. Olson**
LISA A. OLSON
U.S. Department of Justice, Civil Division

---

[7] Plaintiffs have asked that defendant Townley, or alternatively, the United States, be required to pay such costs. See Plaintiffs' Motion for Summary Judgment at 1.

<div style="margin-left: 40%;">

20 Mass. Ave., N.W., Room 7300
Washington, D.C. 20530
Telephone: (202) 514-5633
Telefacsimile: (202) 616-8470
E-mail: lisa.olson@usdoj.gov

</div>

Dated: Oct. 1, 2007                    Counsel for Defendants

# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LAURA GONZALEZ-VERA, et al., )
                                                    )
                    Plaintiffs,              )
                                                    )                    Civ. No. 07-995 HHK
v.                                                 )
                                                    )
MICHAEL VERNON TOWNLEY, et al.,   )
                                                    )
                    Defendants.            )
_____)

## DECLARATION OF STEPHEN J. T'KACH

I, STEPHEN J. T'KACH, declare as follows:

1.      I am the Associate Director of the Office of Enforcement Operations within the

United States Department of Justice, Criminal Division, and have been so employed since

January 1995.  I have also been designated as the Director of the Department's Federal Witness

Security Program ("Program").  In my position as Director of the Program, the Attorney General

has, pursuant to 18 U.S.C. § 3521, et seq., and Attorney General Order No. 2199-98; see 28

C.F.R. 0.111B(b), delegated to me his authority to administer the Program.  Pursuant to the

authority granted to me by 18 U.S.C. § 3521(b)(1)(G), I submit this declaration for the limited

purpose of providing certain information in support of Defendants' Motion to Dismiss, or

Alternatively, for Summary Judgment in the above-captioned case.  This declaration is based

upon my personal knowledge or upon information acquired by me in the course of my official

duties.

2.      As part of my responsibilities with regard to the Program, I conduct the review and

evaluation of Program applicants, including exercising the final approval of witness-applicants'

admission into, and removal from, the Program; I make other determinations in the Attorney

General's stead in regard to such matters as civil judgments; and I perform other duties as necessary to properly supervise the operations of the Program and to effectuate the Witness Security Reform Act of 1984.

3.      Authorized by the Organized Crime Control Act of 1970 and amended by the Comprehensive Crime Control Act of 1984, the Witness Security Program is designed to provide for the security, health, and safety of Government witnesses, and their immediate family members or close associates, whose lives are in danger as a result of their cooperation. Since its inception, more than 8,000 witnesses and over 10,000 family members have entered the Program and have been relocated and given new identities, or otherwise protected.

4.      Michael Vernon Townley testified for the United States in United States v. Sampol, 636 F.2d 621, 629 n.3, 679 (D.C. Cir. 1980). He was sentenced to ten years imprisonment and served five years before he was released on parole. Since that time his identity and location have been protected. Pursuant to his plea agreement, he has cooperated fully with the United States and provided information, including self-incriminating testimony, for nearly thirty years.

5.      Guardianship proceedings regarding Mr. Townley took place in Letelier v. Republic of Chile, 502 F. Supp. 259 (D.D.C. 1980). Letelier was also initiated by Michael Tigar's law firm, and resulted in a $5,062,854.90 million default judgment against Mr. Townley in 1980 for actions stemming from the alleged assassination in Sampol. The plaintiffs in that suit petitioned the Court in 1985 for the appointment of a guardian to enforce the judgment. Through the U.S. Marshals Service, the guardian conducted a deposition of Mr. Townley in a secure location, and he requested and received full disclosure of Mr. Townley's assets and liabilities.

-2-

The guardian's report was provided to Mr. Tigar's law firm in 1986; no assets were located and no payments were ordered; and the plaintiffs in the case dismissed the proceedings without prejudice in 1987.

6.    A default judgment was entered against Mr. Townley on November 23, 2005, in Gonzalez-Vera v. Kissinger, No. 1:02CV02240 (D.D.C.). On February 2, 2007, Mr. Tigar contacted the Attorney General for assistance in enforcing this default judgment pursuant to 18 U.S.C. § 3523. Specifically, he asked the Attorney General to investigate and determine whether Mr. Townley had made reasonable efforts to comply with the judgment. In the event it was determined that reasonable efforts had not been made, Mr. Tigar asked the Attorney General to urge Mr. Townley to make reasonable efforts, and further asked that the identity and location of Mr. Townley be disclosed, which would amount to termination of his protection.

7.    In response to this request, the Attorney General took several measures. On March 6, 2007, the Office of Enforcement Operations ("OEO"), Witness Security and Special Operations Unit, asked the United States Marshals Service to advise Mr. Townley that if he did not take satisfactory steps to comply with the judgment within thirty days, his location and new identity might be divulged. The Marshals Service so advised Mr. Townley on March 13, 2007. On April 5, 2007, I requested an update of Mr. Townley's financial situation from Mr. Johnson. In an April 30, 2007 response, Mr. Johnson provided a current affidavit from Mr. Townley describing his present assets, debts, and income, as well as his financial history. A few days later, I sought further information from Mr. Johnson about Mr. Townley's potential for satisfying the judgment. Mr. Johnson provided the information on May 17, 2007. After receiving this material, and based on Mr. Townley's current economic circumstances, I determined that it was

-3-

reasonable for Mr. Townley to pay $75 per week until the judgment was satisfied. I mailed notice of my decision to Mr. Townley's counsel and to plaintiffs' counsel on June 1, 2007 (attached).

8.     On May 17, 2007, I sent a letter to Mr. Tigar offering to meet with him (attached). Mr. Tigar arranged to meet with the me, and we did meet, on June 14, 2007. In the interim, Mr. Townley agreed to pay the amount specified as long as his economic circumstances remained the same. I informed Mr. Tigar of this fact at our meeting on June 14, 2007.

I declare under penalty of perjury that the foregoing is true and correct.


*October 1, 2007*
DATE                                STEPHEN J. T'KACH



**U.S. Department of Justice**

*Witness Security Program*

---

Office of the Director                    950 Pennsylvania Ave., NW    Washington, DC 20530

JUN - 1 2007

SENSITIVE INVESTIGATIVE MATTER

Mr. Jeffrey M. Johnson, Esquire
Dickstein Shapiro LLP
1825 Eye Street, N.W.
Washington, D.C. 20006-5403

Dear Mr. Johnson:

Reference is made to your letters dated April 30, 2007, and
May 17, 2007, responding to our inquiries concerning a civil
judgment against Michael Vernon Townley. As you know, pursuant
to Title 18, United States Code, Section 3523(a), and to a
request from Michael E. Tigar, Esquire, dated February 2, 2007,
to Attorney General Alberto Gonzales, and received by the
Department of Justice on February 6, 2007, I have been requested
to determine whether Mr. Townley has made "reasonable efforts to
comply with the judgment" against him.

After reviewing the sworn information made available to me
concerning Mr. Townley's current economic circumstances, I
believe that it is not unreasonable for him to pay $75.00 per
week to satisfy this debt. Please advise this office as soon as
possible whether this determination is acceptable to Mr. Townley
since I must reply to Mr. Tigar by June 6, 2007. In addition,
please advise Mr. Townley that if he declines to take
satisfactory steps to comply with the judgment, his location and
identity may be divulged so that collection of the debt can be
pursued directly.

I appreciate your ongoing cooperation in this matter of
mutual concern.

Sincerely,

Stephen J T'Kach by chk

Stephen J. T'Kach
Director

cc: Michael E. Tigar, Esquire
    UNROW Clinic/Washington College of Law
    4801 Massachusetts Avenue, N.W.
    Suite 206C
    Washington, D.C. 20016

**U.S. Department of Justice**

*Witness Security Program*

---

Office of the Director          950 Pennsylvania Ave., NW      Washington, DC  20530

<u>SENSITIVE INVESTIGATIVE MATTER</u>          **MAY 1 7 2007**

Mr. Michael E. Tigar, Esquire
UNROW Clinic/Washington College of Law
4801 Massachusetts Avenue, N.W.
Suite 206©
Washington, D.C. 20016

Dear Mr. Tigar:

Reference is made to your correspondence dated February 2, 2007, and subsequent correspondence dated April 12, 2007, to Attorney General Alberto Gonzales, concerning a civil judgment against Michael Vernon Townley. This office is in receipt of your correspondence and is reviewing the request. A response will be provided to your office as soon as possible. In the future, please note that all correspondence related to the Witness Security Program, whether addressed to the Attorney General or the United States Marshals Service, should be directed to this office so that we can provide an efficient and expeditious response.

Per your request, I will be happy to meet with you at your convenience. Please contact me or Catherine K. Breeden, Chief, Witness Security and Special Operations Unit at (202) 514-3684 to make arrangements.

Sincerely,

Stephen J. T'Kach
Director

# EXHIBIT 2

U.S. Department of Justice
Executive Office for United States Attorneys



United States Attorneys'

# USA Bulletin

**January 2007**            **Vol. 55, No. 1**

## Office of Enforcement Operations

issues, and has written training materials for an international symposium on electronic surveillance.⊕

# Witness Security and Special Operations Unit

*Eileen P. Ruleman*
*Deputy Chief, Witness Security and Special Operations Unit*
*Office of Enforcement Operations*
*Criminal Division*

## I. Federal Witness Security Program

The Federal Witness Security Program (Program) is one of the most effective and successful weapons ever used in prosecuting persons and groups involved in organized criminal activity. The testimony of more than 8,000 protected witnesses during the past thirty-six years has resulted in the conviction of members of many major organized criminal groups.

The Program was created in the 1960s, as a result of Attorney General Robert Kennedy's war against organized crime. In those days, it was difficult to prosecute members of major racketeering organizations because of the government's inability to protect witnesses willing to testify against such dangerous criminals. Criminal organizations were operating with relative impunity as a result of their ability, willingness, and access to financial resources necessary to intimidate and murder the few individuals who could testify against them. However, since the Program's inception, no participant who has followed the Program's rules has been killed or seriously injured as a result of his or her cooperation with the government.

Originally created to overcome the reluctance of witnesses to cooperate against members of the La Cosa Nostra (LCN), the Program has proven itself flexible enough to meet the needs of the ever-changing nature and wide variety of witnesses whom it must serve. Today, such persons may be witnesses against the LCN, but it is more likely that they are cooperating against international or domestic terrorists, drug traffickers, violent street or prison gangs, or perpetrators of economic crimes.

The Program is administered by Director, Stephen J. T'Kach, who serves as the designee of the Attorney General. Mr. T'Kach, who is an Associate Director in the Office of Enforcement Operations (OEO), determines which individuals are accepted into the Program, oversees the wide-ranging operations of the Program, and serves as an ombudsman for Program participants. Mr. T'Kach is the second Director in the Program's history. Mr. Gerald Shur was the first and he spearheaded the creation of the Program. This continuity has enabled the Program to remain consistent in the areas that are essential to its goals and mission, while providing the flexibility necessary for innovation.

The Witness Security and Special Operations Unit (WSSOU) within OEO is responsible for managing a variety of operational aspects of the Program. The WSSOU receives an average of 230 applications for witnesses to be admitted into the Program each year, and accepts approximately 160. Over 95% of the witnesses authorized are criminal associates of the major targets.

## II. Eligibility

Strict criteria must be met before a person is authorized for Program services. The Program is used only as a last resort, when no other means will suffice to keep alive a key witness in a significant prosecution affecting the United States. All applications for Program services must be signed personally by the United States Attorney (USA) in the involved federal jurisdiction. This certifies that the USA considers the case to be of

significant importance to justify the extensive use of government resources required to protect the witness and his or her family members. The signed application, which is submitted to OEO for evaluation, analysis, and review, must contain sufficient details, and must be accompanied by appropriate documentation, to ensure that four basic statutorily mandated criteria are met.

- The significance of the case must be clearly demonstrated.

- The importance of the testimony that the witness will provide, and the lack of alternative sources for it, must be shown.

- The existence of a bona fide threat against the life of the witness must be demonstrated.

- Assurance must be given—if the witness is to be relocated rather than incarcerated—that any danger the witness might pose to a new community is outweighed by the benefits to be gained by his or her testimony.

Assistant United States Attorneys (AUSAs) are strongly encouraged to contact their investigative agents prior to submitting an application, in order to coordinate the proposed protection of the witness.

As part of the overall evaluation process, in addition to a comprehensive criminal background check that is conducted on the witness and any adult family member who is being relocated, the OEO seeks the input of the experts listed below, in each case, before determining whether Program services are warranted.

- Attorneys from the appropriate litigating component of the Department of Justice weigh in on the significance of the case, including whether it merits the unique services of the Program.

- Management personnel from the headquarters of the investigative agency sponsoring the witness must submit a threat assessment detailing the threat believed posed to the witness as a result of cooperation with the government. If the witness, or any of his or her family members, is being relocated in a new community, the agency headquarters also provides an assessment of the risk posed to a relocation community, as well as whether the benefits to be gained from using the witness in the prosecution outweigh any such risk.

- Inspectors from the United States Marshals Service (USMS) conduct an interview of nonprisoner witnesses, as well as any adult family member who is being sponsored for relocation, and provide an assessment of whether they are suitable candidates for the Program. This interview, which allows the USMS to identify potential problems that might prevent successful relocation, is designed to ensure that the witness understands what services can and cannot be provided during Program participation, and that the witness understands his or her responsibilities as a Program participant. The interviewer also asks the witness what he or she may have understood to be promised, and clarifies that neither the prosecutor nor the investigative agency can make any binding promises concerning services provided in the Program. In addition, any exculpatory or impeaching admissions memorialized during the interview may fall under *Brady* and *Giglio*, and AUSAs should make themselves aware of such statutes to ensure compliance with any notice or disclosure requirements.

- Psychologists conduct an evaluation of each witness who is being sponsored for relocation, as well as any adult family member sponsored to accompany him or her into the Program.

Although the Witness Security Program is known primarily for its relocation component with the USMS, which has entered the public consciousness through such movies as *Eraser* and *My Blue Heaven*, the fact is that the vast majority of witnesses who enter the Program are not immediately given a new identity and placed into a new community. Rather, 80% of the approximately 160 new witnesses approved for Program services each year are prisoner-witnesses who have been convicted of a crime and must serve time in the custody of the Federal Bureau of Prisons (BOP). These prisoner-witnesses are separated from other prisoners against whom they are testifying, or prisoners who might pose a threat to them while they are in custody. BOP maintains separate Protective Custody Units (PCUs), or "prisons within prisons" as they are commonly known, to house convicted witnesses who cannot safely be placed in the general inmate population. Each PCU is self-contained to help ensure and maintain security of the witnesses, and the location of the specific facility in which a prisoner-witness is housed is not publicized. There are stringent rules by which prisoner-

witnesses must abide and, like relocated witnesses, those who fail to abide by Program guidelines are subject to removal from the Program.

Because participation in the Program is voluntary, both relocated participants and prisoner-witnesses can remove themselves at any time.

Family members of a prisoner-witness, who are endangered as a result of the prisoner's cooperation, are eligible for consideration to receive protection from the USMS through the relocation component while the prisoner is incarcerated.

A witness's participation in the incarceration component of the Program does not guarantee that full Program services of the relocation component will be provided upon his or her release from custody. Many believe that they can return home, or have alternatives which will be sufficient to protect them in lieu of the rigorousness of the full relocation services of the Program. Approximately one-half of prisoner-witnesses receive further services of the Program upon release, according to the 2006 data.

During the early days of the Program, most witnesses who were authorized for services were U.S. citizens. Today, a significant number of witnesses and their family members are foreign nationals. This requires OEO to coordinate their entry and participation with the Bureau of Immigration and Customs Enforcement (ICE) in the Department of Homeland Security, in addition to other agencies.

Special Limited Services is a unique variation of the Program that allows foreign national witnesses who are subject to deportation, and who would be in danger if they returned to their home countries, to remain in the United States. Since these witnesses are not in danger in this country, full Program services are not required and are not provided. Special Limited Services may be extended to individuals who have been denied or are ineligible for an S Visa, or individuals who are facing imminent deportation or detention by ICE which poses a serious threat to them while an S Visa application is pending.

As traditional jurisdictional boundaries have eroded, and crime has become increasingly international in scope, even many small nations have recognized the need for a mechanism to protect their witnesses. The Program's Director,

Special Counsel, and WSSOU personnel, frequently provide guidance, expertise, and assistance to foreign governments who are interested in developing their own methods of providing security to witnesses.

A witness who enters the Program maintains a unique and continuing relationship with the government. Once an individual is authorized for Program services, the sponsoring AUSA must arrange any telephone calls, pretrial interviews, or other type of contact with the witness through the WSSOU. Even after subsistence allowances and other types of material support are terminated, investigative agencies and prosecuting attorneys who desire to use their own witnesses must observe certain protocols. Once a witness enters the Program, neither the witness nor any family member can be used as an informant or witness in a new case without the express prior approval of OEO. A request to utilize a current or former Program witness as an informant must be made in accordance with the United States Attorneys' Manual (USAM). Former Program participants who are utilized as informants are the sole responsibility of the investigative agency requesting their assistance, and are not eligible for participation in the Program unless they again become a witness as defined in 18 U.S.C. §§ 3521 -3528. It is a violation of federal law for anyone to disclose or disseminate any information about a witness placed in the Program without the express approval of the Program's Director. *See Id.*

The Program is administered pursuant to the provisions of the "Witness Security Reform Act of 1984," which is codified at 18 U.S.C. §§ 3521 -3528. The guidelines established by the Attorney General concerning the Program are detailed in USAM 9-21.000.

## III. Special Operations

The Special Operations component of the WSSOU authorizes the use and targeting of federal prisoners in certain investigations, as set forth in USAM 9-21.050.

## IV. Contacts

Stephen J. T'Kach, Associate Director, Office of Enforcement Operations

Catherine K. Breeden, Chief, Witness Security and Special Operations Unit

Eileen P. Ruleman, Deputy Chief for Witness Security

Joy Lilly, Deputy Chief for Witness Security

Joyce E. Proctor, Deputy Chief for Special Operations

All contacts can be reached at 202-514-3684.◆

**ABOUT THE AUTHOR**

❑**Eileen P. Ruleman** has been a Deputy Chief of the Witness Security and Special Operations Unit of the Office of Enforcement Operations since June 1997. Ms. Ruleman began her tour of duty with the Witness Security and Special Operations Unit in 1986. Ms. Ruleman started her Department of Justice career in the Federal Programs Branch, Civil Division, in August 1979.✡

# The Witness Immunity Unit of the Office of Enforcement Operations

*Kathleen N. Coleman*
*Trial Attorney*
*Witness Immunity Unit*
*Office of Enforcement Operations*
*Criminal Division*

## I. Introduction

Despite its name, the Witness Immunity Unit (WIU) of the Criminal Division's Office of Enforcement Operations has a variety of functions. It is responsible for requests for authorization to immunize witnesses, to prosecute previously immunized witnesses, and to resubpoena previously contumacious witnesses. Further, it handles requests within the Criminal Division seeking waiver of the Department of Justice's (Department) dual prosecution policy (also known as the Petite Policy), and Department-wide requests for authorization to issue subpoenas to attorneys. The WIU is also the point of contact when prosecutors contemplate executing search warrants at law offices, or intend to indict an attorney. Finally, the WIU coordinates global plea agreements. All of these functions are detailed in the United States Attorneys' Manual. The forms that are submitted to the WIU can also be found online, or can be requested from the WIU.

Other divisions within the Department handle immunities for cases brought under the statutes which those divisions oversee. For example, when immunity is sought in a tax case, the request for authorization is sent to the Tax Division, with an informational copy faxed to the WIU. In such a case, the WIU will notify the responsible division whether the Criminal Division concurs or objects to the immunity. In a similar vein, dual prosecution policy requests are handled by the divisions overseeing the crimes which are the subjects of the proposed federal prosecution, such as violations of civil rights or environmental laws.

## II. Immunity matters

### A. The immunity statute

To the layman, a witness who testifies under a grant of immunity can never be prosecuted for the crimes which he discusses while testifying, *i.e.*, the witness has been given "transactional immunity." Prior to 1970, there were a number of immunity statutes, many of which conferred transactional immunity. In 1970, Congress replaced all those statutes with 18 U.S.C. §§ 6001-6006, which provides for "use immunity." With use immunity, prosecutors cannot make direct or indirect use of immunized testimony, except to prosecute the witness for perjury, giving a false statement, or otherwise failing to comply with the compulsion order. 18 U.S.C. § 6003. It is possible to prosecute a previously immunized witness for crimes related to the immunized testimony if it can be established that no use has been, or will be, made of the immunized testimony, but such

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LAURA GONZALEZ-VERA, et al.,    )
                                )
                Plaintiffs,     )
v.                              )                    Civ. No. 07-995 HHK
                                )
MICHAEL VERNON TOWNLEY, et al., )
                                )
                Defendants.     )
_____ )

## DEFENDANTS' STATEMENT OF MATERIAL FACTS
## AS TO WHICH THERE IS NO GENUINE DISPUTE[1]

Pursuant to Fed. R. Civ. P. 56 and LCvR 56.1, defendants hereby submit the following

statement of material facts as to which there is no genuine issue.

1.      Michael Vernon Townley testified for the United States in United States v.

Sampol, 636 F.2d 621 (D.C. Cir. 1980).  He was sentenced to ten years imprisonment in Sampol,

and served five years in prison before he was released on parole, since which time his location

and identity have been protected.  Declaration of Steven J. T'Kach ("T'Kach Dec.") ¶ 4 (Exhibit

1 to Defendants' Motion to Dismiss, or Alternatively, for Summary Judgment).  Pursuant to his

plea agreement, he has cooperated fully with the United States and provided information,

including self-incriminating testimony, over nearly thirty years.  T'Kach Dec. ¶ 4.

2.      Guardianship proceedings regarding defendant Townley took place in Letelier v.

Republic of Chile, 502 F. Supp. 259 (D.D.C. 1980), in which the family of the former Chilean

ambassador (whose assassination was prosecuted in Sampol) sought civil damages from

defendant Townley.  Letelier resulted in a $5,062,854.90 million default judgment against

_____
[1] Defendants do not dispute any of the facts in plaintiffs' statement of material facts, but
do dispute that they are material.

defendant Townley in 1980.  T'Kach Dec. ¶ 5.  The plaintiffs in <u>Letelier</u> petitioned the Court in

1985 for the appointment of a guardian to enforce the judgment.  T'Kach Dec. ¶ 5.  Through the

U.S. Marshals Service, the guardian conducted a deposition of defendant Townley in a secure

location, and he requested and received full disclosure of defendant Townley's assets and

liabilities.  <u>Id.</u>  The guardian's report was provided to Mr. Tigar's law firm in 1986; no assets

were located and no payments were ordered; and the plaintiffs dismissed the proceedings

without prejudice in 1987.  <u>Id.</u>

4.    Plaintiffs now seek to enforce the default judgment entered against defendant

Townley on November 23, 2005, in <u>Gonzalez-Vera v. Kissinger</u>, No. 1:02CV02240 (D.D.C.),

for his alleged collaboration in the death of plaintiff Soria.  Plaintiffs' Amended Complaint ¶ 2.

On February 2, 2007, plaintiffs' counsel contacted the Attorney General for assistance in

enforcing the 2005 judgment pursuant to 18 U.S.C. § 3523.  Plaintiffs' Amended Complaint

Exhibit F.

5.    On March 6, 2007, the Office of Enforcement Operations ("OEO"), Witness

Security and Special Operations Unit, asked the United States Marshals Service to advise

defendant Townley that if he did not take satisfactory steps to comply with the judgment within

thirty days, his location and new identity might be divulged.  T'Kach Dec. ¶ 7.  The Marshals

Service so advised Mr. Townley on March 13, 2007.  <u>Id.</u>  On April 5, 2007, the Director of the

Witness Security Program, who is the Attorney General's designee for such matters, T'Kach

Dec. ¶ 1, requested an update of defendant Townley's financial situation from his former

attorney, Jeff Johnson.  <u>Id.</u> ¶ 7.  In an April 30, 2007 response, Mr. Johnson provided an April

29, 2007 affidavit from Mr. Townley describing his current assets, debts, and income, as well as

his financial history. Id. A few days later, the Witness Security Program Director sought further information from Mr. Johnson about defendant Townley's potential for satisfying the judgment. Id. Mr. Johnson provided the information on May 17, 2007. Id. After receiving this material, and based on defendant Townley's current economic circumstances, the Witness Security Program Director determined that it was reasonable for defendant Townley to pay $75 per week until the judgment was satisfied. Id. On June 1, 2007, the Director sent notice of that determination to Mr. Townley's counsel and to plaintiffs' counsel. Id.

6.      On May 17, 2007, the Witness Security Program Director offered to meet with plaintiffs' counsel. T'Kach Dec. ¶ 8. Plaintiffs' counsel arranged to meet with the Witness Security Program Director, and did meet, on June 14, 2007. Id. In the interim, defendant Townley agreed to pay the amount specified as long as his economic circumstances remained the same. Id. The Director informed plaintiffs' counsel of this fact at their meeting on June 14, 2007. Id.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney

VINCENT M. GARVEY
Deputy Director, Federal Programs Branch

**/s/ Lisa A. Olson**
LISA A. OLSON
U.S. Department of Justice, Civil Division
20 Mass. Ave., N.W., Room 7300
Washington, D.C. 20530
Telephone: (202) 514-5633
Telefacsimile: (202) 616-8470
E-mail: lisa.olson@usdoj.gov
Dated: Oct. 1, 2007                Counsel for Defendants

-3-

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LAURA GONZALEZ-VERA, <u>et al.</u>, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civ. No. 07-995 HHK |
| | ) | |
| MICHAEL VERNON TOWNLEY, <u>et al.</u>, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**ORDER**

    The Court having considered defendants' motion to dismiss, or alternatively, for summary judgment, and plaintiffs' opposition thereto, and good cause having been shown, it is hereby

    ORDERED that defendants' motion to dismiss is granted.


Dated: _____, 2007       _____
                                   HENRY H. KENNEDY, JR.
                                   UNITED STATES DISTRICT JUDGE


Copies to:

Lisa A. Olson, Esq.
U.S. Department of Justice
Room 7300
20 Massachusetts Ave., N.W.
Washington, D.C. 20530
lisa.olson@usdoj.gov

Michael E. Tigar, Esq.
Ali Beydoun, Esq.
Washington College of Law
4801 Massachusetts Ave., N.W.
Washington, D.C. 20016
metigar@gmail.com